UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

| | |
|---|---|
| ALESSI EQUIPMENT, INC., <br><br> Plaintiff, <br><br> -against- <br><br> AMERICAN PILEDRIVING EQUIPMENT, INC. <br><br> Defendant. | DOCKET NO.  7:18-cv-03976-VB <br><br> **<u>AMENDED COMPLAINT</u>** |

------------------------------------------------------------------------x

Plaintiff Alessi Equipment, Inc. ("Alessi" or "Plaintiff"), by and through its attorneys, LAVALLEE LAW OFFICES, PLLC, as and for its Complaint against AMERICAN PILEDRIVING EQUIPMENT, INC. ("APE" or Defendant) hereby alleges as follows:

## THE NATURE OF THE ACTION/FACTUAL BACKGROUND

1.       Plaintiff pursues this action for breach of contract, breach of covenant of good faith and fair dealing, unjust enrichment, an accounting, and specific performance against APE.

2.       Since in its founding in 1988, Plaintiff has been an industry leader in the sale and servicing of hydraulic attachments for demolition, demolition, construction and recycling jobs. Plaintiff works with its customers on a project by project basis to design, adapt and build equipment that meets its clients' specific needs. In fact manufactures routinely turn to Plaintiff to assist in the development of unusual applications of hydraulic equipment.

3.       APE is the world's leader in research and development, production and sales of foundation construction equipment. APE produces the world's largest pile drivers, and has offices in every corner of the United States, Asia, and has distribution worldwide.

4.       By way of background, Plaintiff originally sold an excavator mounted vibro manufactured in Germany by a company called MGF.  This excavator mounted vibro was

marketed by a company called Tramac in the United States and Plaintiff was a dealer for this equipment.

5.      In the early 1990s Tarmac ended their relationship MGF and Plaintiff began to directly work with MGF to fill outstanding orders.  However, MGF ceased business operations in 1991 leaving Plaintiff with orders to fill.

6.      Plaintiff discussed the need to fulfill the remaining orders with several people in the construction industry.  One such person, Skip Gardella, asked Plaintiff's principal if he was familiar with John White, who was President of APE, and provided Plaintiff with an introduction.

7.      In or around 1991/1992 Plaintiff's principal had a discussion with John White of APE concerning the need to complete current and future orders for an excavator mounted vibro and the need to find a new manufacturer to build the vibro equipment for Plaintiff.

8.      Plaintiff was advised that APE was a manufacturer of vibro but they were not in the business of manufacturing and sale of excavator mounted equipment.

9.      After some discussions, Plaintiff decided to try and work with APE and assist in their development of excavator mounted equipment to fulfill clients' needs.

10.     Specifically, to get APE into the industry and get someone to assist in the orders needed to be fulfilled, Plaintiff shipped a MGF RBG vibro unit to APE who in turn reversed engineered and cloned the suppressor from the German unit.

11.     This new unit would become what was and still is sold as the APE 50e.

12.     Seeing the needs for its clients change, Plaintiff requested a smaller unit be manufactured resulting in the model known as APE20e.

13.     Based upon the needs of Plaintiff's customers, and again at Plaintiff's request, APE began to manufacture a smaller unit, known as the 15e.

14.     Plaintiff's client base then needed a bigger unit and as result APE, again with input from Plaintiff, developed the 100e unit.

15.     The market began to shift and Plaintiff's clients began looking toward and using side-mounted equipment.

16.     In or about 2003 Plaintiff again advised APE of the shift in market forces and provided input to APE as they developed the Robovibe unit.

17.     Plaintiff was instrumental in the development and success of the Robovibe unit and in fact APE asked Plaintiff's principal to fly out to Washington State to appear in a promotional video for the Robovibe which was used to market the unit and was in fact on APE's website until the end of May 2018.

18.     Through Plaintiff's efforts, knowledge of the industry and client base APE developed a line of equipment that APE had never manufactured, sold or even considered putting in the marketplace.

19.     For over twenty years APE has benefited directly from Plaintiffs knowledge of and clients based upon the aforementioned various equipment.

20.     In fact, based upon Plaintiff's introduction of APE to this industry, Plaintiff's client base and marketing skills, APE entered into various agreements providing Plaintiff with the exclusive right to sell the equipment and APE marketed that arrangement on its informational materials and website.

21.     Beginning in or about 1996, APE agreed to have Plaintiff serve as its exclusive distributor in the Northeast whereby all equipment sales and replacement parts would be sold directly through Plaintiff regardless of whether a customer contacted APE directly at its corporate or regional offices (the "1996 Agreement").

22.     This arrangement was confirmed in September 2004 after Plaintiff had gone to Washington to observe and participate in the testing of the prototype Robovib.  Plaintiff provided feedback on the equipment and its potential in the market.

23.     While in Washington, over dinner and separate meetings, Plaintiff's Principal, Gerry Alessi, along with John White (President of APE) and Dan Collins (CEO of APE) discussed the continued relationship and financial arrangement between the two companies.

24.     In fact, on September 1, 2004 APE provided Plaintiff with an agreement that would govern their continued relationship until, or if, another agreement was agreed to by the parties (hereinafter the "2004 Agreement" annexed hereto as Exhibit "1").

25.     Specifically, APE agreed to provide Plaintiff with a 25% on the quoted list price of $115,000—or $86,250.00. This price would go down once production began. APE also agreed to provide a six (6) month warranty to assist Plaintiff in marketing the equipment. See Exhibit 1.

26.     As part of the 2004 Agreement APE set up a "Territory for Distributor and Brief Expectation" and provided that:

> APE hereby grants AEI the exclusive right to sell Robovib in the Northeast USA.
> APE hereby grants AEI the non-exclusive right to sell anywhere else in the USA.
> AEI is not allowed to create sub-distributors. This agreement, until written in
> more detail and jointly signed will act as our only agreement.

See Exhibit 1.

27.     As a condition of this arrangement, APE provided that "APE/J&M salesmen are hereby instructed to direct all sales to AEI to provide AEI the first chance to sell the machine." See Exhibit 1.

