UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ALESSI EQUIPMENT, INC.,

                Plaintiff,

     -against-

AMERICAN PILEDRIVING EQUIPMENT, INC.,

                Defendant.
------------------------------------------------------------X
AMERICAN PILEDRIVING EQUIPMENT, INC.,

              Counterclaim-Plaintiff,

     -against-

ALESSI EQUIPMENT, INC.,

              Counterclaim-Defendant.
------------------------------------------------------------X

**OPINION AND ORDER**

18 Civ. 3976 (JCM)

      Plaintiff Alessi Equipment, Inc. ("Alessi") commenced this action against Defendant American Piledriving Equipment, Inc. ("APE") on May 5, 2018. (Docket No. 5).  Alessi filed an amended complaint (the "Amended Complaint") on July 24, 2018. (Docket No. 18).  On March 19, 2019, APE filed an answer and asserted counterclaims against Alessi (the "Counterclaims").[1] (Docket No. 36).  Before this Court are (1) APE's motion for summary judgment dismissing the Amended Complaint; (2) APE's motion for summary judgment granting relief under the Counterclaims, (Docket No. 92); (3) Alessi's cross-motion for summary judgment dismissing the

---

[1] APE also asserted a third-party complaint against John L. White ("Mr. White") on the same date, (Docket No. 36 at 32-31), but that action was dismissed on jurisdictional grounds on September 16, 2019, (Docket No. 57). Thereafter, APE brought suit against Mr. White in the State of Washington. (*See* Docket No. 95 at 10 n.3).  Pursuant to a tolling agreement between APE and Mr. White, APE withdrew that action without prejudice to reassert it pending the outcome of the instant case. (*See id.*).

Counterclaims; and (4) Alessi's cross-motion for summary judgment granting it relief under the Amended Complaint,[2] (Docket No. 100).   On December 22, 2021, the Court held oral argument regarding ten specific questions concerning various issues that were not sufficiently addressed by the parties' papers. (*See* Docket Nos. 112, 113).   For the reasons set forth below, the Court (1) grants in part and denies in part APE's motions for summary judgment; and (2) grants in part and denies in part Alessi's cross-motions for summary judgment.

## I.  BACKGROUND

This case involves a manufacturer-distributor relationship between APE and Alessi for excavator mounted construction equipment.   The following facts are taken from the parties' statements and counterstatements of material fact submitted pursuant to Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York and the exhibits[3] submitted by the parties in support of their contentions.[4]   Any disputes of material fact are noted.

---

[2] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 86).

[3] Whereas the Court need only consider the cited materials in a Rule 56.1 statement, the Court may also rely on evidence in the record even if uncited. *Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014); Fed. R. Civ. P. 56(c)(3).

[4] When facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence and denied by only a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court deems such facts true. *See Annunziata v. Int'l Bhd. of Elec. Workers Local Union # 363*, 15-CV-03363 (NSR), 2018 WL 2416568, at *1, n.1 (S.D.N.Y. May 29, 2018); S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed admitted for purposes of the motion unless specifically controverted . . ."); S.D.N.Y. Local Rule 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Both parties' counterstatements mark certain statements as "disputed," but do not identify any actual factual inconsistency.   Where such counterstatements do not identify a true factual dispute, the Court treats the statement as undisputed. *See Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 408 n.1 (S.D.N.Y. 2017).

In addition, both Rule 56.1 statements contain assertions that are exclusively from sections of the pleadings, which are allegations, not evidence. *See Walsh v. Dejoy*, No. 14-CV-7239 (GBD) (KNF), 2021 WL 4896979, at *8 n.1 (S.D.N.Y. July 28, 2021), *report and recommendation adopted*, 2021 WL 4355366 (S.D.N.Y. Sept. 24, 2021).

APE is a Washington corporation that manufactures, sells and leases deep foundation construction equipment, including vibratory hammers and piledrivers. (Docket Nos. 95-1 ¶ 1; 108 ¶ 1).  It was founded in 1992 by Mr. White and Pat Hughes ("Mr. Hughes"). (Docket Nos. 95-1 ¶ 2; 108 ¶ 2).  Mr. White served as APE's president from its inception until June 15, 2012, when he resigned.[5] (Docket Nos. 95-1 ¶ 3; 108 ¶ 3; *see also* Docket Nos. 93-9 at 37:6-15, 236:6-16;[6] 93-11).  Alessi is a privately owned New York corporation that sells and services excavator mounted construction equipment. (Docket Nos. 95-1 ¶ 4; 108 ¶ 4; 102 ¶ 1; 105 ¶ 1).  It is owned by Gerald Alessi ("Mr. Alessi"), who started it in 1992. (Docket Nos. 93-1 at 36:4-17; 95-1 ¶ 5; 108 ¶ 5).

In or about the early to mid-1990s, Alessi approached APE regarding the possibility of APE manufacturing excavator mounted vibratory hammers for Alessi to sell. (*See* Docket No. 93-18 at 6 ¶ 2; *see also* Docket Nos. 93-1 at 48:9-50:8; 95-1 ¶ 6; 108 ¶ 6).  MGF, the company that had previously manufactured Alessi's vibratory hammers, had gone bankrupt, and Alessi needed a new manufacturer so it could continue selling products to existing clients. (Docket No. 93-1 at 48:9-50:8).  According to Alessi, Alessi sent APE an MGF vibratory hammer so that APE could "reverse engineer" such "a unit that would fit on an excavator" for Alessi's use.[7]

_____

Therefore, the Court only considers these assertions to the extent they are undisputed by the opposing party. *See Melvin v. Cty. of Westchester*, No. 14-CV-2995 (KMK), 2019 WL 1227903, at *1 n.1 (S.D.N.Y. Mar. 15, 2019).

Furthermore, the parties' Rule 56.1 statements and responses thereto contain assertions that are unsupported by any citation to the record.  The Court will not consider these assertions because "a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  The Second Circuit has explained that "[w]here . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently" of such assertions. *Id.*

[5] Mr. Hughes served as APE's Chief Executive Officer ("CEO"). (Docket No. 93-9 at 37:16-17).

[6] Unless otherwise noted, all citations to the record refer to the page numbers assigned upon electronic filing.

[7] The parties dispute whether APE had manufactured excavator mounted equipment before they commenced their relationship. (*Compare* Docket Nos. 93-18 at 6 ¶ 4; 93-1 at 50:9-11; 102 ¶ 4, *with* Docket Nos. 105 ¶ 4; 93-8 at

(Docket Nos. 93-1 at 49:7-50:8; 93-18 at 7 ¶¶ 6-7; *see also* Docket Nos. 102 ¶ 6; 105 ¶ 6). Thereafter, APE developed a line of excavator mounted vibratory hammers including the 15E, 20E, 50E, 100E and 150E. (Docket Nos. 93-1 at 60:20-61:2; 93-9 at 43:6-24; 93-18 at 7 ¶¶ 6-9; 95-1 ¶ 6; 108 ¶ 6).  Mr. White submitted an affidavit asserting that Alessi "educated APE on" its development of these products in that APE "depended on Alessi to tell [it] what size and weight of machine would best fit the varying size of excavators on the market," and Alessi recommended "suspended weights" and "hydraulic flow rates" for each model.[8] (Docket No. 93-18 at 7 ¶ 9).

In or about 1996, the parties commenced a business relationship whereby APE sold equipment to Alessi, and in turn, Alessi sold or leased that equipment to third parties. (Docket Nos. 95-1 ¶ 7; 108 ¶ 7).  The record is inconsistent as to the nature of this arrangement and its level of formality. (*Compare* Docket Nos. 95-1 ¶ 7; 105 ¶ 7, *with* Docket Nos. 102 ¶ 7; 108 ¶ 7). Dan Collins ("Mr. Collins") testified that Alessi "was the only one selling the[] [Robovib][9] in the beginning," but no exclusive distributorship agreement existed in oral or written form. (Docket No. 105 ¶ 7; *see also* Docket No. 93-8 at 101:9-14)  Therefore, APE disputes the existence of any such agreement in the mid-1990s. (Docket No. 105 ¶ 7).  On the other hand, based on both Mr. White and Mr. Alessi's assertions, Alessi claims that around that time, APE formally

---

83:9-84:25). APE also "disputes that Alessi ever shipped" it an MGF product "to be reverse engineered," based on Dan Collins' ("Mr. Collins") testimony that he could not recall such an event. (Docket No. 105 ¶ 6; *see also* Docket No. 93-8 at 82:1-9, 126:7-25). However, a deponent's failure to remember a particular event is insufficient to create a genuine issue of fact for summary judgment purposes. *See Johnson v. City of New York*, No. 18-CV-6256 (RA), 2020 WL 2732068, at *4 (S.D.N.Y. May 26, 2020).

[8] APE seems to dispute that Alessi was involved with this development, but the Court disregards that assertion because it is not supported by any citations to the record. (*See* Docket No. 105 ¶ 6; *see also* Docket Nos. 95-1 ¶ 6; 108 ¶ 6); *supra* n.4.

[9] The word "Robovib" is spelled inconsistently throughout the record and in the parties' papers. (*E.g.*, Docket Nos. 95-1 ¶ 8; 102 ¶ 9).  For ease of reference, the Court will use the spelling "Robovib."

"agreed" to use Alessi as its "exclusive distributor in the Northeast,"[10] such that Alessi would sell all excavator mounted equipment and replacement parts even if a customer "contacted APE directly" (the "1996 Agreement"). (Docket No. 108 ¶ 7; *see also* Docket Nos. 93-9 at 43:1-47:13; 93-18 at 9 ¶ 17).  There is no evidence on record of any such agreement in writing.[11]  Mr. Alessi testified that the agreement was a "handshake agreement" or "understanding" with APE "based on the fact that [Alessi] knew how to mount" excavator mounted "vibros" and understood hydraulic machine systems," and APE "did not want to get involved with" these processes. (Docket No. 93-1 at 55:22-57:19).  He recalled that under the agreement's terms, "50 percent due on order [sic], balance due at time of shipping for a unit [sic].  Parts would be 30 days [sic].  And basically, [Alessi] w[as] handling the excavator-mounted vibros for [APE]." (*Id.* at 56:24-57:4).

In or around 2003 or 2004, APE began manufacturing a new excavator mounted vibratory hammer called the Robovib.[12] (Docket Nos. 95-1 ¶ 8; 108 ¶ 8).  The Robovib differed from APE's previous models because it was "side-mounted," and thus, required "less labor." (Docket No. 93-1 at 66:10-16).  Whereas Mr. Collins, the Chief Financial Officer of APE at the time,[13] testified that Alessi's role related to the Robovib was limited to reporting customer complaints, (*see* Docket No. 93-8 at 22:23-23:12, 142:18-143:1; *see also* Docket No. 105 ¶¶ 5, 8), Alessi claims that it was "instrumental in the development and success of the Robovibe unit,"

---

[10] Whereas Mr. Alessi testified that this agreement was not restricted to a particular territory, (Docket No. 93-1 at 57:10-19), Mr. White testified that the exclusive distributorship was limited to the Northeast, (Docket No. 93-9 at 46:9-22).  Alessi seems to adopt the latter view as its official position on the terms of this agreement. (Docket No. 108 ¶ 7).

[11] Mr. White testified that he believed APE and Alessi formally executed such an agreement in written form, but no such agreement is before the Court. (Docket No. 93-9 at 132:11-19).

[12] The Robovib was based on a design by J&M, APE's wholly owned subsidiary, which was not successful. (Docket Nos. 93-1 at 66:12-22; 93-8 at 141:22-142:10; 93-9 at 41:10-42:12; 95-1 ¶ 8; 108 ¶ 8; 105 ¶ 5).

[13] Collins became APE's president when Mr. White resigned in 2012. (Docket No. 93-8 at 22:23-23:12).

(Docket Nos. 102 ¶ 8; 108 ¶ 8).  Indeed, both Mr. Alessi and Mr. White testified that Mr. Alessi initially suggested that APE begin developing a side mounted unit due to shifting customer demand and provided guidance on the Robovib's design once a prototype was built. (Docket Nos. 93-1 at 66:10-16; 93-9 at 230:16-23, 232:1-233:3; 93-18 at 6-8 ¶¶ 1-12; 102 ¶ 8; 105 ¶ 8). Mr. Alessi also appeared in a promotional video for the Robovib that was posted on APE's website until May 2018, when this lawsuit began. (Docket Nos. 93-9 at 232:1-233:3; 93-18 at 8 ¶ 12; 102 ¶ 8; 105 ¶ 8).

On September 1, 2004, Mr. White wrote a memorandum to Mr. Alessi "grant[ing] to A[lessi]" (1) "the exclusive right to sell Robovib in the Northeast USA;" and (2) the "non-exclusive right to sell anywhere else in the USA" (the "2004 Memorandum"). (Docket No. 93-10 at 2).  It further "instructed" APE salespeople "to direct all sales to A[lessi] to provide A[lessi] the first chance to offer the machine," and "let A[lessi] do the set up and what ever else it takes to service the customer, regardless if [sic] the area of sale is in California, Texas, or any place else in the USA." (*Id.*).  Upon any sale by Alessi, the 2004 Memorandum required a two percent commission to APE, which would be "credited to the territory in which the equipment was sold." (*Id.*).  APE was to "handle the commission internally." (*Id.*).  The price of "the first" Robovib sold to Alessi would be $86,250.00 – a twenty-five percent discount – but "[t]he price w[ould] go down once [APE] g[o]t into production," with a six-month warranty "subject to the terms [in] [APE's] regular written warranty." (*Id.* at 1).  The 2004 Memorandum further stated:

> It is expected that A[lessi] will maintain a high level of customer satisfaction and retain a good reputation of the J&M logo. . . .  [APE] wish[es] to channel the sales through A[lessi] and in return, avoid the service and set up.  In addition, [APE] seek[s] a single source to collect [its] invoices.
>
> . . .

> APE . . . branch managers are depending on A[lessi] to provide a high level of service to its customers in order to maintain the already excellent reputation of the APE/J&M product. . . .  It is the duty of each APE . . . branch to provide assistance to A[lessi]. . .
>
> The spirit of this agreement is to allow A[lessi], an expert in the mounting of excavator attachments, the ability to sell Robovib while at the same time providing APE . . . a single source to manufacture and sell to.

(*Id.* at 2-3).

The 2004 Memorandum also contained an integration clause stating: "This agreement, until written in more detail and jointly signed will act as our only agreement." (*Id.* at 2).  With regard to "chang[ing]" or "void[ing]" the 2004 Memorandum, it provided that "[a]ny branch manager" of APE or "officers" of Alessi could "order a 'sit down,'" and "[v]oiding the agreement would require two-thirds of the APE . . . branch managers voting negatively." (*Id.* at 3).  "Sit down requests" would "go to Dan Collins or John White." (*Id.* at 4).  However, "Ray and Gerry ha[d] full authority to end the agreement at anytime." (*Id.* at 3).  The 2004 Memorandum's subject line read: "Robovib Prototype Sale and Distributorship." (*Id.* at 1).  The Memorandum bears Mr. White's name in typeface at the bottom. (*Id.* at 4).