28.     As consideration for the arrangement and in order that APE would not have to set up and service the equipment sold throughout the country APE's 2004 Agreement provided:

> APE/J&M would like to sell the machine to AEI and let AEI do the set up and
> whatever else it takes to service the customer, regardless if the area of sale is
> in California, Texas, or any place else in the USA.

29.     This provision put the onus on Plaintiff to incur the expense to travel or set up mechanisms to facilitate repairs wherever the equipment is sold.

4

30.    The 2004 Agreement further outlined the importance that APE placed on having Plaintiff serve as the exclusive sales distributor for APE and reason.  Specifically, the 2004 Agreement provided that:

> even in instances where customers wanted to buy direct.  Specifically, It is expected that AEI will maintain a high level of customer satisfaction and retain a good reputation of the J&M logo.  If a situation arises where a contractor would rather buy directly from APE/J&M then a meeting between Alessi and APE/J&M will take place and the issues worked out accordingly.  Again, no APE/J&M salesmen are allowed to directly quote the Robovib unless approved by APE/J&M and only after a meeting to discuss the issues has taken place between APE/J&M and AEI.  **We wish to channel the sales through AEI and in return, avoid the service and set up. In addition, we seek a single source to collect our invoices**.

*Emphasis added.*  See Exhibit 1.

31.    Besides having to take on the responsibility of selling, setting up and servicing the equipment, Plaintiff was also required to pay a commission to APE on every sale Plaintiff made.  In fact, the 2004 Agreement provided that:

> **A two percent commission will be paid to APE/J&M to be credited to the territory in which the equipment was sold**.  In this way, each APE/J&M salesman is granted the benefit of this new invention.  Where the machine initially works will define the territory that gets credit.  APE will handle the commission internally.

*Emphasis added.*  See Exhibit 1.

32.    APE agreed to support Plaintiff's service of the equipment and Plaintiff was permitted to request payment for any warranted service pursuant to the 2004 Agreement which provided that:

> APE/J&M branch managers are depending on AEI to provide a high level of service to its customers in order to maintain the already excellent reputation of the APE/J&M product.  If it is determined that J&M's solid reputation is being tarnished due to a lack of service and support of the Robovib then these issues will be handled quickly and solved**.  It is the duty of each APE/J&M branch to provide assistance to AEI.  APE/J&M branches can provide service for Robovib but only as a last restore after AEI has failed to do so.  AEI has the full right to request and pay for service from any APE branch managers at AEI expense**.

*Emphasis added.*  See Exhibit 1.

5

33.    This was not a one-sided agreement and in fact the 2004 Agreement drafted by

APE clearly outlined it purpose and terms when it sets forth:

**The spirit of this agreement is to allow AEI, an expert in the mounting of excavator attachments, the ability to sell Robovib while at the same time providing APE/J&M a single source to manufacture and sell to**. This spirit should include an understanding that AEI needs to handle their customers without APE/J&M personnel getting in the way. Therefore, all APE/J&M sales and service personnel are cautioned that contractors, when frustrated, will tend to engage one party against the next. Lets stay together as a group and not allow ourselves to be manipulated into conflict between APE/J&M and AEI. We are a team and passion for selling the product should be our common goal. We wish AEI excellent sales and profits.

*Emphasis added.* See Exhibit 1.

34.    In the event of any disputes the 2004 Agreement provided that:

Any branch manager of APE/J&M  or officers of AEI can order a "sit down" if he wants this agreement changed or voided all together.  Voiding the agreement would require two-thirds of the APE/J&M branch managers voting negatively. Ray and Gerry have full authority to end the agreement at anytime.

See Exhibit 1

35.    The 2004 Agreement was controlling until about May 2012, when Alessi and APE

entered into the Distributor Agreement and Memorandum of Understanding ("the Distributor

Agreement"), wherein the agreement that was entered into in 1996 and 2004 were reaffirmed.

See Exhibit 2.

36.    Under the express terms of the Distributor Agreement, APE agreed that Alessi

would continue to be "the exclusive distributor of the APE/J&M Robovib and APE/J&M line of

excavator mounted equipment for the territory called the 'Northeast' which covers the same

territory as APE Northeast." See Exhibit 2.

37.    In consideration of this agreement Alessi once again agreed to pay APE a

commission but this time it agreed to "pay a 2% commission on any APE/J&M Robovib or

excavator mounted equipment sold outside its exclusive territory an in return, APE agrees to direct

all Robovib and excavator rentals and sales to Alessi Equipment as a first option." See Exhibit 2.

38.     Moreover, it was agreed that "[a]ny and all service and set up will be provided by Alessi" or Alessi "can pay APE's service department to provide services." See Exhibit 2.

39.     It was agreed that the agreement was "automatically renewable each year unless otherwise cancelled in writing." See Exhibit 2.

40.     APE further agreed "to two year cancellation period that must be in written form." See Exhibit 2.

41.     APE also agreed to "buy back of any support parts at 20% below initial sale price." See Exhibit 2.

42.     As of the date of this Amended Complaint the Distribution Agreement was never cancelled, remains in full force and effect, and still binds the parties to the terms set forth therein.

43.     Notwithstanding, APE has willfully and intentionally failed to perform its obligations under this contract.

44.     APE has willfully and intentionally breached its agreement with Alessi by failing to have Alessi act as the exclusive distributor in the Northeast territory and preferred distributor nationwide.

45.     APE has willfully and intentionally sold equipment covered under the 1996 Agreement, 2004 Agreement and Distributor Agreement directly to third-parties in the Northeast territory in contravention of the Distributor Agreement.

46.     By way of example, on or about May 31, 2017 APE sold equipment to Moncon Inc., valued at $163,000.00. This sale was not through the Plaintiff as is required under the Distributor Agreement, and is a direct breach of that agreement. See Exhibit 3

47.     In addition, upon information and belief APE has directly sold replacement parts to third-parties in the "Northeast territory" that should have been sold through Alessi as agreed to by the parties.

48.     Upon information and belief APE has repeatedly violated the 1996 Agreement, 2004 Agreement and Distributor Agreement by failing to have Alessi serve as the exclusive

7

distributor of the Northeast territory, by directly selling equipment and replacement parts to third-parties who should have been purchasing the equipment and replacement parts through Alessi.