Neither party disputes that between 2004 and 2016, APE described Alessi as its "distributor" or "dealer" for excavator mounted equipment and the Robovib on its website, via publications, and internally.[14] (Docket Nos. 102 ¶ 19; 105 ¶ 19; *see also* Docket Nos. 103-7 at

---

[14] None of the evidence presented by Alessi explicitly describes Alessi as APE's "exclusive" distributor or dealer, but together, these documents suggest that Alessi was APE's only distributor until 2015 or 2016. (*See, e.g.*, Docket No. 103-10) ("APE and Alessi Equipment, Inc. are revolutionizing the industry once again!!!" dated May 2004); (Docket No. 103-13) ("Alessi Equipment i[s] APE's dealer for all excavator-mounted equipment," dated May 6, 2004); (Docket No. 103-14) ("R. Alessi . . . will be the national distributor of the ROBOVIB," dated September 20, 2004); (Docket Nos. 103-11; 103-12) (as of October 12, 2007, listing "Alessi Equipment" as an "Authorized Distributor[] of APE & J&M" in addition to "J&M" and "APE Holland"); (Docket No. 103-15) ("Gerry is a distributor for APE Equipment in New York," dated June 20, 2016); (Docket No. 103-16) ("Gerry Alessi is *no longer the a [sic] dealer for APE*," dated November 16, 2017) (emphasis added); *see also infra* n.21.  APE's website also bore an Alessi graphic until this lawsuit began. (Docket No. 103-7 at 9:2-8).

9:2-8; 103-10–103-16).  There is also no dispute that in accordance with the 2004 Memorandum, APE directed all sales of the Robovib to Alessi until at least December 15, 2011.[15]  (Docket Nos. 93-8 at 246:8-247:3; 95-1 ¶ 10; 108 ¶ 10).  On that date, Mr. White sent an e-mail to Mr. Alessi and APE sales staff with the subject line "company policy on selling APE equipment-including sub rented equipment." (Docket No. 93-12; *see also* Docket Nos. 95-1 ¶ 10; 108 ¶ 10).  Among other things, the e-mail stated:

> All sales from this date forward will go directly through APE.  No sales of APE equipment in the sub fleet will be sold in any other manner except through APE. Our sales staff will receive a 2% commission on all sales which has been our policy since inception of the company in 1992.
>
> . . .
>
> Our sales staff as [sic] the full right to sell all APE and J&M products, including Robovib and any other APE product without any restrictions other than the following guidelines:
>
> 1)  If it is excavator mounted then you are encouraged to call Alessi and turn over your lead to him.  However, this is not mandatory.
>
> . . .
>
> In the above . . . cases you may not automatically turn over a lead without the prior approval of John White or Dan Collins.

(Docket No. 93-12).  Both Mr. Collins and Mr. White testified that this e-mail did not represent a new agreement, but rather, a "statement of policy." (Docket Nos. 93-8 at 214:7-215:3; 93-9 at 134:24-135:10).  Mr. Alessi did not recall seeing it when it was sent. (Docket No. 93-1 at 142:16-21).

---

[15] APE asserts that "notwithstanding the language of the 2004 Memorandum," (1) each Robovib sale was done on a "transaction-by-transaction basis;" (2) a twenty-five percent discount was "rarely, if ever," offered to Alessi; and (3) the two percent commissions were paid by APE to its salesforce, instead of being paid by Alessi. (Docket No. 105 ¶¶ 11, 15).  However, that is not inconsistent with the language of the 2004 Memorandum. (*See* Docket No. 93-10 at 1-2).

Sometime in early 2012, Mr. White notified APE that he intended to resign, sell his ownership shares and cease his employment with APE. (Docket Nos. 95-1 ¶ 12; 108 ¶ 12).  On or about April 2, 2012, Mr. White and APE entered into a stock purchase agreement that disposed of his shares, and a noncompete agreement that would preclude him from competing with APE for four years starting on June 15, 2012, the effective date of his resignation. (Docket Nos. 95-1 ¶ 13; 108 ¶ 13; *see also* Docket Nos. 93-13; 93-14).  Mr. Collins replaced Mr. White as president. (Docket Nos. 95-1 ¶ 14; 108 ¶ 14).

According to Mr. Collins, before Mr. White's departure, Mr. White asked him whether APE desired to enter into a formal agreement with Alessi before Mr. White's departure. (Docket No. 93-8 at 168:4-169:14).  Mr. Collins declined, stating that APE would "deal with Alessi just as fairly as [it] always ha[d]," entering into contracts for the delivery and sale of each individual piece of equipment ordered by Alessi without an overarching agreement governing those orders.[16, 17]  (*Id.* at 169:15-17, 171:6-21).  However, Mr. White was never told that he lacked authority to act or enter into agreements on behalf of APE in advance of his resignation. (Docket Nos. 93-8 at 167:20-168:11; 93-9 at 236:2-237:22; 103-5 at 6:22-7:16, 8:5-11:24).

On June 12, 2012 – three days before Mr. White's departure – Mr. White e-mailed Mr. Alessi a Distributor Agreement and Memorandum of Understanding (the "2012 Distributor Agreement") bearing Mr. White's signature as of May 27, 2012.[18] (Docket No. 93-15; *see also*

---

[16] From Mr. Collins' perspective, there was never a formal agreement between Alessi and APE, but rather, "policies [they] did business under . . . with varying terms that changed from time to time." (*Id.* at 170:7-15).  Indeed, "John changed his mind all the time," reversing "directives" that were in effect "at one point in time . . . quite often." (*Id.* at 171:22-172:4).

[17] Mr. White denies that the foregoing conversation with Mr. Collins took place. (Docket No. 93-9 at 125:24-126:4).

[18] At some point, Mr. Alessi signed the document using May 27, 2012 as the execution date. (Docket No. 93-16). Mr. Alessi testified that he signed another copy of the agreement on May 27, 2012 and put it in the regular mail, but may not have e-mailed a signed copy back until June 12, 2012. (Docket No. 93-1 at 161:1-163:3).

Docket Nos. 95-1 ¶ 16; 108 ¶ 16).  The 2012 Distributor Agreement provided that "[a]s of May 22, 2012 Alessi . . . is the exclusive distributor of the APE . . . Robovib and APE . . . line of excavator mounted equipment for the territory called the 'Northeast' which covers the same territory as APE Northeast." (Docket No. 93-16).  It further provided that "Alessi agrees to pay a 2% commission on any APE . . . Robovib or excavator mounted equipment sold outside its exclusive territory and in return, APE agrees to direct all Robovib and excavator rentals and sales to Alessi . . . as a first option." (*Id.*).  Moreover, Alessi was to "provide[]" "[a]ny and all service and set up," unless Alessi "pa[id] APE's service department to provide services," and APE "agree[d] to buy back any support parts at 20% below initial sale price." (*Id.*).  The "agreement" was "automatically renewable each year unless otherwise cancelled in writing," with a "two year cancellation period." (*Id.*).  It did not mention the 2004 Memorandum or purport to modify or clarify any pre-existing agreement.

According to Mr. White's affidavit, the 2012 Distributor Agreement was meant to "provide for the same fee structure as outlined in the 2004 agreement" wherein "the equipment was . . . sent to Alessi at a discount from list price and [Alessi] was to in turn sell the equipment at list price paying 2% to APE as a commission on all sales.  Similarly all sales were to be directed through Alessi." (Docket No. 93-18 at 10 ¶ 26).  He further explained in his deposition that the 2012 Distributor Agreement "modif[ied] . . . the agreement we had with Alessi" by requiring Alessi to pay APE's commissions "directly" in order to incentivize APE salespeople to turn over leads to Alessi and thus, increase sales of excavator mounted vibros outside of the Northeast. (Docket No. 93-9 at 115:4-116:11, 117:12-24, 123:1-24, 250:13-251:15).  Mr. Alessi concurred that the 2012 Distributor Agreement "reaffirmed" the 2004 Memorandum, as well as the 1996 Agreement, but required Alessi to pay APE's commissions to encourage more sales.

(Docket No. 93-1 at 99:17-24, 127:16-129:3, 138:14-22).  Although the 2012 Distributor

Agreement did not contain price or discount terms, Mr. Alessi explained that "APE always

dictated the price" and the parties' "implied understanding" based on their longstanding

relationship was that Alessi would "still . . . receive a 20 percent discount on all units and parts."

(*Id.* at 135:1-136:15).  Similarly, although it did not expressly require Alessi to purchase a

specific quantity of products, Mr. Alessi understood that his company was "expected" to "try

[its] hardest" to sell APE's equipment.[19] (*Id.* at 147:16-148:12).  Both Mr. Alessi and Mr. White

testified that they negotiated the agreement orally in response to the concern that APE

salespeople had little motivation to help Alessi make sales outside of the Northeast. (Docket Nos.

93-1 at 127:20-130:12; 93-9 at 115:4-117:24).

The parties dispute whether Mr. White discussed the 2012 Distributor Agreement or its

terms with anyone else at APE before or after his resignation. (*Compare* Docket No. 95-1 ¶ 17,

*with* Docket No. 108 ¶ 17; *see also* Docket No. 105 ¶ 20).  Mr. White testified that he discussed

the 2012 Distributor Agreement with Mr. Collins and Mr. Hughes. (Docket No. 93-9 at 124:6-

125:23).  Moreover, he "probably" "sen[t] [it] out to all the sales guys" before he left the

company. (*Id.* at 145:17-148:1).  However, there are no records before the Court confirming that

he did so.  Mr. Collins testified that nobody at APE knew about the 2012 Distributor Agreement

until December 2017, and that Mr. White's representations concerning these discussions are

"lies."[20] (*See* Docket No. 93-8 at 160:19-163:12, 279:17-23).

---

[19] However, Mr. Alessi recalled that despite the 2012 Distributor Agreement's language, he paid commissions after its execution to APE salespeople for sales in all territories, including the Northeast, because he initially "read it wrong." (*Id.* at 133:6-19, 140:19-25, 150:6-12).

[20] Mr. Collins further asserted that Mr. White "actively hid" the Distributor Agreement from him, Mr. Hughes and the APE salespeople. (Docket No. 93-8 at 279:21-24).  In August 2017, when Mr. White's noncompete agreement with APE expired, Mr. White's newly formed company, Antaeus Foundation Equipment, LLC ("Antaeus"), entered into an agreement with Alessi providing for Alessi's exclusive distribution of Antaeus excavator mounted vibratory pile driver extractors. (Docket Nos. 95-1 ¶ 21; 108 ¶ 21; *see also* Docket No. 93-5).

It is undisputed that in the five years following the execution of the 2012 Distributor Agreement, APE sold the Robovib and other equipment directly to third parties in the Northeast, which Alessi alleges violated the 2012 Distributor Agreement.[21] (*See* Docket Nos. 18 at 7 ¶¶ 45-47; 36 at 6 ¶¶ 46-47; 106 at 9, 20).  However, the parties also continued to engage in a series of transactions whereby APE rented, sold and delivered various equipment to Alessi. (Docket Nos. 95-1 ¶¶ 22-46; 108 ¶¶ 22-46).  On or about January 5, 2016, the parties entered into a rental agreement (the "Rental Agreement") for a "V20E, 20 Excavator Vibro" and "SC20, 20 Sheet Clamp," which required Alessi to remit payments of $4,500.00 per month to APE for a total value of $72,000.00. (Docket No. 93-4 at 1).  The Rental Agreement further provided that payments were due within thirty days of issuance of each invoice. (*Id.*).

Whereas APE delivered the equipment and Alessi initially complied with these payment terms, the parties' relationship devolved when Alessi failed to pay certain invoices dated October 31, November 29, and December 30, 2016, as well as January 27, 2017, leaving $13,530.20 outstanding. (Docket Nos. 95-1 ¶¶ 23-28; 108 ¶¶ 23-28).  Alessi also failed to pay APE for seventeen purchase orders it placed, and that APE filled between November 2016 and December 2017 (the "Purchase Orders").[22] (Docket Nos. 95-1 ¶ 29; 108 ¶ 29; *see also* Docket Nos. 93-2; 93-3).  Coinciding with these failures, an internal APE e-mail exchange on November 16, 2017 reflects that Steve Cress ("Mr. Cress"), APE's vice president, told Jim Casavant, an APE

---

[21] The only one of these transactions specifically referenced in the record is the sale of a Robovib and sheet clamp from APE to Moncon, Inc. in Ridgewood, New York for $163,000.00 on October 31, 2017. (Docket Nos. 18 at 7 ¶ 46; 93-18 at 4; 106 at 20).  APE concedes that it has also sold "replacement parts" directly to additional third parties in the Northeast, (Docket Nos. 18 at 7 ¶ 47; 36 at 6 ¶ 47), and Mr. Alessi testified that he confronted Mr. Collins in 2015 or 2016 when he found out that APE was selling to Sevenson Environmental, another Alessi customer, (Docket No. 93-1 at 164:21-168:2).

[22] Pursuant to the purchase order invoices, these payments were also due thirty days after receipt of the invoice. (Docket Nos. 93-2; 93-3).

employee, that "Gerry Alessi [wa]s no longer the a [sic] dealer for APE" in response to the question: "[I]s [Gerry Alessi] . . . no longer the go to guy for Robovib in the U.S.?"[23] (Docket No. 103-16; *see also* Docket No. 103-7 at 4:8-17, 7:22-24, 13:2-14:17).

On December 15, 2017, APE sent Alessi a letter requesting payment for the balance of the overdue invoices, which totaled $41,305.92. (Docket No. 93-6 at 2).  In response, Mr. Alessi requested "a full credit for the amount outstanding." (*Id.* at 3).  On December 20, 2017, Mr. Alessi separately e-mailed Mr. Collins a copy of the 2012 Distributor Agreement – which Mr. Collins asserts was the first time he saw it. (Docket Nos. 93-7; 93-8 at 160:19-163:12; *see also* Docket Nos. 95-1 ¶ 47; 108 ¶ 47).  According to APE, the total amount due under the Rental Agreement and Purchase Orders is $52,505.92. (Docket No. 36 at 18-22 ¶¶ 47, 53, 67; *see also* Docket No. 95-1 ¶¶ 24-47).  Alessi does not dispute the accuracy of this amount or that it has failed to pay. (Docket No. 108 ¶¶ 24-47).  In his deposition, Mr. Alessi testified that the invoices have not been paid because APE owes Alessi "more money" than the amounts set forth therein. (Docket No. 93-1 at 206:9-213:14).