49.    These acts and breaches by Defendants have injured Plaintiff by preventing it from receiving the benefit of its bargain.

50.    As a result, Plaintiff brings this action seeking breach of contract, breach of covenant of good faith and fair dealing, unjust enrichment, an accounting, and specific performance against APE.

51.    The facts outlined in this complaint are supported by APE's own former President, John White, who has provided an affidavit outlining the relationship between Plaintiff and APE, the agreements that were in place between the parties, and the obligation APE has to Plaintiff. See Exhibit 4.

## JURISDICTION AND VENUE

52.    Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction as the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000.

53.    Alessi is a resident of the State of New York, Westchester County within the jurisdiction of the United States District Court for the Southern District of New York.

54.    APE is a resident of Washington State but routinely conducts business in New York including the sale and service of equipment.

## THE PARTIES

55.    Plaintiff, Alessi is a New York Domestic Business Corporation with its principal place of business at 28 Rosyln Place, Mount Vernon, New York 10550.

56.    Defendant, APE, is a Washington State registered corporation, with its principal place of business at 7032 South 196th Street Kent, WA 98032.

## FIRST CLAIM FOR RELIEF (Breach of Contract)

57.    Plaintiff repeats and realleges paragraphs 1 through 56 above with the same force and effect as if fully set forth herein.

58.     Plaintiff and Defendant entered into a valid and binding agreement in 1996.

59.     The Plaintiff and APE then entered into a valid and binding agreement in 2004.

60.     Thereafter, Plaintiff and defendant entered into a valid and binding Distribution Agreement in 2012.

61.     As outlined above the 2004 Agreement and 2012 Agreement outlined the material terms between the parties, the purpose of the agreement and consideration received by all the parties.

62.     Plaintiff has performed all of its obligations under the 1996 Agreement, 2004 Agreement and Distributor Agreement in 2012.

63.     Defendant has materially breached the 1996 Agreement, 2004 Agreement and the Distributor Agreement by, among other things: (1) failing to honor its obligation to have Alessi serve as the exclusive distributor in the Northeast territory and preferred distributor in other regions, as agreed to in the 1996 Agreement and outlined in the 2004 Agreement and Distributor Agreement; (2) directly selling equipment outlined in the 2004 Agreement Distributor Agreement to third-parties which should have been sold through Alessi as per the 1996 Agreement, 2004 Agreement and Distributor Agreement; (3) by failing to ensure that all replacement parts for equipment under the 1996 Agreement, 2004 Agreement and Distributor Agreement was sold through Alessi; (4) directly selling replacement parts for the equipment outlined in the 2004 Agreement and Distributor Agreement to third-parties which should have been sold through Alessi as per the 1996 Agreement, 2004 Agreement and Distributor Agreement; and (5) failing to provide Alessi information regarding the amount of equipment sold in the Northeast territory and nationwide by APE or third-parties in contravention of the 1996 Agreement 2004 Agreement and Distributor Agreement.

64.     As a result of Defendant's numerous material breaches of the 1996 Agreement, 2004 Agreement and Distributor Agreement, Plaintiff has been damaged, which damages are the natural and proximate consequence of APE's breach of the 1996 Agreement, 2004 Agreement

and Distributor Agreement, in an amount to be determined at trial, but no less than two million dollars.

## SECOND CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing)

65.     Plaintiff repeats and realleges paragraphs 1 through 64 above with the same force and effect as if fully set forth herein.

66.     Defendants agreed to abide by the terms of the 1996 Agreement, 2004 Agreement and Distributor Agreement between Plaintiff and APE.  Implied in this contractual relationship was Defendant's covenant of good faith and fair dealing.

67.     Defendant's actions as set forth above breached this implied covenant of good faith and fair dealing.

68.     More specifically, APE's sales employees routinely bypassed Plaintiff by performing direct sales in contravention of the agreements, each employee was aware of the obligations under the agreements and failed to adhere to them, their actions were ratified by the CEO of APE, Dan Collins who tried to circumvent obligations under the agreements for express purpose to avoid payments that were rightfully due to Plaintiff.

69.     In addition, APE began to provide replacement parts to customers that originally purchased the equipment from Plaintiff and which still owed monies on those purchases.  In allowing these customers to bypass Alessi these customers had no incentive to payoff monies due.  This arrangement also denied Alessi the opportunity to receive monies from sale of parts under the terms of the agreements.

70.     APE has a history of acting in bad faith, not dealing fairly and circumventing payment obligations and commissions.  In fact, treble damages have been awarded against APE in an action for commissions filed in Washington State by a person named Bill Rogers

71.     Defendants' breaches are causing substantial and imminent harm and damage to Plaintiff.

72.     As a result of Defendant's numerous material breaches of the 1996 Agreement 2004 Agreement, and Distributor Agreement, Plaintiff has suffered significant damage, in an amount to be determined at trial, but no less than two million dollars.

### THIRD CLAIM FOR RELIEF
### (Accounting)

73.     Plaintiff repeats and realleges paragraphs 1 through 72 above with the same force and effect as if fully set forth herein.

74.     Plaintiff seeks a formal accounting of all APE's business sales for equipment, governed by the 1996 Agreement, 2004 Agreement and Distributor Agreement, made by Petitioner, by APE and/or other distributors for any of said equipment sold in the "Northeast territory" and nationwide (as per the 2004 Agreement) beginning from the date of the Distributor Agreement until present to determine the extent of APE's actual breach of the 2004 Agreement and Distributor Agreement.

75.     Plaintiff seeks a formal accounting of all APE's business from the sale of replacement parts, governed by the 2004 Agreement and Distributor Agreement, made by Petitioner, by APE and/or other distributors for any of said replacement parts sold in the "Northeast territory" beginning from 1996 the date of the Distributor Agreement until present to determine the extent of APE's actual breach.

76.     As outlined in the 2004 Agreement and incorporated in the 2012 Agreement APE handled internally the commissions and payments due and had the obligation to apprise Plaintiff of the disbursements.  The failed to do so and still have not provided an accounting of sales despite repeated request to do so.

### FIFTH CLAIM FOR RELIEF
### (Specific Performance)

77.     Plaintiff repeats and realleges paragraphs 1 through 76 above with the same force and effect as if fully set forth herein.