On February 18, 2021, APE sent Alessi a letter stating that the 2012 Distributor Agreement was "[n]ever valid and enforceable" as a contract, but that it "[wa]s hereby cancelled" "to the extent it may" be deemed as such by this Court. (*See* Docket No. 103-17).  On February 22, 2021, in response, Alessi sent a letter "acknowledg[ing] receipt" of the "February 18, 2021 'cancellation' letter." (*See* Docket No. 103-18).  However, Alessi noted that "pursuant to the May 27, 2012 agreement any cancellation will not be effective for two years from the letter—February 18, 2023." (*Id.*).

---

[23] Mr. Cress further stated: "If you want to sell a Robovibe, sell it!" (Docket No. 103-16).

## II. DISCUSSION

### A. Legal Standards

### 1. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)) (internal quotations omitted).

In considering a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotations omitted).  However, the nonmovant cannot defeat a motion for summary judgment by relying on unsupported assertions, conjecture or surmise. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The nonmovant must also do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotations omitted).  To survive a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-

finder could decide in its favor." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)).

Federal Rule of Civil Procedure 56 permits a court to grant partial summary judgment on the relief requested and "enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case." *See* Fed. R. Civ. P. 56(d), (g).  "[P]artial summary judgment is . . . a pretrial adjudication that certain issues shall be deemed established for trial of the case" which "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." Fed. R. Civ. P. 56(d) advisory committee's note to 1946 amendment.  The rule permits a court to grant partial summary judgment with respect to liability on a breach of contract claim, but deny summary judgment regarding damages, "thereby establishing liability ahead of trial without granting a final judgment from which appeal can be taken." *Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 705 (S.D.N.Y. 2016); *see, e.g.*, *AT & T Corp. v. Publ'g Concepts L.P.*, No. 08 Civ. 7658(DC), 2010 WL 1191380, at *5 (S.D.N.Y. Mar. 29, 2010); *Int'l Knitwear Co. v. M/V ZIM CANADA*, No. 92 CIV. 7508 (PKL), 1994 WL 924203, at *6 (S.D.N.Y. Oct. 6, 1994).

## 2.  Contractual Construction

"Under New York law,[24] whether a binding agreement exists is" generally a legal question for the court to decide. *See Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008).

---

[24] In a case proceeding under diversity jurisdiction, a federal court applies the choice of law rules of the forum state. *See GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 382 (2d Cir. 2006).  Where, as here, there is no choice of law clause in the alleged contract but "the parties' briefs assume New York law controls, this constitutes their implied consent to the application of New York law and is 'sufficient to establish choice of [that] law'" for analysis of the contractual claims. *See Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 347 (S.D.N.Y. 2013) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).  Accordingly, the Court applies New York law to the issues of contractual interpretation and the alleged agreements' validity, as well as Mr. White's authority to bind APE. *See id.* at 347–48, 350 (citing *IRB–Brazil Resseguros, S.A. v. Inepar Investments, S.A.*, 922 N.Y.S.2d 308, 311 (1st Dep't 2011)).

Where the parties' intention to form a contract is discernible by written agreements alone, "the question is one of law, appropriately decided . . . on a motion for summary judgment." *Mallad Constr. Corp. v. County Fed. Sav. & Loan Ass'n*, 344 N.Y.S.2d 925, 930 (1973).  A factual question arises when the parties' intent cannot be conclusively determined as a matter of law from the terms of the agreement itself. *See id.* ("Only where the intent must be determined by disputed evidence or inferences outside the written words of the instrument is a question of fact presented."); *see also Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) (noting that a "factual question arises when intent cannot be determined from [the relevant] agreement") (citing *Enercomp, Inc. v. McCorhill Publishing, Inc.*, 873 F.2d 536, 546 (2d Cir. 1989)).  To answer that question, the factfinder considers "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *See Brown Bros. Elec. Contractors v. Beam Const. Corp.*, 393 N.Y.S.2d 350, 352 (1977).

Once a contract's existence is established, its "'initial interpretation . . . is [also] a matter of law for the court to decide.' Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (quoting *K. Bell & Assoc., Inc. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996)).  A court may properly decide both of these questions on summary judgment. *See New Paradigm Software Corp. v. New Era of Networks, Inc.*, No. 99 Civ. 12409(RMB)(AJP), 2002 WL 31749396, at *5 (S.D.N.Y. Dec. 9, 2002) (citing *Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 85 (2d Cir. 2002)).  When the terms of an agreement are not ambiguous, the court does not look beyond its "four corners" to determine its intent and parol evidence is inadmissible. *See id.*; s*ee also Weissman v. Sinorm Deli, Inc.*, 646 N.Y.S.2d 308, 313 (1996).  "Contract language is not

ambiguous if it has a 'definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (quoting *Breed v. Ins. Co. of N. Am.*, 413 N.Y.S.2d 352, 355 (1978)).  On the other hand, "[a] contract is ambiguous if it is reasonably susceptible to more than one meaning." *S. New Jersey Rail Grp., LLC v. Lumbermens Mut. Cas. Co.*, No. 06 Civ. 4946(LAK)(AJP), 2007 WL 2296506, at *8 (S.D.N.Y. Aug. 13, 2007).

The mere fact that litigants advance different interpretations of a contract does not render the contract ambiguous if its language is clear. *See id.* at *9; *see also Bethlehem Steel Co. v. Turner Constr. Co.*, 161 N.Y.S.2d 90, 93 (1957).  However, in the event that ambiguity exists and its "resolution . . . hinges on such extrinsic matters as the credibility of witnesses or documents or upon choosing one among several reasonable inferences that may be drawn from such extrinsic evidence, a jury, and not a court, should [generally] decide what meaning is to be ascribed to the contract." *See S. New Jersey Rail Grp.*, 2007 WL 2296506, at *9 (quoting *Chase Manhattan Bank, N.A. v. Keystone Distrib., Inc.*, 873 F. Supp. 808, 811 (S.D.N.Y. 1994)) (internal quotations omitted).  However, the court is tasked with "determin[ing] the value or existence of extrinsic evidence produced by the parties." *See id.*  "Where a reasonable jury could find that the extrinsic evidence supported the non-movant's interpretation of the contract, summary judgment must be denied." *Ross Univ. Sch. of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410 (KAM), 2012 WL 6091570, at *11 (E.D.N.Y. Dec. 7, 2012), *report and recommendation adopted in part*, 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013).  While the interpretation of an ambiguous contract is generally a question of fact, a court may resolve ambiguous contractual language as a matter of law (1) "if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary;"

or (2) "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 158 (2d Cir. 2000) (quoting *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999) (internal quotations omitted).

## B.  The Parties' Motions for Summary Judgment

APE moves for summary judgment seeking (1) relief on APE's counterclaims for breach of contract under the Rental Agreement and the Purchase Orders as well as account stated and unjust enrichment;[25] and (2) dismissal of Alessi's breach of contract as well as unjust enrichment claims under the 1996 Agreement, 2004 Memorandum and 2012 Distributor Agreement. (Docket Nos. 92; 95-1 at 1; *see also* Docket Nos. 18 at 8-10 ¶¶ 57-64, 84-87; 36 at 17-22 ¶¶ 36-67). Alessi cross-moves for summary judgment seeking dismissal of APE's breach of contract, account stated, and unjust enrichment counterclaims, and granting Alessi's breach of contract and unjust enrichment claims. (*See* Docket No. 100).

With respect to APE's counterclaims, APE argues that it is entitled to judgment as a matter of law for the amounts due under the Rental Agreement and Purchase Orders because those writings constitute separate contracts that bound Alessi. (Docket No. 95 at 11).  APE further argues that Alessi cannot withhold these monies to "offset" any amounts due under the 2012 Distributor Agreement, and that Alessi is not entitled to judgment as a matter of law on its claim for breach of this agreement, because (1) it lacks essential terms, mutuality of obligations and consideration; and (2) there are material issues of fact regarding whether Mr. White was

---

[25] Although APE's papers are devoid of any substantive discussion of its account stated counterclaims, at oral argument, APE confirmed that it is pursuing summary judgment on this basis and cited relevant caselaw.

authorized to execute it on behalf of APE.  (Docket Nos. 95 at 11-22; 104 at 8-10, 12-15; 110 at 6-13).

In response, Alessi maintains that it is permitted to withhold the amounts due under the Rental Agreement and Purchase Orders under Section 2-717 of New York's Uniform Commercial Code (the "U.C.C."). (Docket No. 106 at 10-14).  Alessi also argues that the 2012 Distributor Agreement is enforceable, entitling Alessi to judgment as a matter of law on its breach of contract claim, because (1) Mr. White had full authority to enter into the 2012 Distributor Agreement on behalf of APE; and (2) it constitutes a more formalized version of the 2004 Memorandum, which bound both parties. (Docket Nos. 106 at 14-20; 101 at 8, 13-19; 109 at 3-10; *see also* Docket No. 18 at 8-10 ¶¶ 57-64).

APE contends that to the extent the 2004 Memorandum was an enforceable contract,[26] Alessi cannot rely on it to supply the missing elements of the 2012 Distributor Agreement because (1) it was "revoked" or "cancelled" by Mr. White's December 11, 2011 e-mail; and (2) the 2012 Distributor Agreement does not incorporate it by reference. (Docket Nos. 104 at 6-7, 9-11, 15-19; 105 ¶ 17; 110 at 11-12).  Moreover, any claim under the 2004 Memorandum or 1996 Agreement[27] must be dismissed as barred by the statute of limitations. (Docket No. 104 at 11 n.1).  The Court addresses each of these arguments in turn.  Because the parties' arguments hinge on whether the 2012 Distributor Agreement, 2004 Memorandum and/or 1996 Agreement are enforceable, the Court addresses Alessi's breach of contract claim first.

---

[26] During oral argument, APE conceded that the 2004 Memorandum constituted a binding contract at least until Mr. White's December 11, 2011 e-mail.

[27] Although APE did not advance a statute of limitations argument with respect to the 1996 Agreement in its papers, it did so during oral argument in response to questions from the Court. (*See* Docket No. 112).

**1.  The Parties' Cross-Motions on Alessi's Breach of Contract Claim**

Alessi moves for summary judgment on its claims for breach of contract under the 2012 Distributor Agreement, 2004 Memorandum and 1996 Agreement, arguing that they constitute enforceable contracts that barred APE from selling its excavator mounted equipment to third parties in the Northeast. (*See* Docket Nos. 100; 101 at 13-19; 106 at 14-20; *see also* Docket No. 18 at 8-10 ¶¶ 57-64).  The Court begins with an analysis of the 2012 Distributor Agreement. APE argues that there are material issues of fact regarding whether the 2012 Distributor Agreement is enforceable because (1) Mr. White was not authorized to execute it on behalf of APE; and (2) it lacks essential terms as well as mutual obligations and consideration. (Docket No. 104 at 8-15).  Alternatively, APE argues that the 2012 Distributor Agreement is unenforceable as a matter of law. (Docket No. 95 at 22).

**i.  Mr. White's Authority to Bind APE**

APE's first contention regarding Mr. White's authority is insufficient to create a genuine issue of material fact on Alessi's breach of contract claim.  To recover on a claim for breach of contract under New York law, "a plaintiff must prove '(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.'" *Terwilliger v. Terwilliger*, 206 F.3d 240, 246–47 (2d Cir. 2000) (quoting *First Investors Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir. 1998)).  For a contract to be enforceable, there must be "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kasowitz, Benson, Torres & Friedman, LLP v. Reade*, 950 N.Y.S.2d 8, 9 (1st Dep't 2012), *aff'd*, 20 N.Y.3d 1082, 987 N.E.2d 631 (2013) (quoting *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121 (1st Dep't 2009)).  "[B]y entering into contracts, an authorized agent can bind its principal." *Eastman Kodak*, 936 F. Supp. 2d at 348 (citing *Haydock v. Stow*, 40 N.Y. 363, 368 (1869); *Worrall v. Munn*, 5 N.Y. 229, 238 (1851)).  Indeed, corporations "of necessity" enter into contracts

-20-

"through the acts and representations of an agent." *See id.* (quoting *Kirschner v. KPMG LLP*, 912 N.Y.S.2d 508 (2010)) (internal quotations omitted).

Also under New York law, the president of a corporation has the actual authority to "make such ordinary contracts as custom and the necessities of business would justify or require," unless such authority is limited by contrary provisions in the corporation's by-laws or charter or an action by the company depriving him of that authority. *See Equity Grp., Inc. v. RCM Techs., Inc.*, No. 84 Civ 2759 (JFK), 1986 WL 12513, at *3 (S.D.N.Y. Oct. 31, 1986). "Where the president of a corporation makes a contract in the ordinary business of the corporation, the law presumes that he had the authority to do so and the burden of proving otherwise is on the party seeking to disavow the contract." *Id.*

Here, APE argues that Mr. White lacked authority to bind APE via the 2012 Distributor Agreement "because he plainly did so against APE's best interests" and was instructed not to do so by Mr. Collins, who shortly replaced him as president. (*See* Docket No. 104 at 8-9). However, there is no dispute that Mr. White remained the president of APE until June 15, 2012. (Docket Nos. 95-1 ¶ 3; 108 ¶ 3).  In addition, there is no evidence that APE took any actions to limit his authority to enter contracts in advance of his resignation, or that the 2012 Distributor Agreement was a transaction outside of APE's ordinary course of business. (*See* Docket Nos. 93-8 at 167:20-168:11; 93-9 at 236:2-237:22; 103-5 at 6:22-7:16, 8:5-11:24).  Moreover, even assuming that Mr. Collins told Mr. White not to enter into the 2012 Distributor Agreement, Mr. White's authority was not contingent on consent from Mr. Collins or anyone else at APE, nor a corporate resolution. (*See* Docket Nos. 93-8 at 167:20-168:11; 93-9 at 236:2-237:22; 103-5 at

6:22-7:16, 8:5-11:24).  Mr. White therefore had actual authority to enter into the 2012

Distributor Agreement on behalf of APE.[28] *See Equity Grp.*, 1986 WL 12513, at *3.

The Court is also unaware of any legal authority for APE's argument that Mr. White's

alleged failure to act in APE's "best interests" or advise APE of this action after the fact absolves

APE from being bound. (*See* Docket No. 104 at 8-9).  Mr. Alessi testified that Alessi and APE in

fact "entered [into] an agreement in May 2012" and APE has not introduced any evidence to

dispute that this belief was unreasonable. (Docket No. 93-1 at 116:1-9); *see also Highland*

*Capital Mgmt.*, 607 F.3d at 328; *Eastman Kodak*, 936 F. Supp. 2d at 349.  The Distributor

Agreement itself bears Mr. White's signature followed by his title: "President" of "APE."