11

78.     The 1996 Agreement, 2014 Agreement and Distributor Agreement are valid and enforceable contract between APE and Plaintiff.

79.     Under the terms of the 1996 Agreement, 2014 Agreement and Distributor Agreement, Plaintiff and Defendant made several valid and enforceable mutual agreements.

80.     Plaintiff substantially performed its obligations under the 1996 Agreement, 2014 Agreement and Distributor Agreement.

81.     Upon information and belief, Defendant is able to  and required to continue to perform under the 1996 Agreement, 2014 Agreement and Distributor Agreement.

82.     Plaintiff has suffered harm resulting from APE's refusal to adhere to the terms of the 1996 Agreement and Distributor Agreement, for which there is no adequate remedy at law.

83.     Plaintiff has demanded, and is entitled to, specific performance of APE's obligations under the 1996 Agreement, 2014 Agreement and Distributor Agreement.

### SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment)

84.     Plaintiff repeats and realleges paragraphs 1 through 83 above with the same force and effect as if fully set forth herein.

85.     In consideration for the 1996 Agreement, 2004 Agreement and Distributor Agreement, APE received business through the Plaintiff's efforts.

86.     Plaintiff has wrongfully refused to abide by the terms of the 1996 Agreement, 2014 Agreement and Distributor Agreement with regard to allow Plaintiff to have the exclusive right to serve as the distributor in the Northeast territory, in violation of the 1996 Agreement and Distributor Agreement.  It would be unjust and inequitable to allow APE to benefit in this manner without remuneration to Plaintiff.

87.     By reason of the foregoing, APE has been unjustly enriched at the expense of Plaintiff, and Plaintiff has suffered damages in an amount to be established at trial.

12

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Alessi Equipment, Inc. pray that this court:

a.   Enter judgment in its favor for breach of contract, for a sum to be
determined at trial but no less than two million dollars.

b.  Order an Accounting of all business conducted by and through APE in the
Northeast territory;

c. Award the full costs of this action, including attorney's fees, costs and
disbursements incurred by Plaintiff;

d. Award compensatory and punitive damages in an amount to be determined
at trial;

e. Order Specific Performance of the Agreement; and

f. Such other and further relief as the Court may deem just and proper.

Dated: Farmingdale, New York
July 20, 2018

LAVALLEE LAW OFFICES PLLC

By:_____

Keith A. Lavallee
Kristopher M. Dennis, of counsel
4 West Gate Road
Farmingdale, NY 11735
(516) 756-5100
(516) 756-4629 Fax

To:    All Parties Via ECF

13

# EXHIBIT
# 1

September 1, 2004

From:  John White, President, APE

To:      Gerry Alessi, AEI

Subj.:  Robovib Prototype Sale and Distributorship

Dear Gerry,

Thanks for coming to Seattle with your group to observe and participate in the testing of the prototype Robovib.  We appreciate all the feedback we received from you and your team.  In addition, thanks for paying for the fine dinner we had at Salty's.  Teresa and David send their thanks as well as all that attended the dinner.

## PRICING OF THE ROBOVIB and DISTRIBUTOR DISCOUNT

We initially quoted AEI, at the dinner table, a price of $115,000.  This was rejected and the price of the Movax product line was handed to us.  The Movax sale price to the customer is around $83,000.  We are not aware of the actual discounted price of the Movax to the distributor but we do understand that if the distributor is not allowed to make at least 20% then he will not do well.  In fact, at a discount of 20% we doubt the distributor can do more than break even, based on our own experience with the Junttan rigs.

APE/J&M is providing a 25% discount.  In other words, We are quoting the first Robovib for $115,000 less 25% which is a total price of $86,250.  The price will go down once we get into production.   Warranty is six months and subject to the terms as our regular written warranty.

## PRICING COMPARISONS OF MOVAX AND ROBOVIB

The price of the Robovib is higher than a Movax.  If a Movax can sell to a distributor for the $46,700 that AEI showed us on a piece of paper at the dinner table then we can tell you that Movax would need to make the machine for about $35,000.  If Movax indeed can do this then Robovib will never sell for as low as a Movax.

## PROTO TYPE COSTS COMPARED TO PRODUCTION COSTS

The proto type cost with all the ginger bread out (development costs) is high.  Can we get these costs lowered?  The answer is yes.  However, how much lower can we expect?  The most realistic person would hope that we

could get ten percent. That ten percent would take a honest reduction from every supplier and I think it is possible. However, even if we cut manufacturing costs by ten percent, we will not be lower than what AEI reports the Movax to be.

Our price is our price. It is based on our numbers. We can quote a Movax if you wish. We can buy one from HMC at distributor price anytime we wish. However, we believe that our Robovib is worth the extra money and therefore we must sell on features and benefits rather than on the lowest price. Our price may be double but our machine should be double the machine.

TERRITORY FOR DISTRIBUTOR and brief expectations

APE hereby grants AEI the exclusive right to sell Robovib in the Northeast USA. APE hereby grants AEI the non-exclusive right to sell anywhere else in the USA. AEI is not allowed to create sub-distributors. This agreement, until written in more detail and jointly signed will act as our only agreement.

APE/J&M salesmen are hereby instructed to direct all sales to AEI to provide AEI the first chance to sell the machine. APE/J&M would like to sell the machine to AEI and let AEI do the set up and what ever else it takes to service the customer, regardless if the area of sale is in California, Texas, or any place else in the USA.

It is expected that AEI will maintain a high level of customer satisfaction and retain a good reputation of the J&M logo. If a situation arises where a contractor would rather buy directly from APE/J&M then a meeting between Alessi and APE/J&M will take place and the issues worked out accordingly. Again, no APE/J&M salesmen are allowed to directly quote the Robovib unless approved by APE/J&M and only after a meeting to discuss the issues has taken place between APE/J&M and AEI. We wish to channel the sales through AEI and in return, avoid the service and set up. In addition, we seek a single source to collect our invoices.

COMMISSIONS TO APE/J&M FOR SALES OF ROBOVIB

A two percent commission will be paid to APE/J&M to be credited to the territory in which the equipment was sold. In this way, each APE/J&M salesman is granted the benefit of this new invention. Where the machine initially works will define the territory that gets credit. APE will handle the commission internally.