(Docket No. 93-16).  Mr. Alessi also testified that pursuant to the 2012 Distributor Agreement,

Alessi paid a two percent commission on all APE Robovibs or excavator mounted vibros that it

sold outside of the Northeast, which APE does not dispute. (Docket No. 93-1 at 152:6-9).  "Even

where an officer acts to the detriment of corporate interests, the law imposes no duty on a third

party who deals with the corporation to inquire into its employee's actual authority." *Goldston v.*

*Bandwidth Tech. Corp.*, 859 N.Y.S.2d 651, 655 (1st Dep't 2008) (noting that "risk of loss from

an unauthorized act of a dishonest employee falls on the corporation which appointed him to act

on its behalf and not on the party who relies on his apparent authority") (quoting *Geotel, Inc. v.*

*Wallace*, 556 N.Y.S.2d 577, 578 (1st Dep't 1990)) (internal quotations omitted).  Thus, Alessi

was entitled to rely on Mr. White's authority as President of APE to enter into the 2012

Distributor Agreement, and APE was bound by Mr. White's execution of the 2012 Distributor

---

[28] Even if Mr. White did not have such actual authority, an agent "may otherwise bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists." *Highland Capital Mgmt. v. Schneider*, 607 F.3d 322, 328 (2d Cir. 2010).  Here, as President of APE, Mr. White may be "presumed" to have had apparent authority to make a contract in the ordinary course of business. *See Equity Grp.*, 1986 WL 12513, at *3; *see also Atai v. Dogwood Realty of N.Y., Inc.*, 807 N.Y.S.2d 615, 618–19 (2d Dep't 2005).

Agreement. *See Eastman Kodak*, 936 F. Supp. 2d at 349.  Consequently, APE has not raised a material issue of fact with respect to Mr. White's authority requiring denial of summary judgment on Alessi's breach of contract claim under the 2012 Distributor Agreement.

### ii.  The 2012 Distributor Agreement

APE further argues that the 2012 Distributor Agreement is unenforceable as a matter of law because it lacks mutual obligations, consideration and essential terms. (*See* Docket Nos. 95 at 15-21; 104 at 12-14; 110 at 10-12).  In addition, according to APE, the U.C.C. cannot supply any of these missing elements because the 2012 Distributor Agreement is not a contract for the sale of goods. (Docket No. 95 at 17-18).  In its papers, Alessi responds that the 2012 Distributor Agreement constitutes the final version of the 2004 Memorandum, which was a binding "preliminary agreement" that outlined the essential terms of the parties' relationship and provided the requisite consideration and mutual obligations to bind the parties. (Docket Nos. 101 at 8-11, 16-19; 106 at 14-20; 109 at 8-10).  At oral argument, Alessi alternatively argued that under the U.C.C., the 2012 Distributor Agreement is also enforceable without reference to the 2004 Memorandum based on its explicit language as well as the parties' conduct.

Central to the parties' arguments is whether the 2012 Distributor Agreement constitutes a valid contract or is void for indefiniteness, lack of consideration or mutuality.  This inquiry turns on whether or not their alleged contractual relationship was one for the sale of goods governed by the U.C.C.  In addition to consideration, a valid contract requires "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't. of Transp.*, 693 N.Y.S.2d 857, 860 (1999)) (internal quotations omitted).  Generally, "a mere agreement to agree, in which

a material term is left for future negotiations, is unenforceable." *Joseph Martin, Jr.,*

*Delicatessen, Inc. v. Schumacher*, 436 N.Y.S.2d 247, 248 (1981).

However, "it is not required that every one of [a contract's] terms be fixed with complete

certainty for [it] to have legal efficacy." *AFP Imaging Corp. v. Philips Medizin Systeme*

*Unternehmensbereich Der Philips GmbH*, No. 92 CIV. 6211 (LMM), 1994 WL 652510, at *5

(S.D.N.Y. Nov. 17, 1994), *aff'd sub nom. AFP Imaging Corp. v. Phiips Medizin Systeme*

*Unternehmen sbereich Der Philips, GmbH*, 122 F.3d 1055 (2d Cir. 1995); *see also Tractebel*

*Energy Mktg., Inc.*, 487 F.3d at 95.  Indeed, where the parties intended to form a contract and the

contract is for the sale of goods, "[t]he U.C.C. is particularly forgiving of indefinite terms." *See*

*AFP Imaging Corp.*, 1994 WL 652510, at *5; *see also* N.Y. U.C.C. § 2-204; *Kleinschmidt Div.*

*of SCM Corp. v. Futuronics Corp.*, 395 N.Y.S.2d 151, 152 (1977) ("Under the Uniform

Commercial Code, if the parties have intended to contract, and if an appropriate remedy may be

fashioned, a contract for sale does not fail for indefiniteness if terms, even important terms, are

left open.").  Under the U.C.C.'s rationale, "[t]he fact that one or more terms are left open is not

fatal, because 'a contract for sale does not fail for indefiniteness if the parties have intended to

make a contract and there is a reasonably certain basis for giving an appropriate remedy.'"

*Fakhoury Enterprises, Inc. v. J.T. Distributors*, No. 94 Civ. 2729 (PKL), 1997 WL 291961, at *3

(S.D.N.Y. June 2, 1997) (quoting N.Y. U.C.C. § 2–204(3)); *cf. Enercomp, Inc. v. McCorhill*

*Pub., Inc.*, 873 F.2d 536, 546 (2d Cir. 1989) ("Many a gap in terms can be filled, and should be

[filled], where it is clear that the parties intended to form a contract and to bind themselves to

render a future performance.") (quoting *Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447,

453 (2d Cir. 1977)) (internal quotations omitted).

At oral argument, APE emphatically disputed that the U.C.C. applies to this case, and that its gap filling provisions can cure the 2012 Distributor Agreement's alleged deficiencies. Therefore, the Court must first determine whether or not the U.C.C. governs the 2012 Distributor Agreement.

**(a) Applicability of the U.C.C.**

Unless otherwise indicated, New York's U.C.C. applies to contracts for the "present or future sale of goods." *See* N.Y. U.C.C. § 2-106(1). "Goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action." N.Y. U.C.C. Law § 2-105(1). An alleged agreement is subject to the U.C.C. if it is "predominantly for the sale of goods." *See E. Mishan & Sons, Inc. v. Homeland Housewares, LLC*, No. 10 Civ. 4931(DAB), 2012 WL 2952901, at *4 (S.D.N.Y. July 16, 2012). To determine whether that is the case for an alleged "mixed" contract providing for both services and goods, courts look to whether the alleged contract's "primary purpose" is to provide for the sale of such goods, *see St. Anne-Nackawic Pulp Co. v. Rsch.-Cottrell, Inc.*, 788 F. Supp. 729, 734 (S.D.N.Y. 1992), or alternatively, whether "'service predominates,' and the sale of [such] items is 'incidental.'" *See Mega Tech Int'l Corp. v. Miller Elec. Mfg. Co.* [hereinafter "*Mega Tech II*"], 97 Civ. 1085 (DLC), 1998 WL 264856, at *2 (S.D.N.Y. May 26, 1998) (quoting *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742 (2d Cir. 1979)). Key factors in making this distinction include "whether the subject of the agreement is declared to be goods and whether the defendant's compensation is based on the price of the goods sold or the provision of related services." *See id.* (citing *Triangle Underwriters*, 604 F.2d at 742; *St. Anne-Nackawic Pulp Co.*, 788 F. Supp. at 734). "This inquiry depends heavily on the facts and terms peculiar to that contract." *Those Certain Interested Underwriters, at Lloyd's, London,*

-25-

*subscribing to Pol'y No. Z101663/003 v. Farley Grp.*, Nos. 1:12–CV–0707 (GTS/FRT), 1:13–CV–385 (GTS/FRT), 2015 WL 5602924, at *41 (N.D.N.Y. Sept. 23, 2015) (quoting *Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F. Supp. 658, 667 (S.D.N.Y. 1996)) (internal quotations omitted).

Under this standard, numerous courts within this Circuit have determined that "exclusive dealership or distributorship arrangements" involving the sale of complex equipment in specific geographic territories – like that alleged here – are "predominantly for the sale of goods" and thus, subject to the U.C.C. *See Mega Tech II*, 1998 WL 264856, at *2 (collecting cases); *see, e.g.*, *Multi-Juice, S.A. v. Snapple Beverage Corp.*, No. 02 Civ. 4635(RPP), 2006 WL 1519981, at *4, *10 (S.D.N.Y. June 1, 2006) (applying U.C.C. to alleged exclusive distribution agreement involving "shipment of Snapple products from Snapple to Multi-Juice" in Greece); *Old Country Toyota Corp. v. Toyota Motor Distributors, Inc.*, 966 F. Supp. 167, 167–70 (E.D.N.Y. 1997) (finding that U.C.C. governed car dealership agreement because its purpose was "to provide for and regulate the ongoing sale of cars to Old Country"); *Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1060 (S.D.N.Y. 1996), *aff'd*, 108 F.3d 1369 (2d Cir. 1997) (holding that "overall contract as alleged was predominantly for the sale and delivery of goods" where alleged contract involved distribution of aircraft within particular states); *Panda Cap. Corp. v. Kopo Int'l, Inc.*, 662 N.Y.S.2d 584, 585–86 (2d 1997) (analyzing under U.C.C. the parties' agreement designating plaintiff as "the sole representative" of defendant "in North America" and requiring plaintiff to order specific amounts of product from defendant per year).[29]

---

[29] Of course, whether an alleged distributorship agreement is governed by the U.C.C. is not a foregone conclusion, as such an agreement, "which may include exclusivity, best efforts and non-competition provisions, may encompass much more than the mere sale of goods." *See Surgimex, Inc. v. Procter & Gamble Distrib. Co.*, No. CV-82-2503, 1987 WL 12559, at *3 n.3 (E.D.N.Y. June 5, 1987).  However, the majority of cases of which this Court is aware wherein the U.C.C. was held inapplicable rely on specific precedent from the Court of Appeals employing the General Obligations Law to analyze alleged oral distributorship agreements in light of the statute of frauds. *See id.*; *see, e.g.*, *Clarence Beverage, Inc. v. BRL Hardy (USA), Inc.*, No. 99-CV-0256E(M), 2000 WL 210205, at *2

In *Mega Tech International, Inc. v. Miller Electric Manufacturing Company*, for example, the parties disputed whether the defendant's letter to the plaintiffs established "an exclusive dealing contract" designating the plaintiffs as defendant's "sole exclusive agent[s]" for the purpose of selling its products to specific purchasers. *See Mega Tech II*, 1998 WL 264856, at *2; *see also Mega Tech Int'l Corp. v. Miller Elec. Mfg. Co.* [hereinafter "*Mega Tech I*"], 97 Civ. 1085 (DLC), 1997 WL 790750, at *1 (S.D.N.Y. Dec. 23, 1997). The court found that the U.C.C. governed the alleged contract's formation in light of this robust precedent and the repeated references to "sales terminology" in the parties' correspondence. *See Mega Tech II*, 1998 WL 264856, at *2. Moreover, the plaintiffs' compensation derived from the sale price of the products "paid directly . . . by the purchasing end-users" rather than any commissions or fees paid by the defendants. *See id.* (citing *St. Anne-Nackawic Pulp Co.*, 788 F. Supp. at 733–34). The court found that these circumstances demonstrated as a matter of law that service was "only incidental" to the alleged agreement, such that "the UCC provisions related to contract formation" governed. *See id.* at *3.

Similarly here, the 2012 Distributor Agreement's terms indicate that its primary purpose was to effectuate the sale of goods from APE to Alessi. *See St. Anne-Nackawic Pulp Co.*, 788 F. Supp. at 734. As in *Mega Tech II*, the alleged agreement expressly references "sales" and "rentals" of APE's Robovib and excavator mounted equipment as the dominant transactions both in and outside of Alessi's "exclusive territory." (*See* Docket No. 93-16); *see also Mega Tech II*, 1998 WL 264856, at *2. The "service" for which Alessi is responsible is relegated to the last of the parties' obligations, and is not necessarily mandatory: "*Any* and all service and set up will be provided by Alessi . . . or Alessi . . . can pay APE's service department to provide services." (*See*

---

(W.D.N.Y. Feb. 8, 2000); *North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 292 N.Y.S.2d 86 (1968). Therefore, these cases are distinguishable.

Docket No. 93-16) (emphasis added).  Moreover, absent any language indicating otherwise, the

only basis for Alessi's compensation is payment by end-users, and APE's compensation is based

on commissions not for services, but for "s[ales] outside [Alessi's] exclusive territory." (*See id.*);

*see also Mega Tech II*, 1998 WL 264856, at *2; *St. Anne-Nackawic Pulp Co.*, 788 F. Supp. at

734.  In addition, courts have recognized that "[a] sale of equipment is not removed from Article

2 merely because the equipment was specifically designed and manufactured before delivery" or

involves installation services, a common feature of sophisticated machinery and manufacture-

distributor relationships involving "middlemen" like Alessi. *See Crown Castle USA Inc. v. Fred

A. Nudd Corp.*, No. 05-CV-6163T, 2008 WL 163685, at *5 (W.D.N.Y. Jan. 16, 2008), *modified

on other grounds on reconsideration*, 2008 WL 3841298 (W.D.N.Y. Aug. 13, 2008); *see also

Those Certain Interested Underwriters*, 2015 WL 5602924, at *43–44; *Songbird Jet Ltd., Inc. v.

Amax, Inc.*, 581 F. Supp. 912, 924 & n.37 (S.D.N.Y. 1984).

      Relying on *Fakhoury Enterprises, Inc. v. J.T. Distributors*, No. 94 Civ. 2729 (PKL), 1997

WL 291961 (S.D.N.Y. June 2, 1997), APE contends that the U.C.C. does not apply because the

2012 Distributor Agreement does not contain the essential terms of a contract for the sale of

goods or require Alessi to buy anything. (Docket No. 95 at 17-18).  APE erroneously argues that

*Fakhoury* stands for the proposition that "[a] contract for the sale of goods must be between a

buyer and a seller and must contain the essential terms 'quantity, price, and time and manner of

delivery.'" (*Id.* at 18) (quoting *Fakhoury*, 1997 WL 291961, at *4).  Although the New York

Court of Appeals has explained that an alleged contract may fail for indefiniteness "when a

dispute over material terms manifests a lack of intention to contract," that reasoning is entirely

separate from inquiring, in the first instance, whether the alleged contract must be construed

under the U.C.C. *See Kleinschmidt Div. of SCM Corp.*, 395 N.Y.S.2d at 152.  As the *Fakhoury*

court expressly recognized, under the U.C.C., "[t]he fact that one or more terms are left open is not fatal," *see* 1997 WL 291961, at *3, because the U.C.C.'s gap filling provisions may supply the missing terms. *See* N.Y. U.C.C. § 2-204(3), cmt. 3.  Therefore, APE's argument that the UCC does not apply is misplaced.