**MAINTAINING A SOLID REPUTATION FOR SERVICE AND SUPPORT *via a sense of urgency to keep the equipment up and running.***

APE/J&M branch managers are depending on AEI to provide a high level of service to its customers in order to maintain the already excellent reputation of the APE/J&M product.  If it is determined that J&M's solid reputation is being tarnished due to a lack of service and support of the Robovib then these issues will be handled quickly and solved.   It is the duty of each APE/J&M branch to provide assistance to AEI.  APE/J&M branches can provide service for Robovib but only as a last restore after AEI has failed to do so.  AEI has the full right to request and pay for service from any APE branch managers at AEI expense.

The spirit of this agreement is to allow AEI, an expert in the mounting of excavator attachments, the ability to sell Robovib while at the same time providing APE/J&M a single source to manufacture and sell to.  This spirit should include an understanding that AEI needs to handle their customers without APE/J&M personnel getting in the way.  Therefore, all APE/J&M sales and service personnel are cautioned that contractors, when frustrated, will tend to engage one party against the next.  Lets stay together as a group and not allow ourselves to be manipulated into conflict between APE/J&M and AEI.  We are a team and passion for selling the product should be our common goal.  We wish AEI excellent sales and profits.

SIT DOWN

Any branch manager of APE/J&M  or officers of AEI can order a "sit down" if he wants this agreement changed or voided all together.  Voiding the agreement would require two-thirds of the APE/J&M branch managers voting negatively.  Ray and Gerry have full authority to end the agreement at anytime.

The following people have the authority to order a "Sit Down"

Ray Alessi
Gerry Alessi
King Evarts
Dave Yingling
Jimmy Deemer
John Konwick
Bill Ziadie
Joe Saverase
Paul Kuzik
Jim Bushyeager

Jim Casavant
Wally Brumsey
Joe Wright
Steve Cress

Sit down requests go to Dan Collins or John White.


Sincerely,


John L. White
President, APE

# EXHIBIT 2



VIBRATORY HAMMERS • POWER UNITSAUGER SYSTEMS • DIESEL & HYDRAULIC HAMMERS
DRILL RIGS • HYDRAULIC PILING RIGS • WICK DRAIN INSTALLERS • LEAD SYSTEMS



www.apevibro.com

www.jandm-usa.com

## American Piledriving Equipment Inc. and Alessi Equipment Inc.

### Distributor Agreement and Memorandum of Understanding

As of May 22, 2012 Alessi Equipment Inc. of 28 Roslyn Place, Mt. Vernon, NY 10550 is the exclusive distributor of the APE /J&M Robovib and APE/J&M line of excavator mounted equipment for the territory called the "Northeast" which covers the same territory as APE Northeast.

In addition, Alessi Equipment agrees to pay a 2% commission on any APE/J&M Robvib or excavator mounted equipment sold outside its exclusive territory and in return, APE agrees to direct all Robvib and excavator rentals and sales to Alessi Equipment as a first option.

Any and all service and set up will be provided by Alessi Equipment or Alessi Equipment can pay APE's service department to provide services.

This agreement is automatically renewable each year unless otherwise cancelled in writing.

APE agrees to a two year cancelation period that must be in written form.
APE agrees to buy back of any support parts at 20% below initial sale price.

John L. White, President APE          Gerald F. Alessi, Vice President, Alessi Equipment Inc.

Date: 27 may 2012     Date: 27 / may 2012

President, APE
206 498-9400

**APE HEADQUARTERS**
7032 S 196th STREET
KENT WA 98032
(800) 248-8498 • (253) 872-0141
Fax (253) 872-8710

**NORTHEAST REGIONAL OFFICE**
401 Hamet St.
Syracuse, NJ 088-2
(888) 217-3324 • (315) 432-6604
Fax (315) 432-6601

**APE CHINA**
Building No 233, F. Qiao Road
G. C. Industrial Zone Binjiang District
Shanghai, China 201906
0/1-86-21-3877-1221
Fax 011-86-21-3680-0553

**LOUISIANA REGIONAL OFFICE**
39266 A DOYLE DRIVE
GONZALES LA 70737
(225) 644-7722
Fax (225) 644-7626

**GULF REGIONAL OFFICE**
3975 FM 359 • 1485
Conroe TX 77306
(800) 596-2677 • (936) 271-1044
Fax (936) 271-1046

**MID-ATLANTIC REGIONAL OFFICE**
500 Nesbit Road #200
Virginia Beach VA 23462
(888) 399-7590 • (757) 5) 890-761
Fax (757) 518-9747

**SOUTHEAST REGIONAL OFFICE**
345 Industrial Park Road
Mulberry, FL 33860
(800) 370-1041 • (863) 324-0175
Fax (863) 318-9409

**MID-WESTERN REGIONAL OFFICE**
50 Gerber Industrial Dr
St Peters MO 63376
(877) 296-1044 • (636) 397-8400
Fax (636) 279-4274

**WESTERN REGIONAL OFFICE**
2985 Lindley Road
Stockton CA 95205
(800) 245-4201 • (209) 942-2166
Fax (209) 942-2455

# EXHIBIT 3



American Piledriving Equipment, Inc.
PO Box 88730
Seattle, WA  98138
USA
Phone No.: 253-872-0141
Fax No.: 253-872-8710

# PRO FORMA INVOICE

Page:  1

| | |
|---|---|
| Pro Forma Invoice No.: | ES-04231 |
| Pro Forma Invoice Date: | 10/31/2017 |
| Job No.: | N217-473 |