Furthermore, APE's theory that the 2012 Distributor Agreement is not a contract for the sale of goods simply because it does not require Alessi to purchase anything, oversimplifies *Fakhoury*'s holding. (Docket No. 94 at 18).  As the *Fakhoury* court explained, an otherwise valid contract for the sale of goods that lacks an express purchase obligation does *not* necessarily fail for indefiniteness. *See* 1997 WL 291961, at *3.  This is because, under U.C.C. § 2-306(2), where the alleged contract contains an exclusivity term, such exclusivity "implie[s]" "an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." *Id.* (quoting N.Y. U.C.C. § 2-306(2)) (internal quotations omitted); *cf. Advanced Water Techs., Inc. v. Amiad U.S.A., Inc.*, 457 F. Supp. 3d 313, 321–22 (S.D.N.Y. 2020).  In *Fakhoury*, the court found that there was no binding contract under the U.C.C. or common law not because the writing lacked a purchase obligation, but rather, because the evidence as a whole "manifest[ed] a lack of intent to form a contract for sale." *See* 1997 WL 291961, at *4.  Such evidence included the alleged contract's "ambiguous" price term – which was "contingent upon" the place of delivery being New York, a term which itself was noncommittal – as well as the absence of any other material terms. *See id.* at *1, *4. Moreover, evidence showed that the notice provision "was left blank" because the plaintiff had not yet decided "what quantity he would buy and whether he would pick up the items in New York," calling into doubt whether the parties had agreed on any of these terms, and thus, whether the plaintiff intended to buy anything under the alleged agreement. *See id.* at *1, *3–4.  APE's argument misses these nuances, and therefore, is

unpersuasive.  In addition, *Fakhoury* does not provide a basis for finding the U.C.C. inapplicable

here because the record is devoid of any similar facts calling into question the parties' intent to

purchase or sell APE's equipment. *See id.* at *3; *see also Kleinschmidt Div. of SCM Corp.*, 395

N.Y.S.2d at 152.

Therefore, the U.C.C. governs whether the 2012 Distributor Agreement is enforceable.

**(b) Enforceability of the 2012 Distributor Agreement**

The Court next considers APE's arguments that the 2012 Distributor Agreement is

invalid.

**(i)  Open Terms**

APE first argues that the 2012 Distributor Agreement is unenforceable because it is

devoid of the essential terms in a contract for the sale of goods. (Docket No. 94 at 18).  A valid

contract requires "a manifestation of mutual assent sufficiently definite to assure that the parties

are truly in agreement with respect to all material terms." *Express Indus. & Terminal Corp.*, 693

N.Y.S.2d at 860.  "In a contract for a sale of goods, the essential terms are quantity, price, and

time and manner of delivery." *Fakhoury*, 1997 WL 291961, at *3 (quoting *Judal Indus. v.

Welsbach Elec. Corp.*, 526 N.Y.S.2d 154, 156 (1988)) (internal quotations omitted).  However,

in the absence of a specified time, price and manner of delivery in a contract for the sale of

goods, the U.C.C.'s "gap filling" provisions supply "a reasonable time" for shipment or delivery;

"a reasonable price at the time of delivery;" and "the seller's place of business . . . [,] [the

seller's] residence" or any other location of the goods known by the parties. *See* N.Y. U.C.C.

Law §§ 2-305(1); 2-308; 2-309(1).  In addition, "[a] lawful agreement . . . for exclusive dealing

in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use

best efforts to supply the goods and by the buyer to use best efforts to promote their sale." *See*

N.Y. U.C.C. Law § 2-306 & cmt. 5.  Thus, the absence of a quantity term in an alleged exclusive

distributorship contract such as the one here does not make an otherwise valid contract invalid. *See Mega Tech I*, 1997 WL 790950, at *3 (holding that alleged contract with exclusive distribution term was not unenforceable under U.C.C. § 2-306(2) simply because it did not include a quantity term); *cf. Chartwell Therapeutics Licensing LLC v. Citron Pharma LLC*, 16 CV 3181 (MKB) (CLP), 2019 WL 12518722, at *5 (E.D.N.Y. Sept. 4, 2019) ("New York law recognizes a[n] 'exclusive dealing' exception to the quantity rule.").

The U.C.C.'s formation provisions reiterate that an alleged contract is not necessarily void for indefiniteness even where terms are left open.  Under Section 2-204, "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." N.Y. U.C.C. § 2-204(1); *see also* N.Y. U.C.C. § 2-207(3).  Moreover, "[e]ven though one or more terms are left open a contact for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." N.Y. U.C.C. § 2-204(3). Comment 3 to this section explains that "[i]f the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, *despite missing terms*, if there is any reasonably certain basis for granting a remedy. . . . Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat adequate agreement," as the U.C.C. "mak[es] provision elsewhere for missing terms needed for performance, open price, remedies and the like." *See id.*, cmt. 3 (noting that "commercial standards on the point of 'indefiniteness' are intended to be applied") (emphasis added).  Whereas "[t]he more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, . . . their actions may frequently be conclusive on the matter despite the omissions." *See id.*

A key corollary to this rule – which was central to *Fakhoury* – is that "[w]hen a dispute over material terms manifests a lack of intention to contract, no enforceable contract results." *See Kleinschmidt Div. of SCM Corp.*, 41 N.Y.2d at 973 (citing N.Y. U.C.C. § 2-204); *see also Fakhoury*, 1997 WL 291961, at *3; *supra* Section II.B.1.ii(a).  Thus, when presented with an alleged contract for the sale of goods containing open terms, courts ask whether the parties intended to be bound despite these gaps. *See, e.g.*, *Dayton Superior Corp. v. Marjam Supply Co.*, No. 07 CV 5215(DRH)(WDW), 2011 WL 990300, at *7–8 (E.D.N.Y. Feb. 22, 2011); *Wellington Farms of Massachusetts, Inc. v. Cap. Area Food Bank*, 66 N.Y.S.3d 501, 503 (2d Dep't 2017); *cf. Luis Hirsch y Cia. Sociedad Anonima v. Rosenblatt Casing Co.*, 418 F.2d 1300, 1301 & n.2 (2d Cir. 1969).

Here, the 2012 Distributor Agreement does not include quantity, price, time or delivery terms. (Docket No. 93-16).  Contrary to APE's contentions, however, that does not automatically render the 2012 Distributor Agreement unenforceable because U.C.C. § 2-306(2) addresses the missing quantity and the U.C.C's gap filling provisions provide the other terms. *See* N.Y. U.C.C. §§ 2-305(1); 2-306(2); 2-308; 2-309(1).  Before finding the agreement valid, however, pursuant to U.C.C. § 2-204(3), the Court must determine whether APE and Alessi intended to make a contract despite leaving these terms open, and whether any dispute over any of the terms undermines such an intent to be bound.[30] *See Dayton*, 2011 WL 990300, at *7–8; *see also Fakhoury*, 1997 WL 291961, at *3; *Kleinschmidt Div. of SCM Corp.*, 41 N.Y.2d at 973.

---

[30] Alessi primarily argues that the 2012 Distributor Agreement is enforceable because any missing contractual elements or essential terms are in the 2004 Memorandum.  Alessi contends that these two agreements should be evaluated together because the 2004 Memorandum constituted a binding "preliminary agreement" setting forth the terms of the parties' distributorship, which was formalized by the 2012 Distributor Agreement. (*E.g.*, Docket No. 106 at 16-20).  This theory is grounded in caselaw that held that a preliminary agreement containing all essential terms that provided that it would later be expressed in a more formal manner is enforceable as to those essential terms. *See, e.g.*, *Arcadian Phosphates*, 884 F.2d at 69; *Teachers Ins. & Annuity Ass'n of Am. v. Trib. Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987).

When determining whether the parties intended to be bound, "[i]t is the responsibility of the Court to interpret written instruments, while other evidence about intent, 'from which differing inferences can be drawn,' . . . is left for the trier of fact." *Sabella v. Scantek Med., Inc.*, No. 08 Civ. 453(CM)(HBP), 2009 WL 3233703, at \*18 (S.D.N.Y. Sept. 25, 2009) (quoting *Flores v. Lower E. Side Serv. Ctr., Inc.*, 796 N.Y.S.2d 491, 495 (2005)). "However, when there are no competing inferences to be drawn, that is to say when there are no questions of fact, a court may find that the parties entered into an enforceable contract." *Id.* In making this determination, the court looks "not to the[] [parties'] 'after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time'" of contracting. *See Blake v. Fiit Int'l, Inc.*, No. 05 Civ. 6150(HBP), 2007 WL 980362, at \*6 (S.D.N.Y. Mar. 30, 2007) (quoting *Stetson v. Duncan*, 707 F. Supp. 657, 666 (S.D.N.Y. 1988)). When the parties' "expressions and conduct would lead a reasonable person to conclude that they intended to reach a binding agreement, the agreement is enforceable." *Kaplan v. Vincent*, 937 F. Supp. 307, 312 (S.D.N.Y. 1996). "In determining the intention of the contracting parties, it is proper to consider matters outside the writings, including the previous dealings between the

---

However, this caselaw is inapposite because the 2012 Distributor Agreement changed important aspects of the 2004 Memorandum, belying any contention that the 2012 Distributor Agreement is simply a more formal version of the 2004 Memorandum. For example, whereas the 2004 Memorandum stated that APE would handle commissions "internally," the 2012 Distributor Agreement provided that Alessi would pay commissions. (*Compare* Docket No. 93-10 at 2, *with* Docket No. 93-16). Similarly, the 2004 Memorandum covered the Robovib only, but the 2012 Distributor Agreement explicitly encapsulated sales of the Robovib and "all excavator mounted equipment." (*Compare* Docket No. 93-10 at 1, *with* Docket No. 93-16). The caselaw on which Alessi relies is also irrelevant because it focuses on the enforceability of the preliminary agreement – under Alessi's theory, the 2004 Memorandum – not the 2012 Distributor Agreement that Alessi is attempting to enforce. Furthermore, although APE concedes that the 2004 Memorandum was binding at least until December 2011, *see supra* n.26, Alessi's theory overlooks the maxim that extrinsic evidence is inadmissible to interpret an unambiguous contract. *See supra* Section II.A.2. Alessi has not presented any reasons why the 2004 Memorandum is ambiguous such that the Court may refer to the 2012 Distributor Agreement to discern its meaning. Nor does the 2004 Memorandum meet the rigid standard for incorporation by reference of the 2012 Distributor Agreement, which requires that an extrinsic document be "identified beyond all reasonable doubt" in the operative agreement. *See Nat'l Grid Corp. Servs., LLC v. Brand Energy Servs., LLC*, No. 2:13-cv-1275 (DRH)(ARL), 2017 WL 1194499, at \*7-8 (E.D.N.Y. Mar. 30, 2017) (quoting *Sea Trade Co. v. FleetBoston Fin. Corp.*, No. 03-cv-10254, 2007 WL 1288592, at \*4 (S.D.N.Y. May 1, 2007)) (internal quotations omitted); *see also PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996). Therefore, the Court rejects this argument.

-33-

parties and the practices of the trade." *Vinifera Imports Ltd. v. Societa Agricola Castello Romitorio SRL*, No. 2:16-cv-00103 (ADS)(ARL), 2020 WL 1184962, at *5 (E.D.N.Y. Mar. 12, 2020) (quoting *Paper Corp. of U.S. v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337, 347 (S.D.N.Y. 1992)) (internal quotations omitted).

The record demonstrates that when making the 2012 Distributor Agreement, the parties intended to be bound by all material terms.  Unlike in *Fakhoury*, nothing before the Court suggests the absence of agreement or any disputed material terms.[31] *See Fakhoury*, 1997 WL 291961, at *3-4; *see also Kleinschmidt Div. of SCM Corp.*, 41 N.Y.2d at 973; *supra* Section II.B.1.ii(a).  The parties duly executed the 2012 Distributor Agreement designating Alessi as the "exclusive distributor" of APE's Robovib and excavator mounted equipment in the Northeast, and requiring APE to "direct all Robovib and excavator rentals and sales to Alessi . . . as a first option," with Alessi to pay APE two percent commissions on sales outside the Northeast. (Docket No. 93-16).  Absent a showing of fraud or some other wrongful conduct, none of which is alleged here,[32] "[a]n individual who signs . . . a written contract . . . is conclusively presumed to know its contents and to assent to them." *Imero Fiorentino Assocs., Inc. v. Green*, 447 N.Y.S.2d 942, 943 (1st Dep't 1982); *see also Saffire Corp. v. Newkidco, LLC*, 286 F. Supp. 2d 302, 306 (S.D.N.Y. 2003); *Aoki v. Aoki*, 29 N.Y.S.3d 864, 870 (2016).

The deposition testimony also indicates that both APE and Alessi expected the price under this agreement to be the same as it had been under the 2004 Memorandum – a twenty

---

[31] The only discernible dispute as to any of the 2012 Distributor Agreement's terms is Mr. Alessi's mistaken belief that they required him to pay commissions in the Northeast as well as other territories, when the agreement's plain language only imposed this obligation "outside [Alessi's] exclusive territory." (Docket Nos. 93-1 at 133:6-19, 140:19-25, 150:6-12; 93-16); *see supra* n.19.  Neither party suggests that this was a material term on which agreement was required.

[32] Indeed, although APE argues that Mr. White acted against its "best interests," its claims against him are no longer pending in this Court. (Docket No. 104 at 8-9); *see supra* n.1.

percent discount off of APE's list price. (Docket Nos. 93-1 at 135:1-136:15; 93-9 at 115:4-116:11).  Alternatively, "months of invoices to which [neither party] objected form an adequate basis from which to infer the price term." *Prot. Indus. Corp. v. Kaskel*, 691 N.Y.S.2d 457, 458 (1st Dep't 1999).  Moreover, although the agreement lacked a quantity term, both parties understood that it required APE to make Alessi its exclusive distributor in the Northeast. (Docket Nos. 93-1 at 147:16-148:12; 93-18 at 10 ¶ 26).  In conformity with these terms, Alessi purchased or rented Robovibs and other excavator mounted equipment from APE for distribution to third parties in the Northeast, and paid APE commissions based on sales it made elsewhere. (*See* Docket Nos. 93-1 at 150:6-12; 93-2—93-4).  In addition, until the beginning of this lawsuit, APE held Alessi out as its only distributor and as late as 2017, at least one APE employee believed Alessi was "the go to guy for the Robovib in the U.S." (Docket Nos. 103-7 at 9:2-8; 103-10–103-16).  Although it is unclear when exactly APE began selling directly to third parties in the Northeast, *see supra* n.21, "[t]hese circumstances are consistent with the notion that the parties intended" the 2012 Distributor Agreement "to be binding."[33] *See Sabella*, 2009 WL 3233703, at *20.