**Sold To:**
Moncon Inc.
56-21 Metropolitan Ave
Ridgewood, NY  11385
USA

**Ship To:**
Moncon Inc.
56-21 Metropolitan Ave
Ridgewood, NY  11385
USA

| | | | |
|---|---|---|---|
| Ship Via | | Customer ID | C9110 |
| Ship Date | 10/31/2017 | P.O. Number | |
| Terms | | P.O. Date | 10/31/2017 |
| | | SalesPerson | Paul Kuzik |

| Item No. | Description | Equip. No. | Unit | Qty | Unit Price | Disc % | Net Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| VR | APE-Robovibe with Manifold, Rototilt, Yoke/Bracket MON-20171238 and Joystick controller | V1022 | Each | 1 | 150,750.00 | | 150,750.00 | 150,750.00 |
| SC20 | 20 Sheet Clamp MON-20171286 Includes installation on customer excavator | A4576 | Each | 1 | 12,250.00 | | 12,250.00 | 12,250.00 |

| | |
|---|---|
| Amount Subject to Sales Tax | 0 |
| Amount Exempt from Sales Tax | 163,000.00 |

*IMPORTANT: Subject to Sales Order Terms and Conditions

Customer Signature  _____

| | |
|---|---|
| **Subtotal:** | **163,000.00** |
| Invoice Discount: | 0.00 |
| Tax: | 0.00 |
| **Total (USD):** | **163,000.00** |

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

| | |
|---|---|
| ALESSI EQUIPMENT, INC., <br><br> Plaintiff, <br><br> -against- <br><br> AMERICAN PILEDRIVING EQUIPMENT, INC. <br><br> Defendant. | DOCKET NO.  7:18-cv-03976-VB <br><br><br> **AFFIDAVIT OF JOHN L. WHITE** |

-------------------------------------------------------------------x

STATE OF WASHINGTON   )
                       ) ss.:
COUNTY OF _____ )

JOHN L. WHITE, being duly sworn, hereby deposes under penalty of perjury and says:

1.      I am over 18 years of age and am the former President of AMERICAN PILEDRIVING EQUIPMENT, INC., ("APE") a defendant in the above-captioned action and as such am familiar with the facts and circumstances set forth below and the subject matter of this lawsuit.

2. Sometime in the early to mid-1990's I was introduced to Gerry Alessi of ALESSI EQUIPMENT, INC. ("Alessi") who was looking for a manufacturer to build excavator mounted vibro for orders placed and future orders made with Alessi.

3.      At that time, Alessi was representing European made excavator mounted vibratory pile drivers, and as my memory recalls, MGF was one of them.  At the time of meeting to the Alessi's, MGF had tried to enter the USA but was failing or had failed.

4.      At that time APE was a manufacturer of crane suspended vibratory pile drivers but we were not in the business of manufacturing and sale of excavator mounted equipment.

5.     APE was interested in the potential business that could be derived from working with Alessi and it was agreed that we would try and work together on developing equipment to meet Alessi's sales needs.

6.     Alessi provided us with a MGF RBG vibro unit, shipping it to our Kent factory, to inspect and reverse engineer.  We were focused mainly on the technology necessary to attach the vibro directly to the excavator rather than hang it from a wire rope cable.

7.     Our engineers were able to reverse engineer the suppressor from the MGF German unit.

8.     This new unit would become the APE 50E vibro. The "E" standing for "excavator mounted"  and was the unit APE first sold to Alessi.

9.     Alessi also educated APE on the development of additional excavator mounted vibro models.  We depended on Alessi to tell us what size and weight of machine would best fit the varying size of excavators on the market.  Alessi gave us the recommended suspended weights we needed to reach for each model as well as the hydraulic flow rates of each model of excavator.  We then developed accordingly.  Through this work we developed a whole line of excavator models to fit very small to very large excavators.

10.     In or about 2002 Alessi advised APE that there was a shift in the market and there was now a demand by his customers and potential customers for side-mounted equipment attachments.  Alessi was representing a European model called the Movax and provided APE with all the weaknesses and shortcomings of the Movax and asked us to build a better unit than the Movax.

11.     With this in mind Alessi helped and provided input into what would be developed and ultimately sold as APE's Robovibe unit.  This help turned out to be extremely valuable because we were not experienced on all the sizes and lifting capacities of excavators and we did not have the knowledge necessary to determine what size machine would be most successful in that market segment.  Alessi was extremely experienced in common sizes,

weights, dimensions, lifting capacity, hydraulic flow rates as well as what was most popular with regards to excavators on the market.  The Alessi's had been in the business of renting and selling excavator attachments for decades and this knowledge was crucial for us to be able to select the right size machine to attack the market.

12.    Alessi was instrumental in the development and success of the Robovibe unit and in fact we asked Plaintiff's principal, Gerry Alessi, to fly out to Washington State to appear in a promotional video for the Robovibe which was used to market the unit and was in fact on APE's website.

13.    It is without question that through Alessi's efforts, knowledge of the industry and client base APE developed a line of excavator equipment that was well suited for the excavator market.  We learned from Alessi that renting and selling excavator machines was not easy due to all the varying hydraulic flow rates, load sensing, hydraulic horsepower limiting as well as suspended weight variances between many different sizes of vibros.  APE determined that we were better off to just sell to Alessi and let Alessi worry about all the extra work it takes to fit one to an excavator.

14.    This new equipment benefited APE during my tenure and opened a new client base to the Company.  In addition, the new client base increased our ability to sell our conventional models, since many of the new clients also were engaged in pile driving that did not involve excavators.

15.    Based upon this and in my role as President of APE, APE entered into various agreements providing Alessi with the exclusive right to sell the equipment.  We agreed to market the equipment and send potential customers to Alessi, avoiding what we considered massive amounts of sales time trying to solve all the dynamics of fitting a vibro to an excavator.

16.    This arrangement was mutually beneficial to both APE and Alessi and was celebrated by all the owners of APE as well as with Alessi.

17.     Beginning in or about 1996, APE agreed to have Plaintiff serve as its exclusive distributor in the Northeast whereby all equipment sales and replacement parts would be sold directly through Plaintiff regardless of whether a customer contacted APE directly at its corporate or regional offices (the "1996 Agreement").

18.     This arrangement was later confirmed in September 1, 2004 agreement that I prepared and which outlined the terms of our relationship. A copy of this agreement is annexed hereto as Exhibit A.

19.     At all times both APE and Alessi agreed to be bound by the terms of the 2004 Agreement.

20.     We agreed to sell the equipment to Alessi at a discount off of list price and Alessi would be able to sell the equipment for list price.