APE fails to introduce evidence of any dispute as to the 2012 Distributor Agreement's material terms that would undermine this expressed intent. *See Kleinschmidt Div. of SCM Corp.*, 41 N.Y.2d at 973; *see also Wellington Farms*, 66 N.Y.S.3d at 503.  APE contends that there are genuine disputes of material fact precluding summary judgment in Alessi's favor because Mr. White disregarded Mr. Collins' instructions not to enter into an agreement with Alessi and kept the 2012 Distributor Agreement secret after resigning. (Docket No. 104 at 8-10).  However, even

---

[33] This is so even though the invoices exchanged between the parties "contain[] varying prices" because such variation does not constitute a "dispute over essential terms [that] manifest[s] a lack of intention to contract." *See Wellington Farms*, 66 N.Y.S.3d at 503 (quoting *Judal* 526 N.Y.S.2d at 156) (internal quotations omitted).

viewing the facts in APE's favor, these allegations are immaterial because "[a] party cannot generally avoid the effect of a [signed contract] on the ground that he or she did not know its contents." *Dasz, Inc. v. Meritocracy Ventures, Ltd.*, 969 N.Y.S.2d 653, 655 (4th 2013) (quoting (*Cash v. Titan Fin. Servs., Inc.*, 873 N.Y.S.2d 642, 646 (2d Dep't 2009)) (internal quotations omitted); *see also Lansco Corp. v. N.Y. Brauser Realty Corp.*, 881 N.Y.S.2d 74, 76 (2009) ("[T]he signer of an instrument is . . . bound by its terms regardless of whether he actually read it."). As Judge Learned Hand famously explained, "[a] contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties." *Hotchkiss v. National City Bank*, 200 F. 287, 293 (S.D.N.Y. 1911), *aff'd*, 201 F. 664 (2d Cir. 1912), *aff'd*, 231 U.S. 50 (1913). Indeed, the parties' intent to be bound is determined based on the objective manifestations of their intent when contracting. *See Blake*, 2007 WL 980362, at *6. Moreover, there is no dispute of material fact that Mr. White, as President of APE, had authority to enter into the 2012 Distributor Agreement. *See supra* Section II.B.1.i.; *cf. Hutchinson Burger, Inc. v. Hutch Rest. Assocs., L.P.*, 954 N.Y.S.2d 87, 88 (1st Dep't 2012). Thus, APE and its employees' subjective intent or knowledge before or after the 2012 Distributor Agreement's execution is irrelevant.[34]

Therefore, the presence of open terms in the 2012 Distributor Agreement do not render it unenforceable as a matter of law. Alessi is entitled to summary judgment on the issue of whether the parties intended to be bound.

---

[34] For the same reasons, the fact that Mr. White eventually entered into another exclusive distributorship with Mr. Alessi via a new company that competes directly with APE is also irrelevant to the parties' intent to be bound. *See Blake*, 2007 WL 980362, at *6; *supra* n.20. The same is true with regard to whatever APE intended at the time of the December 15, 2011 e-mail from Mr. White, several months before the 2012 Distributor Agreement was signed. (Docket No. 93-12).

**(ii) Consideration and Mutuality of Obligation**

APE also contends that the 2012 Distributor Agreement is unenforceable because it lacks consideration and mutuality of obligation. (Docket No. 94 at 15-20).  Although the Court rejects Alessi's attempt to look to the 2004 Memorandum for these elements, *see supra* n.30, a review of the 2012 Distributor Agreement makes clear that it is not deficient in this respect.

Traditionally, "[t]he doctrine of 'mutuality of obligation' requires a valid contract to be based on an exchange of reciprocal promises." *AP Links, LLC v. Glob. Golf, Inc.*, 08-CV-3602 (TCP)(AKT), 2010 WL 11629613, at *6 (E.D.N.Y. Oct. 4, 2010) (quoting *Doctor's Assoc., Inc. v. Distajo*, 66 F.3d 438, 451 (2d Cir. 1995)) (internal quotations omitted).  But modern courts have rejected this concept as antiquated, finding that "so long as a contract is supported by sufficient consideration, 'there is no additional requirement of . . . "mutuality of obligation."'" *See id.* (quoting *Hale v. First USA Bank, N.A.*, No. 00-CV-5406, 2001 WL 687371, at *5 (S.D.N.Y. June 19, 2001)); *see also Robert L. Haag, Inc. v. Swift & Co.*, 696 F.2d 30, 32 (2d Cir. 1982).  As to consideration, "[i]t is hornbook law that a contract which does not require performance by each party is unenforceable for lack of consideration." *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1219 (E.D.N.Y. 1990). Consideration exists if "something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him." *Reeves Ent. Grp. v. LBS Commc'ns Inc.*, No. 91 Civ. 0534 (CSH), 1991 WL 135476, at *6 (S.D.N.Y. July 18, 1991) (quoting *Hamer v. Sidway*, 124 N.Y. 538, 545 (1891)) (internal quotations omitted).  However, "courts do not inquire into the adequacy of consideration;" as "long as a contract provides some consideration[,] . . . even a peppercorn," it is enough in the eyes of the law. *See AP Links*, 2010 WL 11629613, at *6 (quoting *RLS Assocs., LLC v. United Bank of Kuwait PLC*, 380 F.3d 704, 709 (2d Cir. 2004)) (internal quotations omitted).

APE argues that the 2012 Distributor Agreement lacks both mutuality and consideration because it does not explicitly "require Alessi to provide or do anything," much less purchase any products, "in exchange for APE granting it an exclusive territory." (Docket No. 94 at 17). Furthermore, according to APE, the agreement's two percent commission requirement cannot serve as consideration because it is divisible from its exclusivity provision. (*Id.* at 19-21).

Both arguments are meritless.  APE's first contention with respect to Alessi's purchase obligations has been soundly rejected under both the common law and the U.C.C. in the context of otherwise enforceable exclusive distributorship agreements. *See, e.g.*, *Vinifera Imports Ltd.*, 2020 WL 1184962, at *6–7; *Baker's Aid*, 730 F. Supp. at 1219; *Beautis Prod. Co. v. Chromatic Corp.*, 1978 WL 23479, at *37 (Sup. Ct. N.Y. Cnty. July 6, 1978); *see also* N.Y. U.C.C. § 2-306(2), cmt. 5.[35]  As discussed, exclusivity terms impliedly obligate both parties to "use their best efforts to distribute the product subject to the agreement." *See Vinifera Imports Ltd.*, 2020 WL 1184962, at *6; *see also King Fook Jewellery Grp. Ltd. v. Jacob & Co. Watches Inc.*, 14 Civ. 742 (ER), 2016 WL 11642662, at *8 (S.D.N.Y. July 25, 2016).  For this reason, in exclusive contractual relationships, "[a] promise may be lacking, and yet the whole writing may be 'instinct with an obligation' imperfectly expressed." *Wood v. Lucy, Lady Duff Gordon*, 222 N.Y. 88, 91 (1917); *see also supra* n.35.  Thus, "[t]he failure of [such] an agreement explicitly to require one party to promise to purchase from the party who has promised to sell does not render the agreement unenforceable" for lack of consideration or mutuality. *See Vinifera Imports Ltd.*,

---

[35] Although the court in *Fakhoury* viewed the U.C.C.'s approach to exclusive dealership as distinct from the common law's, *see* 1997 WL 291961, at *3, that notion has been criticized in light of pervasive authority that the U.C.C. "codified the New York Court of Appeals's holding in *Wood*." *See MDC Corp. v. John H. Harland Co.*, 228 F. Supp. 2d 387, 394 (S.D.N.Y. 2002) (collecting cases); *see, e.g.*, *Beautis Prod.*, 1978 WL 23479, at *37 (noting that *Wood* and U.C.C. § 2-306(2) impose the same duty "to use all reasonable efforts to market the products in an exclusive agency contract"); N.Y. U.C.C. Law § 2-306 (McKinney 2021) ("Subsection (2) is apparently based upon *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 18 N.E. 214 (1917).").

2020 WL 1184962, at *6 (quoting *Paper Corp.*, 807 F. Supp. at 347) (internal quotations omitted).

In addition to these implied obligations, the 2012 Distributor Agreement expressly requires Alessi to "provide[]" "[a]ny and all service and set up" or "pay APE's service department to provide services" for all sales, without regard to a particular territory. (Docket No. 93-16). In other words, in exchange for the exclusive right to sell the Robovib and APE's excavator mounted equipment in the Northeast, Alessi incurred the obligation to provide services associated with sales of those products in all territories, or pay APE if it did not desire to do so. The undertaking of the duty to provide customer service and repairs in exchange for other rights constitutes consideration. *See, e.g.*, *CMEG NYMEX Holding Inc. v. Optionable, Inc.*, No. 09-CV-3677 (GBD)(JLC), 2012 WL 3683560, at *2 (S.D.N.Y. Aug. 24, 2012). Thus, regardless of whether Alessi's obligation to pay commissions is divisible from the exclusivity portion of the contract, the agreement as a whole is supported by consideration. *See AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890 F. Supp. 2d 373, 383 (S.D.N.Y. 2012); *see also Coleman v. Sys. Dialing LLC*, No. 15cv3868 (DLC), 2016 WL 3387748, at *3 (S.D.N.Y. June 17, 2016) ("Because both Ornette Coleman and Sound Chemistry obtained and gave up something in agreeing to the Artist Agreement, the agreement does not lack consideration.").

For the above reasons, the record does not reveal any genuine dispute of material fact as to the validity of the 2012 Distributor Agreement. Because APE concedes in its Answer that it sold products covered by the agreement to third parties in the Northeast, APE is liable for material breach thereof. (*See* Docket No. 36 at 6 ¶¶ 46-47); *see also Boscov's Dep't Stores, LLC v. AKS Int'l AA Corp.*, No. 01 Civ.10580 (GWG), 2004 WL 205825, at *2 (S.D.N.Y. Feb. 4, 2004); Fed. R. Civ. P. 8(d). Alessi is therefore entitled to partial summary judgment as to

liability on its breach of contract claim under the 2012 Distributor Agreement with respect to these sales.[36]  However, issues of fact remain with respect to Alessi's damages.  As the party moving for summary judgment, it was Alessi's responsibility to present sufficient undisputed material facts for the Court to rule in its favor. *See Celotex*, 477 U.S. at 323.  Alessi's papers are devoid of any legal argument or factual analysis related to the amount of its damages.  Therefore, the Court denies Alessi summary judgment on the issue of damages with respect to this claim. *See Sicom*, 168 F. Supp. 3d at 708 (granting partial summary judgment on contractual liability but denying summary judgment as to damages where "plaintiff [did] . . . not provide[] a sufficient undisputed basis for the Court to make a determination as to the quantum of damages").  The Court also denies APE's motion for summary judgment dismissing Alessi's claim under the 2012 Distributor Agreement in its entirety.

### iii.  The 2004 Memorandum and the 1996 Agreement

The parties also cross-move for summary judgment on Alessi's claim for breach of contract under the 2004 Memorandum and the 1996 Agreement. (*See* Docket Nos. 92; 95-1 at 1; 100).  Alessi claims that these agreements imposed an exclusive distributorship concurrently with the 2012 Distributor Agreement, such that APE is also liable for their breach because it sold product to third parties in the Northeast. (Docket Nos. 101 at 18-19; 106 at 14; 109 at 8-10).  APE responds that any claim under these agreements is barred by the applicable statute of

---

[36] The Court notes that the Amended Complaint also claims that APE breached the 2012 Distributor Agreement, 2004 Memorandum and 1996 Agreement by "failing to provide Alessi information regarding the amount of equipment sold in the Northeast territory and nationwide by APE or third-parties." (*See* Docket No. 18 at 9 ¶ 63). Alessi appears to have abandoned this argument, as it appears nowhere in Alessi's moving or opposition papers. *See Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 601 n.5 (S.D.N.Y. 2013).  In any event, no language in the written agreements at issue entitles Alessi to such information.  Alessi has not put forth any evidence that the 1996 Agreement or any course of conduct did so either.  Therefore, the Court denies Alessi's motion for summary judgment and grants APE's cross-motion with respect to Alessi's breach of contract claim to the extent it relates to APE's failure to provide sales information. *See Demetriades v. Royal Abstract Deferred, LLC*, 74 N.Y.S.3d 5, 6–7 (1st Dep't 2018) ("In the absence of any evidence of limiting instructions . . . providing that defendant was not to transfer funds unless expressly authorized directly by plaintiff . . . there is no basis for a breach of contract claim here based on defendant's conduct of transferring the funds upon the instructions of Kalpakis.").

limitations. (*See* Docket No. 104 at 11 n.1).  Specifically, as it explained more fully during oral argument, APE contends that because Mr. White's December 15, 2011 e-mail cancelled or "revo[ked]" such agreements, Alessi's claim for breach arose on that date such that its May 2018 complaint was filed too late. (*See id.*).

As an initial matter, the December 15, 2011 e-mail is not a modification or termination of either earlier agreement.  New York law permits parties to modify a contract "by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." *CT Chems. (U.S.A.) Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179 (1993); *see Martin v. Peyton*, 246 N.Y. 213, 218 (1927).  In addition, an original contract may be discharged by mutual consent and the making of a new contact. *See Schwartzreich v. Bauman-Basch*, 231 N.Y. 196, 204 (1921).  Under this scenario – on which APE relies – "[f]undamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (1980)); (*see also* Docket No. 104 at 16-17).  In addition, New York law dictates that subsequent contracts "regarding the same subject matter supersede[] the prior contract," even if there is no express termination, and even if the subsequent contract lacks an integration or merger clause. *See Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1195 (S.D.N.Y. 1996); *see also Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 809-11 (S.D.N.Y. 2008); *People ex rel. Spitzer v. Grasso*, 861 N.Y.S.2d 627, 635 (1st Dep't 2008).  This is because "[p]rior agreements and negotiations are deemed to merge and be subsumed in a later written agreement." *See Indep. Energy*, 944 F. Supp. at 1195.

However, the December 15, 2011 e-mail does not qualify as a modification because that communication does not contain the elements of a binding contract.  Indeed, "if there is nothing to show it was the design to surrender or extinguish the preceding covenants the presumption is they will remain in force." *Brazill v. Weed*, 190 N.Y.S. 43, 49 (Sup. Ct. N.Y. Cnty. 1921). Although Mr. Alessi is copied, the e-mail is solely addressed to the APE "[s]ales [s]taff," and does not manifest any *mutual* assent by both Alessi and APE to modify the 2004 Memorandum or set forth a new contract governing their relationship.[37] *See Express Indus. & Terminal Corp.*, 693 N.Y.S.2d at 860; *see, e.g.*, *Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, 112 F. Supp. 3d 83, 107 (S.D.N.Y. 2015) (finding no evidence of amendment to contract where referenced e-mails "fail[ed] to manifest the parties' final agreement concerning a modification"); *Al-Bawaba.com, Inc. v. Nstein Techs. Corp.*, 45550/07, 2009 WL 4927157, at *10 (Sup. Ct. Kings Cnty. 2009) (holding that e-mails could not demonstrate mutual agreement absent evidence of meeting of the minds).  The 2011 e-mail does not impose mutual obligations, let alone assent by Alessi to change the parties' relationship or adopt new covenants. *See Fakhoury Enterprises*, 1997 WL 291961, at *2.  Therefore, the e-mail did not modify the parties pre-existing agreements.