21.     It was agreed that Alessi would be the exclusive distributor of this equipment in the Northeast territory and non-exclusive distributor in the entire country. But, all sales would be directed through Alessi in the first instance regardless of where the purchases were derived from. Our mission was to sell to Alessi and let Alessi deal with all the headaches of attaching the machine to the excavator as well as after service.

22.     In consideration of this arrangement Alessi was required to "set up and whatever else it takes to service the customer, regardless if the area of sale is in California, Texas, or any place else in the USA."

23.     APE wanted this arrangement "to channel the sales through AEI and in return, avoid the service and set up. In this way, all we had to do was take the order, build the equipment, ship it, and get paid. It was a win-win for both sides.

24.     As an additional benefit to APE, Alessi was required to pay a commission of 2% of every sale made. This would allow the sales team to benefit from the sale. In that way, our sales and service personal would remain motivated should Alessi call on them for help.

25.     As noted in the September 1, 2004 Agreement the purpose and"

spirit of this agreement is to allow AEI, an expert in the mounting of excavator attachments, the ability to sell Robovib while at the same time providing APE/J&M a single source to manufacture and sell to.  This spirit should include an understanding that AEI needs to handle their customers without APE/J&M personnel getting in the way.  Therefore, all APE/J&M sales and service personnel are cautioned that contractors, when frustrated, will tend to engage one party against the next.  Let's stay together as a group and not allow ourselves to be manipulated into conflict between APE/J&M and AEI. We are a team and passion for selling the product should be our common goal. We wish AEI excellent sales and profits.

26.     In May 2012, I had Alessi enter into another agreement to reaffirm the 2004 Agreement.  This agreement (annexed hereto as Exhibit B) was to provide for the same fee structure as outlined in the 2004 agreement and was in operation during my tenure at APE. Specifically, the equipment was to be sent to Alessi at a discount from list price and he was to in turn sell the equipment at list price paying 2% to APE as a commission on all sales.  Similarly all sales were to be directed through Alessi.  As I recall, I agreed to allow Alessi to pay the 2% commission direct to the APE sales person as a means of further motivating teamwork between the two companies.  It was an idea I got from the business school when studying incentives.

27.     During my tenure at APE there were instances where sales were made directly by APE without going through Alessi.  Each time this happened we talked it through with Alessi and made adjustments to settle commissions.

28.     This was an issue that I discussed with Dan Collins and we would always resolve the issue.  We did our best to honor the agreement and when there was mistakes we worked together to resolve them through credits on future purchases or in reduction in parts pricing.

29.     In the past, APE has been charged with not living up to its commitments to dealers and brokers and visa versa.  The incident with Bill Rogers is still in my mind as one of the prime examples of how bad things get when you fail to stick with the agreements.  I made my best effort to avoid the mistakes we made in the past and to honor the agreement with Alessi as best I could up to the day I left APE.

30.    Both APE and Alessi benefited from the arrangements set forth in the various agreements.  In particular, Alessi opened markets to APE that they had not been engaged in and customers that originated from Alessi.  He helped us sell many standard vibros directly to customers he developed through selling them related excavator attachments, not just vibros. Alessi helped us with many Northeast customers for both the excavator machines he had an exclusive on as well as ones that he got nothing in return for helping close a sale.

DATED   July 11, 2018

By: _____

JOHN L. WHITE

**STATE OF WASHINGTON**

County of  King

Signed or attested before me this  18th  day of

July  , 2018

by  John L. White  .

_____

**YOUR NAME HERE, Notary Public**
My Commission Expires Your Date Here



FRANCISCO A CASTAÑEDA
COMMISSION EXPIRES
NOTARY
PUBLIC
02-19-19
STATE OF WASHINGTON



September 1, 2004

From:  John White, President, APE

To:     Gerry Alessi, AEI

Subj.:  Robovib Prototype Sale and Distributorship

Dear Gerry,

Thanks for coming to Seattle with your group to observe and participate in
the testing of the prototype Robovib. We appreciate all the feedback we
received from you and your team. In addition, thanks for paying for the
fine dinner we had at Salty's. Teresa and David send their thanks as well
as all that attended the dinner.

### PRICING OF THE ROBOVIB and DISTRIBUTOR DISCOUNT

We initially quoted AEI, at the dinner table, a price of $115,000. This was
rejected and the price of the Movax product line was handed to us. The
Movax sale price to the customer is around $83,000. We are not aware of
the actual discounted price of the Movax to the distributor but we do
understand that if the distributor is not allowed to make at least 20% then
he will not do well. In fact, at a discount of 20% we doubt the distributor
can do more than break even, based on our own experience with the
Junttan rigs.

APE/J&M is providing a 25% discount. In other words, We are quoting
the first Robovib for $115,000 less 25% which is a total price of $86,250.
The price will go down once we get into production.   Warranty is six
months and subject to the terms as our regular written warranty.

### PRICING COMPARISONS OF MOVAX AND ROBOVIB

The price of the Robovib is higher than a Movax. If a Movax can sell to a
distributor for the $46,700 that AEI showed us on a piece of paper at the
dinner table then we can tell you that Movax would need to make the
machine for about $35,000. If Movax indeed can do this then Robovib
will never sell for as low as a Movax.

### PROTO TYPE COSTS COMPARED TO PRODUCTION COSTS

The proto type cost with all the ginger bread out (development costs) is
high. Can we get these costs lowered? The answer is yes. However, how
much lower can we expect? The most realistic person would hope that we

could get ten percent. That ten percent would take a honest reduction from every supplier and I think it is possible. However, even if we cut manufacturing costs by ten percent, we will not be lower than what AEI reports the Movax to be.

Our price is our price. It is based on our numbers. We can quote a Movax if you wish. We can buy one from HMC at distributor price anytime we wish. However, we believe that our Robovib is worth the extra money and therefore we must sell on features and benefits rather than on the lowest price. Our price may be double but our machine should be double the machine.

TERRITORY FOR DISTRIBUTOR and brief expectations

APE hereby grants AEI the exclusive right to sell Robovib in the Northeast USA. APE hereby grants AEI the non-exclusive right to sell anywhere else in the USA. AEI is not allowed to create sub-distributors. This agreement, until written in more detail and jointly signed will act as our only agreement.