---

[37] Moreover, because the e-mail is not signed by Alessi, it violates the express language of the 2004 Memorandum and the statute of frauds. (*See* Docket No. 93-12).  The 2004 Memorandum states: "This agreement, until written in more detail and jointly signed[,] will act as our only agreement." (Docket No. 93-10 at 2).  Where, as here, a contract precludes modification absent a writing signed by both parties, a subsequent writing that purports to modify it but that is devoid of both signatures is unenforceable. *See Glob. Events LLC v. Manhattan Ctr. Studios, Inc.*, 998 N.Y.S.2d 336, 337 (1st Dep't 2014). Also, a modification or new contract for the sale of goods for $500.00 or more must comply with the statute of frauds. *See* N.Y. U.C.C. Law §§ 2-201; 2-209(3).  Under the statute of frauds, "a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." N.Y. U.C.C. Law § 2-201.  The 2004 Memorandum falls within the statute of frauds because it quotes the Robovib at $86,250.00. (Docket No. 93-10 at 1).  The December 15, 2011 e-mail covers both the Robovib and "any other APE product." (Docket No. 93-12).  Moreover, it is not signed by Alessi, the party against whom APE attempts to enforce it. (*Id.*).  Therefore, any purported contract or modification through this writing is unenforceable against Alessi as a matter of law. *See* N.Y. U.C.C. Law §§ 2-201; 2-209(3); *see also Dallas Aerospace*, 352 F.3d at 782–84.

APE also argues that the 2011 e-mail constitutes a "revocation" of the 2004 Memorandum, but that theory fails. (Docket No. 104 at 11 n.1).  The specific term "revocation" refers to the "termination" of "an offeree's power of acceptance" before a contract is deemed binding under New York law. *See, e.g.*, *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 89 (S.D.N.Y. 1999); *see also* N.Y. U.C.C. § 2-205.  The facts here do not bear out an offer or acceptance, nor do the parties characterize them as such.  Indeed, APE concedes that the 2004 Memorandum constituted a binding contract at least until Mr. White's e-mail. *See supra* n.26.  Therefore, the court rejects APE's "revocation" theory.

To the extent APE meant to advance the theory that the e-mail constituted a "repudiation" of its contractual duties – rather than a "revocation" – courts have held that under the U.C.C., "an aggrieved party is free to await performance following an anticipatory repudiation" rather than immediately bringing suit. *See Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 90 F. Supp. 2d 401, 412 (S.D.N.Y. 2000); *see also Ramey v. Dist. 141, Int'l Ass'n of Machinists & Aerospace Workers*, 378 F.3d 269, 279 (2d Cir. 2004); N.Y. U.C.C. § 2-610.  Therefore, even assuming the e-mail qualifies as an anticipatory repudiation, it was not the triggering event that caused the statute of limitations under the 1996 Agreement or 2004 Memorandum to begin to run rendering Alessi's action untimely. *See Cary Oil*, 90 F. Supp. 2d at 412 ("[T]he statute of limitations for failure to perform [does] not begin to run [even in the case of an anticipatory breach] until the time fixed for performance. The UCC appears to have adopted this approach.").  In any event, the precise moment when Alessi's cause of action under these agreements began to run is immaterial because as explained further below, the 1996 Agreement and exclusive distributorship provisions of the 2004 Memorandum were supplanted by the parties' later agreements.  Consequently, the Court need not reach APE's statute of limitations argument.

Indeed, even assuming the 1996 Agreement was enforceable, it was superseded by the subsequent written agreements between the parties. *See Indep. Energy Corp.*, 944 F. Supp. at 1195. With respect to oral agreements, "[a] subsequent written agreement lucidly manifests the parties' intent that the written agreement supersede the oral agreement and that it constitute the entire agreement between the parties." *Doherty v. New York Tel. Co.*, 609 N.Y.S.2d 306, 307 (2d Dep't 1994). It is undisputed that the 1996 Agreement imposed an exclusive distributorship for APE's existing excavator mounted equipment – the same relationship covered by the 2004 Memorandum and 2012 Distributor Agreement. Therefore, the 1996 Agreement was superseded long ago and Alessi cannot proceed based on any breach of the 1996 Agreement, regardless of when the statutory period for this claim began to run.

The Court reaches a similar conclusion regarding Alessi's claim under the 2004 Memorandum although the analysis is less straightforward. Alessi argues that the 2012 Distributor Agreement reaffirmed the parties' exclusive distributorship, but changed their arrangement regarding commissions. (*See* Docket No. 109 at 10). A comparison of the two documents also reveals that whereas the 2004 Memorandum only covers the Robovib, the 2012 Distributor Agreement covers the Robovib and the "APE . . . line of excavator mounted equipment." (*Compare* Docket No. 93-16, *with* Docket No. 93-10 at 1-2). "[A] subsequent contract not pertaining to 'precisely the same subject matter' will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." *A & E Television Networks, LLC v. Pivot Point Ent., LLC*, No. 10 Civ. 09422(AJN), 2013 WL 1245453, at *10 (S.D.N.Y. Mar. 27, 2013) (quoting *CreditSights, Inc. v. Ciasullo*, No. 05 Civ. 9345(DAB), 2007 WL 943352, at *6 (S.D.N.Y. Mar. 29, 2007)). Moreover, "the fact that a subsequent contract contains provisions which are of the

-44-

same subject matter as those in an earlier agreement is not sufficient to supersede the entire

contract; rather, a subsequent agreement supersedes only those terms of the earlier contract that

are of the same subject matter." *Medtech*, 596 F. Supp. 2d at 810 (quoting *CreditSights*, 2007

WL 943352, at *6) (internal quotations omitted).  To determine whether a specific contractual

provision is superseded by a subsequent one, the court considers (1) whether the subsequent

contract contains an integration and merger clause indicating that the prior provision is

superseded; (2) "whether the two provisions have the same general purpose or address the same

general rights[;]" and (3) "whether the two provisions can coexist or work in tandem." *See A & E

Television Networks*, 2013 WL 1245453, at *10-11 (quoting *Medtech*, 596 F. Supp. 2d at 809)

(internal quotations omitted) (finding that subsequent provisions did not supersede former

provisions despite the presence of an integration clause because they could work "in tandem,"

with one "describ[ing] the process and manner by which the parties w[ould] decide specific

compensation amounts" and the other "recit[ing] . . . the specific amounts to be paid for Season 3

through 6"); *see also Medtech*, 596 F. Supp. 2d at 810 (finding that subsequent provisions

superseded prior ones because both addressed confidentiality and the subsequent contract

contained an integration and merger clause); *Kreiss v. McCown DeLeeuw & Co.*, 37 F. Supp. 2d

294, 301 & n.8 (S.D.N.Y. 1999) (finding that "[b]ecause the subject matter of the Stockholders

Agreement d[id] not cover the specific award . . . of equity and stock options, the agreement

d[id] not supersede the Term Sheet in that regard," but "Options Agreement" superseded "Term

Sheet" with regard to "stock options" because "both agreements concern[ed] the specific amount

of stock options awarded to Plaintiffs").  New York law also "favors applying specific contract

terms over more general ones when they conflict." *Vogt v. DG Fastchannel, Inc.*, No. 10 Civ.

3356 (LTS)(AJP), 2010 WL 11571117, at *3 (S.D.N.Y. Nov. 9, 2010) (citing *Aramony v. United Way of America*, 254 F.3d 403, 413 (2d Cir. 2001)).

Here, the 2012 Distributor Agreement does not completely replace the 2004 Memorandum because the two agreements' specific provisions do not cover "precisely the same subject matter." *See A & E Television Networks*, 2013 WL 1245453, at *10.  Although the Court rejects Alessi's reliance on inadmissible parol evidence to interpret these unambiguous writings, *see supra* Section II.A.2; (*e.g.*, Docket No. 109 at 10), the Court agrees that the plain language of the 2012 Distributor Agreement does not cover various topics addressed by the 2004 Memorandum, including the pricing of the Robovib and Alessi's obligations with respect to maintaining APE's reputation. (*Compare* Docket No. 93-16, *with* Docket No. 93-10).  Similarly, many of the agreements' provisions address the same rights, but can "work in tandem." *See A & E Television Networks*, 2013 WL 1245453, at *10.  For example, Alessi's "service" and "set up" obligations in the 2012 Distributor Agreement dovetail the 2004 Memorandum's more specific instruction that Alessi "do . . . what ever [sic] else it takes to service the customer" and "provide a high level of service to its customers." (*Compare* Docket No. 93-10 at 2-3, *with* Docket No. 93-16).  Moreover, the 2012 Distributor Agreement does not contain an integration or merger clause indicating that it subsumes all prior agreements. (Docket No. 93-16).

However, the 2012 Distributor Agreement supersedes the 2004 Memorandum with respect to the payment of commissions and the products covered by the parties' exclusive distributorship. *See A & E Television Networks*, 2013 WL 1245453, at *10.  The agreements' provisions governing these topics conflict in that the 2012 Distributor Agreement puts the onus on Alessi to pay APE's commissions, and expands the relationship to cover the Robovib and other excavator mounted equipment. (*Compare* Docket No. 93-10 at 2-3, *with* Docket No. 93-

16).  Therefore, as to these rights and obligations, the 2004 Memorandum is no longer in effect

and the 2012 Distributor Agreement controls.

Because Alessi's claim for breach relates to APE's direct sales of both Robovibs and

other equipment to third parties in the Northeast, (*see* Docket No. 18 at 9 ¶ 63), its cause of

action arises under the exclusivity provision of 2012 Distributor Agreement, not the 2004

Memorandum.  Consequently, although the 2004 Memorandum remains in force in certain

respects, Alessi cannot proceed under the exclusivity provision of the 2004 Memorandum for its

breach of contract claim as a matter of law and APE's statute of limitations defense has no

further impact on the viability of this claim.

For the above reasons, APE's motion for summary judgment with respect to the 1996

Agreement and 2004 Memorandum is granted, and Alessi's cross-motion for summary judgment

on these claims is denied.

## 2.  The Parties' Cross-Motions on Alessi's Unjust Enrichment Claim

APE seeks dismissal of Alessi's unjust enrichment claim on the grounds that (a) it is

inapplicable where there is a binding contract, or (b) alternatively, there is no dispute of material

fact as to whether APE was unjustly enriched at Alessi's expense. (Docket Nos. 94 at 22-24; 110

at 13-14).  Alessi responds that to the extent any of the alleged contracts are unenforceable, its

unjust enrichment claim must proceed in light of evidence that "APE . . . sold equipment

developed as a result of Alessi's efforts, input and client base." (Docket No. 106 at 20).  Alessi

also cross-moves for summary judgment granting its unjust enrichment claim on the same basis.

(Docket No. 101 at 19-21).  The Court agrees that Alessi's unjust enrichment claim must be

dismissed because the 2012 Distributor Agreement is valid and enforceable.

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1)

that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good

conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)) (internal quotations omitted).  However, unjust enrichment is a quasi-contract claim based on "an obligation the law creates in the absence of any agreement." *Goldman v. Metropolitan Life Ins. Co.*, 807 N.Y.S.2d 583, 877 (2005).  Thus, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery" under an unjust enrichment theory "for events arising out of the same subject matter." *See Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 521 N.Y.S.2d 653, 656 (1987).  Thus, a defendant is entitled to summary judgment on an unjust enrichment claim if the court finds that the contract at issue is "valid and enforceable." *See Blum v. Spaha Capital Mgmt., LLC*, 44 F. Supp. 3d 482, 496 (S.D.N.Y. 2014); *see also Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 594–95 (S.D.N.Y. 2018).  This is so even if the court finds a dispute of material fact regarding "which documents or provisions are incorporated into a contract, . . . because 'all that matters' is 'that there is at least one express agreement that governs the contractual relationship . . . .'" *See Mindspirit, LLC*, 346 F. Supp. 3d at 594 (quoting *Design Partners, Inc. v. Five Star Elec. Corp.*, No. 12-CV-2949 (PKC)(VMS), 2017 WL 818364, at *8 (E.D.N.Y. Mar. 1, 2017)).

Here, Alessi's unjust enrichment claim fails because the 2012 Distributor Agreement is enforceable as a matter of law. *See Blum*, 44 F. Supp.3d at 496; *supra* Section II.B.1.  Therefore, APE's motion for summary judgment with respect to this claim is granted, and Alessi's cross-motion is denied.

### 3.  The Parties' Cross-Motions on APE's Breach of Contract Claims

APE seeks summary judgment granting its counterclaims against Alessi for breach of contract with respect to Alessi's failure to pay the amounts due under the Rental Agreement,

Purchase Orders and invoices reflecting these transactions. (*See* Docket Nos. 94 at 7, 11-15; 110 at 6-9).  In response, Alessi argues that it was permitted to withhold such amounts under U.C.C. § 2-717, and APE's counterclaims cannot be disposed of because they are "inextricably interwoven" with Alessi's pending claim for breach of the 2012 Distributor Agreement, 2004 Memorandum and 1996 Agreement. (Docket No. 106 at 10-14).  Although not substantively addressed in its moving papers, Alessi also cross-moves for summary judgment dismissing these counterclaims on the same basis. (Docket No. 100).  Because the Court rejects Alessi's reliance on U.C.C. § 2-717, it grants APE summary judgment on such counterclaims and denies Alessi's cross-motion.

APE's breach of contract counterclaims center on Alessi's failure to remit payment for several invoices reflecting various equipment that APE delivered to Alessi for sale or rental in 2016, 2017 and 2018. (*See* Docket No. 36 at 17-20 ¶¶ 36-53).  Alessi concedes that the invoices are consistent with its Purchase Orders and the terms of the parties' Rental Agreement; that the goods were delivered by APE; and that the amounts reflected in the invoices are accurate. (Docket No. 108 ¶¶ 22-47).  However, Alessi argues that under U.C.C. § 2-717, no monies are due because it is withholding payment as setoff for its damages under its own breach of contract claim. (*See id.*; *see also* Docket No. 106 at 10-14).