APE/J&M salesmen are hereby instructed to direct all sales to AEI to provide AEI the first chance to sell the machine. APE/J&M would like to sell the machine to AEI and let AEI do the set up and what ever else it takes to service the customer, regardless if the area of sale is in California, Texas, or any place else in the USA.

It is expected that AEI will maintain a high level of customer satisfaction and retain a good reputation of the J&M logo. If a situation arises where a contractor would rather buy directly from APE/J&M then a meeting between Alessi and APE/J&M will take place and the issues worked out accordingly. Again, no APE/J&M salesmen are allowed to directly quote the Robovib unless approved by APE/J&M and only after a meeting to discuss the issues has taken place between APE/J&M and AEI. We wish to channel the sales through AEI and in return, avoid the service and set up. In addition, we seek a single source to collect our invoices.

COMMISSIONS TO APE/J&M FOR SALES OF ROBOVIB

A two percent commission will be paid to APE/J&M to be credited to the territory in which the equipment was sold. In this way, each APE/J&M salesman is granted the benefit of this new invention. Where the machine initially works will define the territory that gets credit. APE will handle the commission internally.

MAINTAINING A SOLID REPUTATION FOR SERVICE AND
SUPPORT *via a sense of urgency to keep the equipment up and
running.*

APE/J&M branch managers are depending on AEI to provide a high level
of service to its customers in order to maintain the already excellent
reputation of the APE/J&M product. If it is determined that J&M's solid
reputation is being tarnished due to a lack of service and support of the
Robovib then these issues will be handled quickly and solved. It is the
duty of each APE/J&M branch to provide assistance to AEI. APE/J&M
branches can provide service for Robovib but only as a last restore after
AEI has failed to do so. AEI has the full right to request and pay for
service from any APE branch managers at AEI expense.

The spirit of this agreement is to allow AEI, an expert in the mounting of
excavator attachments, the ability to sell Robovib while at the same time
providing APE/J&M a single source to manufacture and sell to. This
spirit should include an understanding that AEI needs to handle their
customers without APE/J&M personnel getting in the way. Therefore, all
APE/J&M sales and service personnel are cautioned that contractors,
when frustrated, will tend to engage one party against the next. Lets stay
together as a group and not allow ourselves to be manipulated into conflict
between APE/J&M and AEI. We are a team and passion for selling the
product should be our common goal. We wish AEI excellent sales and
profits.

SIT DOWN

Any branch manager of APE/J&M or officers of AEI can order a "sit
down" if he wants this agreement changed or voided all together. Voiding
the agreement would require two-thirds of the APE/J&M branch managers
voting negatively. Ray and Gerry have full authority to end the agreement
at anytime.

The following people have the authority to order a "Sit Down"

Ray Alessi
Gerry Alessi
King Evarts
Dave Yingling
Jimmy Deemer
John Konwick
Bill Ziadie
Joe Saverase
Paul Kuzik
Jim Bushyeager

Jim Casavant
Wally Brumsey
Joe Wright
Steve Cress

Sit down requests go to Dan Collins or John White.


Sincerely,


John L. White
President, APE





VIBRATORY HAMMERS • POWER UNITSAUGER SYSTEMS • DIESEL & HYDRAULIC HAMMERS
DRILL RIGS • HYDRAULIC PILING RIGS • WICK DRAIN INSTALLERS • LEAD SYSTEMS



www.apevibro.com

www.jandm-usa.com

## American Piledriving Equipment Inc. and Alessi Equipment Inc.

### Distributor Agreement and Memorandum of Understanding

As of May 22, 2012 Alessi Equipment Inc. of 28 Roslyn Place, Mt. Vernon, NY 10550 is the exclusive distributor of the APE /J&M Robovib and APE/J&M line of excavator mounted equipment for the territory called the "Northeast" which covers the same territory as APE Northeast.

In addition, Alessi Equipment agrees to pay a 2% commission on any APE/J&M Robvib or excavator mounted equipment sold outside its exclusive territory and in return, APE agrees to direct all Robvib and excavator rentals and sales to Alessi Equipment as a first option.

Any and all service and set up will be provided by Alessi Equipment or Alessi Equipment can pay APE's service department to provide services.

This agreement is automatically renewable each year unless otherwise cancelled in writing.

APE agrees to a two year cancelation period that must be in written form.
APE agrees to buy back of any support parts at 20% below initial sale price.

John L. White, President APE          Gerald F. Alessi, Vice President, Alessi Equipment Inc.

Date: 27 MAY 2012      Date: 27 / MAY  2012

President, APE
206 498-9400

APE HEADQUARTERS
7032 S 196th Street
Kent  WA 98032
(800) 248-8498 • (253) 872-0141
Fax (253) 872-6710

NORTHEAST REGIONAL OFFICE
401 Haight St.
Somerset, NJ 08873
(800) 247-7524 • (732) 432-6604
Fax (732) 432-6605

APE CHINA
Building No 233, F. Qiao Road
G.C.C. Industrial Zone, Binhai New District
Shanghai, China 201906
(011-86-21-3871-1221)
Fax (011-86-21-3860-0855)

LOUISIANA REGIONAL OFFICE
39266 A Doyle Drive
Gonzales, LA 70737
(225) 644-7722
Fax (225) 644-7626

GULF REGIONAL OFFICE
3974 FM Hwy 1485
Conroe, TX  77306
(800) 596-2677 • (936) 271-1044
Fax (936) 271-1046

MID-ATLANTIC REGIONAL OFFICE
500 Newlins Road #200
Virginia Beach  VA 23462
(866) 399-7596 • (757) 523-5240
Fax (757) 515-9341

SOUTHEAST REGIONAL OFFICE
325 Industrial Park Road
Medford, FL 33860
(800) 578-1044 • (863) 324-0378
Fax (863) 315-9409

MID-WESTERN REGIONAL OFFICE
50 Gerber Industrial Dr.
St. Peter  MO 63376
(877) 290-1044 • (636) 397-8400
Fax (636) 278-4278

WESTERN REGIONAL OFFICE
2985 Langley Road
Stockton  CA 95205
(800) 245-4401 • (209) 942-2166
Fax (209) 942-2455