The U.C.C. provides that a seller is entitled to payment for goods sold and delivered to the buyer, which the buyer then accepts. *See* N.Y. U.C.C. Law § 2-607(1).  The buyer may thus bring a breach of contract action for the price of goods sold and delivered by showing "the purchase, sale and delivery of [such] goods at an established price and nonpayment therefor." *See Conocophillips v. 261 E. Merrick Rd. Corp.*, 428 F. Supp. 2d 111, 126 (E.D.N.Y. 2006) (quoting *Daewoo Int'l (Am.) Corp. Creditor Trust v. SSTS Am. Corp.*, No. 02 Civ. 9629(NRB),

2004 WL 830079, at *2 (S.D.N.Y. April 13, 2004)) (internal quotations omitted).  However, under U.C.C. § 2-717, upon notice to the seller, the buyer "may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." N.Y. U.C.C. Law § 2-717.  Comment 1 to the same section states that the "[t]o bring this provision into application *the breach involved must be of the same contract under which the price in question is claimed to have been earned*." N.Y. U.C.C. Law § 2-717, cmt. 1 (emphasis added).

The parties dispute whether APE's counterclaims for the price of the goods delivered constitutes an action for breach under the "same contract" as Alessi's breach claim under the 2012 Distributor Agreement. *See* N.Y. U.C.C. Law § 2-717; (Docket Nos. 94 at 11-15; 106 at 10-14; 110 at 6-9).  Alessi argues that because the Purchase Orders and invoices emanate from the parties' relationship under the 2004 Memorandum and 2012 Distributor Agreement, this requirement under U.C.C. § 2-717 is satisfied. (Docket No. 106 at 11).  APE maintains that Alessi is not entitled to any setoff because APE's breach of contract claims stem from the Purchase Orders and invoices, and thus, contracts that are separate from the 2012 Distributor Agreement. (Docket No. 110 at 6-9).

Alessi relies on *Created Gemstones, Inc. v. Union Carbide Corp.*, 417 N.Y.S.2d 905 (1979), wherein the Court of Appeals addressed the applicability of U.C.C. § 2-717 to a distribution agreement requiring the plaintiff to purchase $400,000.00 worth of the defendant's synthetic gems for a period of ten years. (Docket No. 106 at 12-14).  Two years into the agreement, the plaintiff brought a breach of contract action premised on the defendant's unilateral imposition of a $200,000.00 credit line and insistence on cash payment for orders above that amount. *See Created Gemstones*, 417 N.Y.S.2d at 906.  The defendant

counterclaimed for, among other things, $224,681.73 due for previous deliveries of gems. *See id.* The Special Term found that fact issues with respect to the defendant's alleged breach precluded summary judgment on the plaintiff's action, but granted summary judgment on the defendant's counterclaims.[38] *See id.* The Court of Appeals reversed the judgment as to the counterclaims, explaining that under U.C.C. § 2-717, "a buyer may defeat or diminish a seller's substantive action for goods sold and delivered by interposing a valid counterclaim for breach of the underlying sales agreement." *See id.* at 907. The court found that "proper disposition of the counterclaims must await resolution of th[e] [outstanding] factual question" because the plaintiff's liability on the counterclaims hinged on whether or not the defendant ultimately breached the distribution agreement. *See id.* at 907–08 ("If, after trial, it is determined that defendant did in fact breach, then plaintiff's liability on the counterclaims would be extinguished to the extent that it was damaged by the breach. By the same token, should defendant be found not to have breached, it would be entitled to judgment on the counterclaims."). Thus, the court held, "summary judgment may not be granted on a seller's counterclaim for goods sold and delivered where there are unresolved factual issues, in the buyer's action for damages, concerning whether the seller breached the underlying contract of sale." *See id.* at 906.

*Created Gemstones* does not govern this case for two reasons. First, unlike in *Created Gemstones*, APE's counterclaims explicitly derive from its rights to payment under the Rental Agreement, Purchase Orders and invoices it sent to Alessi pursuant thereto — not under the 2012 Distributor Agreement. (*See* Docket No. 36 at 17-20 ¶¶ 36-53). Those documents, rather than the 2012 Distributor Agreement, describe the nature of the specific goods delivered and contain

---

[38] The Appellate Division upheld this portion of the Special Term's ruling. *See id.*

the price, quantity, time and manner of delivery.[39] (*Compare* Docket Nos. 36-1–36-5, *with* Docket No. 93-16).  No such contracts reflecting orders for individual quantities of gemstones were before the *Created Gemstones* court. *See* 417 N.Y.S.2d at 906.  Indeed, there, the extent of the plaintiff's liability on the counterclaims depended on the defendant's liability in the original action under the very same contract. *See id.* at 907–08.  Consequently, that case does not establish that the counterclaims here constitute an action under the "same contract" as Alessi's breach of contract claim for purposes of U.C.C. § 2-717. *See* N.Y. U.C.C. § 2-717.

Courts within this Circuit presented with counterclaims that derive from purchase orders and invoices for deliveries of goods akin to those here have found that this standard is not satisfied to permit a setoff for any damages resulting from a related distribution agreement. *See, e.g.*, *Gallo Wine Distributors, L.L.C. v. Niebaum-Coppola Est. Winery, L.P.*, 56 F. App'x 8, 10 (2d Cir. 2003) (summary order);[40] *Palm Bay Int'l, Inc. v. Marchesi Di Barolo S.p.A.*, 09-CV-599 (ADS)(AKT), 2010 WL 11629645, at *5 (E.D.N.Y. May 17, 2010).  This is because, under New York law, "[f]or section 2-717 to be applicable" in an action to recover the price of goods based on invoices in the context of a distributorship, "the seller must breach the same contract under which the moneys from the buyer are due and not a separate distributorship agreement." *See Sunbeam Corp. v. Morris Distrib. Co.*, 389 N.Y.S.2d 173, 175 (3d Dep't 1976); *cf. Palm Bay*,

---

[39] Indeed, as already noted, whereas the 2012 Distributor Agreement establishes an exclusive distributor relationship between the parties, it does not explicitly set forth any specific price, quantity, time or manner of delivery. (*See* Docket No. 93-16).

[40] APE's reliance on *Gallo Wine Distributors* is technically impermissible under Second Circuit Local Rule 32.1.1, which prohibits parties from citing summary orders filed prior to January 1, 2007. *See* Second Circuit Local Rule 32.1.1; (Docket No. 110 at 7-8).  Recognizing that such summary orders are not precedential, however, the Court considers it in conjunction with other persuasive authority that may be "predictive of how the Court would in fact decide a future case such as this one." *See Harris v. United Fed'n of Tchrs., New York City Loc. 2*, No. 02-Civ. 3257 (GEL), 2002 WL 1880391, at *1 n.2 (S.D.N.Y. Aug. 14, 2002); *see also Palm Bay Int'l, Inc. v. Marchesi Di Barolo S.p.A.*, 09-CV-599 (ADS)(AKT), 2010 WL 11629645, at *5 (E.D.N.Y. May 17, 2010) ("[A]lthough the Court recognizes that it is not *bound* by the holding or reasoning in *Gallo*, it views *Gallo* as a reasonable starting point for its own analysis.") (emphasis in original).

2010 WL 11629645, at *5 (finding U.C.C. § 2-717 inapplicable because "[a]lthough the underlying Importation Agreement did establish the broader details of the parties' relationship, the actual price, type, quantity and delivery date for the various shipments of wine" on which counterclaims were based "were contained in the individual purchase orders" such that "each party's claimed rights ha[d] their origins in different contracts"); *Panda Cap.*, 662 N.Y.S.2d at 586 (finding "issue of fact as to whether [defendant] breached the same contracts, i.e., the various purchase orders, *as distinct from the representation agreement itself*") (emphasis added). Here, APE's rights to payment under its breach of contract claims originate in the Rental Agreement, invoices and Purchase Orders rather than the 2012 Distributor Agreement.[41] *See Palm Bay*, 2010 WL 11629645, at *5.

Second, *Created Gemstones* is inapposite because it involved fact issues with respect to the plaintiff's breach of contract claim which, in turn, triggered the need for a trial to resolve the defendant's counterclaims. *See* 417 N.Y.S.2d at 907–08. However, here, as stated *supra*, the Court has not identified any issues of material fact with respect to the liability portion of Alessi's breach of contract claim. *See supra* Section II.B.1. Alessi does not put forth any other "factual issues that bear on the Court's analysis of § 2-717."[42] *See Palm Bay Int'l*, 2010 WL 11629645, at *6. Thus, the rationale in *Created Gemstones* for denying summary judgment is inapplicable.

---

[41] For these reasons, the Court respectfully disagrees with the court in *RPJ Sportswear, Inc. v. Xylo Tex, Ltd.*, 681 F. Supp. 225 (S.D.N.Y. 1988), on which Alessi also relies. (Docket No. 106 at 11-12). There, the court denied summary judgment on the defendant's breach of contract counterclaim for payment of outstanding invoices because the plaintiff's action for damages under the underlying exclusive distributorship agreement was still pending. *See id.* at 228–29. The court opined that based on *Created Gemstones*, summary judgment was inappropriate because the defendant's "right to recover on its counterclaim depend[ed] on a determination at trial as to whether [it] breached that contract." *See id.* at 229. However, this conclusion ignores the distinction noted above between the counterclaim in *Created Gemstones* based on a distribution agreement, and the counterclaim before the Court based on invoices and purchase orders – which constitute contracts under which a seller can recover separately from a distribution agreement. *See Conocophillips*, 428 F. Supp. 2d at 126; *Palm Bay*, 2010 WL 11629645, at *5. Thus, the *RPJ Sportswear* court's analysis is not persuasive. *See* 681 F. Supp. at 228.

[42] Indeed, the existence of distinct contracts under U.C.C. § 2-717 is a question of law. *See Palm Bay Int'l*, 2010 WL 11629645, at *6.

Based on the foregoing, the invoices, Purchase Orders and Rental Agreement under which APE seeks relief in its breach of contract counterclaims constitute separate contracts for purposes of U.C.C. § 2-717. *See id.* The Court therefore rejects Alessi's setoff theory. *See Palm Bay Int'l*, 2010 WL 11629645, at *6. In light of Alessi's admission that the amounts under the invoices are accurate and otherwise past due, (*see* Docket No. 108 ¶¶ 23-47), there is no dispute of material fact as to whether Alessi breached these contracts. APE is entitled to summary judgment on these breach of contract claims, and the Court denies Alessi's cross-motion for summary judgment for their dismissal.

**4.  The Parties' Cross-Motions on APE's Claims for Account Stated**

APE also moves for summary judgment granting its counterclaims for account stated. (Docket Nos. 95-1 at 1; 110 at 9; *see also* Docket No. 36 at 20-22 ¶¶ 54-62). Alessi cross-moves for summary judgment dismissing these counterclaims. (Docket No. 100). The Court grants Alessi's cross-motion and denies APE's motion with respect to these counterclaims because they are duplicative of APE's breach of contract claims.

To succeed on an account stated claim, a plaintiff "must prove the existence of an agreement between [the] defendant[] and [the plaintiff] based upon prior transactions between them." *Carey v. Mui–Hin Lau*, 140 F. Supp. 2d 291, 298 (S.D.N.Y. 2001) (citing *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999)). "Such an agreement is implied if the plaintiff shows that (1) defendants received invoices from him, and (2) defendants failed to object within a reasonable time or defendants made partial payment on account." *Id.*; *see also Abbott, Duncan & Wiener v. Ragusa*, 625 N.Y.S.2d 178, 178 (1st Dep't 1995) ("An account stated is an account, balanced and rendered, with an assent to the balance either express or implied."). However, where, as here, an enforceable agreement exists and the plaintiff's account stated claim seeks the same damages as the plaintiff's breach of contract claim, the

account stated claim is duplicative of the contractual claim and must be dismissed. *See Pro. Merch. Advance Cap., LLC v. C Care Servs., LLC*, No. 13-cv-6562 (RJS), 2015 WL 4392081, at *6 (S.D.N.Y. July 15, 2015); *see also Media Tenor Int'l AG v. Medco Health Solutions, Inc.*, No. 13 Civ. 7223 (DLC), 2014 WL 2933215, at *8 (S.D.N.Y. June 27, 2014) ("If plaintiff can prove an enforceable contract, then it will be able to recover under that cause of action, and the account stated claim can be dismissed.") (quoting *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 567 N.Y.S.2d 404, 409 (1st Dep't 1991)) (internal quotations omitted).

APE's counterclaims for account stated assert identical damages to its alleged damages under its breach of contract claims under the Rental Agreement, invoices and Purchase Orders. (*See* Docket No. 36 at 17-22 ¶¶ 36-62). Moreover, the Court has already determined that these documents constitute enforceable agreements and that APE is entitled to judgment on the contractual claims thereunder as a matter of law. *See supra* Section II.B.3. Therefore, Alessi's cross-motion for summary judgment dismissing APE's account stated claims is granted, and APE's motion for summary judgment granting such claims is denied.

### 5. The Parties' Cross-Motions on APE's Unjust Enrichment Claim

Alessi also seeks summary judgment dismissing APE's counterclaims for unjust enrichment based on the Rental Agreement, Purchase Orders and unpaid invoices. (Docket No. 100). APE cross-moves for summary judgment granting these claims. (Docket Nos. 92; 110 at 9). Because the Court already identified enforceable agreements governing the unpaid invoices, *see supra* Section II.B.3, these unjust enrichment counterclaims must be dismissed as duplicative of APE's breach of contract claims. *See supra* Section II.B.2; *see also Mindspirit*, 346 F. Supp.

3d at 594–95.  Therefore, Alessi is entitled to summary judgment on these counterclaims and the Court denies APE's cross-motion.[43]

## III.  CONCLUSION

For the foregoing reasons Alessi's motion for summary judgment is granted in part and denied in part, and APE's motion for summary judgment is granted in part and denied in part.

In summary, Alessi is entitled to judgment as a matter of law with respect to liability on its breach of contract claim under the 2012 Distributor Agreement only; however, damages related to this claim cannot be determined on the instant motion and must proceed to trial. Furthermore, APE is entitled to summary judgment on its breach of contract counterclaim in its entirety; therefore, Alessi must pay the amounts reflected in the outstanding invoices, Purchase Orders and Rental Agreement.  Alessi's breach of contract claim under the 1996 Agreement and 2004 Memorandum, as well as Alessi's unjust enrichment claim are dismissed in their entirety. Finally, APE's account stated and unjust enrichment claims are also dismissed in their entirety.

The Clerk is respectfully requested to terminate the pending motions. (Docket Nos. 92; 100).

Dated: January 6, 2022
          White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge

---

[43] In a single line in its memorandum of law in support of its motion for summary judgment, Alessi also requests "an award of costs[] [and] reasonable attorney fees for the instant motion." (Docket No. 101 at 12).  Alessi does not cite any legal authority or circumstances that it believes entitle it to such costs and fees.  Absent such an explanation, Alessi is not entitled to an award for litigation costs and fees associated with its own summary judgment motion. *Cf. BCI Constr., Inc. v. 797 Broadway Grp., LLC*, Nos. 1:16-CV-1077 (FJS/TWD), 1:16-CV-1113 (FJS/TWD), 2017 WL 1743824, at *3 (N.D.N.Y. May 3, 2017).