UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ALESSI EQUIPMENT, INC.,

                         Plaintiff,

       -against-

AMERICAN PILEDRIVING EQUIPMENT, INC.,          **OPINION AND ORDER**

                       Defendant.           18 Civ. 3976 (JCM)
-------------------------------------------------------------X
AMERICAN PILEDRIVING EQUIPMENT, INC.,

                       Counterclaim-Plaintiff,

       -against-

ALESSI EQUIPMENT, INC.,

                       Counterclaim-Defendant.
-------------------------------------------------------------X

      Plaintiff Alessi Equipment, Inc. ("Alessi") commenced this action against Defendant

American Piledriving Equipment, Inc. ("APE") on May 5, 2018 asserting, *inter alia*, claims for

breach of contract. (Docket No. 5).  Alessi filed an amended complaint (the "Amended

Complaint") on July 24, 2018. (Docket No. 18).  On March 19, 2019, APE filed an answer and

asserted counterclaims for breach of contract against Alessi. (Docket No. 36).  On January 6,

2022, the Court granted Alessi partial summary judgment with respect to liability on Alessi's

claim for breach of the parties' Distributor Agreement and Memorandum of Understanding,

dated May 27, 2012 (the "2012 Distributor Agreement" or the "Agreement"), and granted APE

summary judgment with respect to APE's breach of contract counterclaims in their entirety.

(Docket No. 114).  The Court held a four-day jury trial from June 8, 2022 through June 13, 2022

with respect to damages flowing from APE's breach of the 2012 Distributor Agreement, and the

jury found APE liable for $920,846.70. (Docket No. 174).  Presently before the Court is APE's

motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil

Procedure ("Rule") or, in the alternative, for a new trial or remittitur pursuant to Rule 59(a).

(Docket No. 183).  Alessi opposes the motion, (Docket No. 191), and APE replied, (Docket No.

197).

       For the following reasons, APE's motion is denied in its entirety.

## I.  BACKGROUND

       The Court presumes the parties' familiarity with the underlying facts of this case, set out

in greater detail in the Court's Opinion and Order regarding their cross-motions for summary

judgment. (Docket No. 114).  The Court therefore limits this discussion to a summary of the

pretrial proceedings and trial.

       Alessi and APE began a manufacturer-distributor relationship sometime in the 1990s.

(Tr.[1] 159:5-13).  Alessi distributes excavator-mounted construction equipment. (*Id.* at 12:19-

13:4).  APE manufactures and distributes piledriving equipment, including excavator-mounted

piledriving equipment and a product called the Robovib. (*Id.* at 21:24-22:13, 23:11-16).  The

parties formalized their relationship via a September 1, 2004 memorandum from John White

("Mr. White"), APE's president at the time, to Gerry Alessi ("Mr. Alessi"), Alessi's owner,

"grant[ing] to A[lessi]" (1) "the exclusive right to sell Robovib in the Northeast USA;" and (2)

the "non-exclusive right to sell anywhere else in the USA" (the "2004 Memorandum"). (PX-3 at

3; *see also* Tr. 144:25-145:22).  The 2004 Memorandum provided that "the first" Robovib would

be sold at a 25% discount, and "[t]he price w[ould] go down once [APE] g[o]t into production."

_____

[1] Refers to the Trial Transcript dated June 8, 9, 10 and 13, 2022. (Docket Nos. 196; 201-203).  All citations to the
Trial Transcript reference the original page numbers rather than the page numbers assigned upon electronic filing.

(PX-3 at 2).  The 2004 Memorandum further stated: "[W]e do understand that if the distributor is not allowed to make at least 20% then he will not do well.  In fact, at a discount of 20% we doubt the distributor can do more than break even." (*Id.*).

The parties entered into the 2012 Distributor Agreement—on which Alessi's breach of contract claim is based—on May 27, 2012. (PX-4).  It is undisputed that the Agreement required that (1) Alessi be APE's exclusive distributor of the Robovib and the APE/J&M line of excavator-mounted equipment in the Northeast; and (2) Alessi pay APE 2% commissions on any APE/J&M Robovib or excavator mounted-equipment sold outside the Northeast. (Tr. 475:9-15). The 2012 Distributor Agreement further provided that "in return" for these commissions, "APE agree[d] to direct all Robovib and excavator rentals and sales to Alessi . . . as a first option," and "agree[d]" to a two-year cancellation period. (PX-4).  The 2012 Agreement did not mention any price or discount, nor did it provide any additional information regarding the products to be directed to Alessi "as a first option." (*See id.*).

At the summary judgment stage, the Court ruled as a matter of law that APE breached the 2012 Distributor Agreement by failing to direct to Alessi all sales of equipment covered by the Agreement in the Northeast. (Docket No. 114 at 38-39).  At trial, Alessi alleged that as damages, because it was entitled to a 20% discount on purchases from APE, Alessi should be awarded 20% of all sales of covered equipment to third-parties in the Northeast from the Agreement's execution to the end of its two-year cancellation period. (Tr. 3:13-24, 16:3-15, 454:22-455:2). Alessi also alleged that (1) the Agreement's exclusivity provision covered replacement parts, and thus, Alessi was owed 20% of APE's parts sales to third-parties in the Northeast; (2) the Agreement required APE to offer to Alessi all sales of covered equipment and parts *outside* the Northeast as a first option, and because APE failed to do so, Alessi was entitled to 20% of such

sales outside the Northeast to third-parties; and (3) APE failed to give Alessi a 20% discount on all covered equipment and parts that Alessi purchased, such that Alessi was also entitled to the difference between the prices it paid during the relevant period and 20% of each sale to Alessi.[2] (*E.g.*, *id.* at 442:16-21, 454:13-455:9). Alessi alleged that these lost sales and unfulfilled discounts amounted to $1,440,896.42 in damages. (*Id.* at 454:22-24).

In response, APE argued that these alleged damages were inflated in several ways. APE maintained that the 2012 Distributor Agreement did *not* give Alessi (1) the exclusive right to sell *parts* in the Northeast; (2) the right to be offered sales outside the Northeast as a first option; or (3) the right to a discount. (*Id.* at 8:13-10:12). APE further maintained that even if the Agreement gave Alessi the right to be offered sales outside the Northeast, (1) this right did not cover *parts* or the *APE/J&M line of excavator-mounted equipment*; and (2) per the Agreement, Alessi would have been obligated to pay APE 2% commissions on any sales outside the Northeast, so these commissions should be deducted from any damages for such sales.[3] (*Id.* at 9:15-22).

The testimony at trial focused on the parties' understandings of the 2012 Distributor Agreement as well as the parties' course of dealing, and the deterioration of their business relationship. On direct examination, Mr. Alessi testified that the Agreement covered the Robovib as well as "[t]he original top-mounted vibros, which is the 15, the 20, the 50, the 100 and the 150E"—also known as the "E series"[4]—as well as replacement parts for this equipment.

---

[2] Alessi did not allege that failure to provide a discount constituted a breach in its Amended Complaint, and first raised this argument in the Joint Pretrial Order without any objection from APE. (Docket No. 149 at 5, 18; *see also* Tr. 338:25-339:2).

[3] Although Alessi did not object, APE raised these arguments for the first time at a case management conference on May 2, 2022, in the Joint Pretrial Order or at trial. (*Cf.* Docket No. 149 at 19 n.1).

[4] In other words, according to Mr. Alessi, the "APE/J&M line of excavator-mounted equipment" noted in the second paragraph of the Agreement referred to "the E series vibros." (*Id.* at 90:14-16). Alessi also offered evidence—in the

(*Id.* at 15:21-24, 23:24-24:4, 62:17-63:13, 81:18-21; *see also* Tr. 22:2-8).   Mr. Alessi understood that under the Agreement, the Northeast was Alessi's exclusive territory, and outside that area, "APE . . . agree[d] to direct all Robovib[] and excavator rentals and sales to Alessi . . . as its first option,"[5] with both territories covering these products. (*Id.* at 23:11-24:4; *see also* Tr. 104:17-105:2).   In return, "if one of the APE salesmen . . . gave [Alessi] a sales lead," Alessi would "write [the salesman] a check for . . . 2 percent of the unit." (*Id.* at 25:22-26:3).   Alessi was also responsible for installing equipment or parts and conducting repairs for customers. (*Id.* at 14:22-24, 16:8-15).   With respect to "compensation," Alessi "would get a [20%] discount from APE and . . . [Alessi] would sell" both the equipment and parts "at a list price to the customer," and thus, profit from the difference. (*Id.* at 16:8-13; *see also id.* at 22:14-18, 25:2-8).   Although the 20% discount was not mentioned in the Agreement, Mr. Alessi understood that it was a required term of the Agreement because he "always had a 20 percent discount with APE." (*Id.* at 24:5-11; *see also id.* at 39:20-23).   Moreover, the 2004 Memorandum stated that Alessi would receive a 25% discount on the first Robovib; that "the price would go down from there;" and, consistent with industry standards, that "20 percent . . . [wa]s a baseline minimum for distributorship on making money and supporting product." (*Id.* at 85:6-12, 144:21-146:21; *see also* PX-3).

---

form of a November 19, 2019 price list that APE e-mailed to Mr. Alessi—suggesting that 64X Vibros were subject to the Agreement as well. (*See id.* at 148:15-149:13; PX-72).  The heading of the price list read: "Excavator Mounted Vibratory Drivers/Extractors – Typical Setup." (PX-72).  APE initially objected when Alessi introduced the price list into evidence, but ultimately concurred that "all" of the products listed, including the 64X, were "subject to this litigation." (Tr. 149:5-15).  Mr. Alessi was never asked to clarify this issue.

[5] Although the Agreement's language referencing Alessi's rights to distribute certain products in the Northeast differed from its language addressing these rights outside the Northeast, Mr. Alessi testified that both territories covered the same products. (*Id.* at 108:9-19).  Mr. Alessi believed the words "excavator rentals and sales" in the second paragraph of the Agreement referred to the E-series (also known as "excavator-mounted") line of equipment—even though these products are not excavators—because APE "do[es] not sell excavators." (*Id.* at 108:20-109:24).

Beginning in 2013 or 2014, Mr. Alessi noticed that APE's invoices for both parts and equipment no longer showed a 20% discount. (Tr. 24:9-16, 49:2-50:16, 55:17-56:14). Sometimes, the invoices reflected a discount lesser than 20%, while on other occasions, the invoices showed no discount at all. (*Id.* at 55:2-56:14; *e.g.*, PX-79; PX-81). Mr. Alessi called APE to complain every time this happened, but was repeatedly told that "that's what you're going to get," (Tr. 24:9-25:16), or that the discount was "already" reflected in the price,[6] (*id.* at 48:3-6). Beginning in 2015, Mr. Alessi also learned that APE had begun selling directly to Sevenson Environmental and Moncon, two of his customers in New York. (*Id.* at 27:1-28:20). He explained that APE's practice of selling directly to Alessi's customers "destroy[ed] [his] business"—causing sales to decrease every year—and was in contravention of "the whole purpose of the distribution agreement." (*Id.* at 28:24-29:5; *see also* PX-71). APE took no steps to stop this practice when Alessi complained. (Tr. 30:6-11). On the other hand, according to Mr. Alessi, nobody from APE contacted him regarding unpaid commissions during the relevant period. (*Id.* at 26:14-25). Alessi stopped selling APE equipment "around 2017" and received a letter from APE "purport[ing] to cancel" the 2012 Distributor Agreement on February 18, 2021. (*Id.* at 30:12-16, 36:9-20; *see also* PX-5).

On cross-examination, Mr. Alessi admitted that no invoices or other documents demonstrating that he ever received or was promised a 20% discount during the relevant period were admitted into evidence, even though he was sure such evidence existed. (Tr. 82:13-84:7). To the contrary, APE had sent invoices reflecting an approximately 15% discount, and although Alessi had complained, Mr. Alessi "had no choice" but to "accept[]" each transaction because he

---

[6] However, the prices changed "constantly" and APE rarely gave Alessi current price lists, preventing Alessi from evaluating whether any discount was incorporated. (*Id.* at 41:9-15, 48:3-23)

needed the money. (*Id.* at 113:13-115:19).  Mr. Alessi also admitted that the 25% discount represented in the 2004 Memorandum only applied to the first Robovib.[7] (*Id.* at 155:12-156:1). He further admitted the 2012 Distributor Agreement did not explicitly give Alessi the "exclusive right to sell replacement parts;" rather, Mr. Alessi "understood" that this was included based on "how the distributorships work in the industry," the parties' decades-long relationship, and their "previous arrangements."[8] (*Id.* at 87:4-8, 102:20-103:24).  Mr. Alessi also testified that even though the Agreement required Alessi to pay commissions to APE, Alessi paid them directly to APE's salespeople. (*Id.* at 110:2-25; *see also id.* at 133:21-134:10).  Mr. Alessi did not believe that 2% should be deducted from APE's sales of covered products to third-parties to account for these commissions because Alessi would "mark [the price] up 2 percent above the list price" to cover that amount. (*Id.* at 112:6-10).

APE's counsel tried to get Mr. Alessi to concede that discounts were incorporated into the prices on several invoices by comparing them to discounted prices for the same products on other invoices, but Mr. Alessi responded that this pattern only confirmed that he was not always offered the promised discount and that the prices fluctuated. (*Id.* at 121:9-126:4).  Mr. Alessi acknowledged that his company had expenses when handling installation, repairs or set-up such as paying mechanics and fronting travel costs. (*Id.* at 134:17-143:6).  He further admitted that set-up would be more expensive for Alessi if a customer was located outside the Northeast, but insisted that this would never dissuade Alessi from accepting a sale in such a location because the customer would pay any additional costs for set-up and travel. (*Id.* at 143:2-144:2).

---

[7] However, Mr. Alessi insisted that the agreed-upon discount was 20% "going forward." (*Id.* at 156:11-21).

[8] As Mr. Alessi explained, based on his thirty-five years in the industry, "when you sell the unit, . . . the same discount applies to the parts as well.  That's how you support the unit." (*Id.* at 87:8-10, 90:19-91:1).

Furthermore, despite counsel's attempt to highlight the ambiguity of the Agreement's language regarding the covered products for transactions outside the Northeast, Mr. Alessi explained that this provision must refer to "excavator-mounted series" because the E-series products "are the only attachments APE made to go on an excavator" and "[APE] d[id not] sell excavators." (*Id.* at 108:12-110:1).

Alessi introduced into evidence twenty-one invoices from the relevant period reflecting direct sales of equipment and related accessories from APE to third-parties both in and outside of the Northeast, (PX-11; PX-12; PX-13; PX-18; PX-19; PX-20; PX-22; PX-23; PX-24; PX-27; PX-29; PX-30; PX-31; PX-34; PX-37; PX-39; PX-40; PX-41; PX-42; PX-43; PX-44), as well as nine invoices from the same timeframe reflecting sales of such products to Alessi but showing no discount at all or a discount below 20%, (PX-16; PX-17; PX-21; PX-26; PX-28; PX-33; PX-38; PX-79; PX-81).  Dan Collins ("Mr. Collins"), APE's current President and former CFO,[9] testified that APE's invoices "generally" designated parts with the letter "P" and equipment with the letters "E" or "ES."[10] (Tr. 158:20-23, 160:6-22).  He admitted that APE did not "refer the possibility" of the third-party sales to Alessi, explaining that he was unaware of the 2012 Distributor Agreement.[11] (*E.g.*, *id.* at 174:2-8, 176:4-6).  For the same reason, he never communicated with Mr. Alessi about any obligation on Alessi's part to pay APE 2% commissions on sales outside the Northeast. (*Id.* at 196:14-197:16).  However, Mr. Collins testified that he was aware of the 2004 Memorandum and its requirement that Robovibs be sold

---

[9] Counsel for Alessi called Mr. Collins as an adverse witness during Alessi's case-in-chief, and Mr. Collins also submitted direct testimony on behalf of APE.

[10] Mr. Collins later testified that "SC" designations indicated "a credit." (Tr. 316:2-5).

[11] Mr. Collins also testified that he "d[id not] think" Alessi purchased 64X Vibros from APE, but admitted that the price list exchanged between the parties that was introduced through Mr. Alessi included the 64X and listed the price for it. (*Id.* at 170:90-171:1; *see also* PX-72; *supra* n.4).

through Alessi when it was in force. (*Id.* at 198:3-17).  He further explained that APE provided Alessi a 15% discount "most of the time," and disagreed with the proposition that a 20% discount is "the least a distributor can do . . . to break even." (*Id.* at 210:4-14).  With respect to one invoice reflecting a sale to Alessi without any discount listed, Mr. Collins represented that "the price reflect[ed] a discount" but could not direct counsel to any evidence on the invoice that such a discount was provided. (*Id.* at 212:21-213:8; *see also* PX-16).

Alessi also introduced PX-9, which Mr. Collins testified was "a listing of transactions" from 2012 through 2020 containing APE invoice numbers, customer names, and sales amounts, all pulled from APE's internal accounting system. (Tr. 161:3-162:4).  Mr. Collins explained that the "P numbers" in the left-most column reflected sales of parts; the "SP numbers" reflected "service and parts;" and while the "E" or "ES" numbers generally reflected sales of equipment, the few "E" and "ES" numbers on PX-9 were "probably . . . mistake[s]" because the spreadsheet seemed to reflect parts-related transactions. (*Id.* at 163:11-165:23).

Before resting, counsel for Alessi read into the record portions of Mr. White and Pat Hughes'[12] ("Mr. Hughes") deposition testimony.[13]  This included Mr. White's testimony that under the 2012 Distributor Agreement, Alessi was not required to sell APE's products at list price, but rather, "could sell [them] for whatever price [it] wanted;" and that the Agreement covered "parts to repair the Robovib[] as well as vibros that are side mounted." (*Id.* at 245:13-18, 246:2-5).  Mr. White further testified that contrary to Mr. Collins' testimony on the stand, Mr.

---

[12] Pat Hughes is the chairman and CEO of APE. (*Id.* at 288:8-14).

[13] These individuals, both residents of Washington, are beyond the scope of this Court's subpoena power. *See* Fed. R. Civ. P. 45(c); *see also Broumand v. Joseph*, 522 F. Supp. 3d 8, 23 (S.D.N.Y. 2021); *Ping-Kuo Lin v. Horan Cap. Mgmt., LLC*, No. 14 Civ. 5202(LLS), 2014 WL3974585, at *1 (S.D.N.Y. Aug. 13, 2014).  Therefore, the parties submitted deposition designations to be read to the jury and the Court ruled on any objections outside the jury's presence. (Tr. 218:13-244:22, 248:6-253:11); (*see also* Docket Nos. 172-73).

White remembered discussing that Agreement with him. (*Id.* at 245:20-25).  Counsel also read Mr. Hughes' testimony that before leaving APE, Mr. White was the President of APE and handled "sales and product design." (*Id.* at 288:17-23).

During APE's case-in-chief, Mr. Collins testified that certain sales data introduced through Mr. Alessi that purported to show a decline in APE's sales to Alessi between 2013 and 2016 was incomplete. (*Id.* at 292:9-15).  Mr. Collins explained that the "actual sales numbers" for the same years showed that the sales increased each year except between 2013 and 2014. (*Id.* at 293:1-295:4; *see also* PX-71).  According to Mr. Collins, Mr. Alessi's understanding that the Agreement covered parts in addition to equipment was "absurd" because parts are delivered to customers separately for repairs, and the two categories have different designations on invoices. (Tr. 295:8-296:18).  Mr. Collins further disputed Mr. Alessi's contention that Alessi was promised or ever received 20% discounts, stating that discount amounts fluctuated over time and Alessi was "typically" given only 15% discounts. (*Id.* at 296:22-297:8).  Mr. Collins explained that APE's invoices did not always reflect discounts made "because the prices [we]re negotiated ahead of time, they are quoted, . . . [and] [a] downpayment is made . . . before the invoice is ever generated," and "different people that generate invoices do it differently." (*Id.* at 298:21-299:9).  Therefore, Mr. Collins insisted that some invoices reflecting sales to Alessi incorporated discounts even though no such discounts were indicated.[14] (*Id.* at 299:11-302:23; *see also* PX-28; PX-33).

Mr. Collins represented that he had reviewed APE's records and could not locate any documents reflecting that Alessi paid commissions to APE's salespersons from 2012 onward.

---

[14] However, PX-79, an invoice dated March 22, 2013, did not incorporate any discount into the price because it reflected the sale of "a used piece of equipment" which "w[as] negotiated completely separately outside of an existing price structure." (*Id.* at 302:14-303:5).

(Tr. 303:17-25).  APE's counsel elicited further testimony from Mr. Collins that unlike Alessi, APE's business structure includes regional and international offices in order to sell and service its products locally and to eliminate extra transportation costs. (*Id.* at 304:10-305:21).

On Mr. Collins' cross-examination, Alessi's counsel elicited testimony that based on two invoices showing transactions on December 5, 2014 and May 5, 2016, a Robovib cost "approximately $125,000" during that period. (*Id.* at 316:16-317:12; *see also* PX-26; PX-38). When shown a third invoice from October 29, 2015 showing a Robovib sold to Alessi for $100,570.00—which Mr. Collins had previously claimed incorporated a discount—Mr. Collins conceded that based on his own logic, this discount was "closer to 25%" than 15%. (Tr. 318:3-319:10; *see also* PX-33).  Alessi's counsel then introduced into evidence PX-127, which Mr. Collins identified as "some kind of a commission schedule"—most likely produced by APE— with "Employee/Salesperson listing[s] with . . . paid dates" as well as invoice numbers and customer names in the first, second, third and fifth columns.[15] (Tr. 320:1-24; *see also* PX-127). Mr. Collins further identified sales amounts for transactions between 2012 and 2019[16] in the "third-to-last column," with the caveat that the schedule was "not comprehensive" because it did not include all of APE's sales during that period. (Tr. 322:1-16).

After APE rested, the Court held a charging conference outside the presence of the jury to allow the parties to be heard on its proposed charge.  In the course of that discussion, APE

---

[15] When asked whether PX-127 also identified "the sales of equipment" presumably in the "Invoice #" column, however, Mr. Collins stated that he "[was] not sure what the numbers reflect[ed]" besides invoice numbers. (Tr. 320:10-14; *see also* PX-127).

[16] The parties stipulated that additional transactions predating this period would be redacted from the version of this exhibit that was published to the jury. (Tr. 320:25-321:9).

objected to the Court's proposed charge regarding Alessi's claim for damages flowing from

APE's failure to provide Alessi discounts on parts. (*Id.* at 355:4-19).  Counsel stated:

> One of the four components of [Alessi]'s statement of damages . . .
> was the failure to provide [a] discount on parts . . . .  There's no[]
> evidence that was offered in this case . . . – no invoices, no evidence,
> suggesting that APE did not give a discount on parts or the proper
> amount of a discount on parts.  We had invoices entered.  There was
> a lot of testimony about certain invoices pertaining to equipment . .
> . , but nothing on parts.  So that category should really not be
> presented to the jury.

(*Id.* at 355:9-19).  Alessi responded that this category should be included in the charge because

there was sufficient evidence of such damages through PX-9. (*Id.* at 355:25-357:10).  APE

protested that PX-9 was insufficient because it only showed Alessi's purchases of parts on

particular dates, without showing "what the price should have been." (*Id.* at 357:17-19).  The

Court determined that because PX-9 showed parts that were sold at particular prices on particular

occasions, that document, combined with testimony that Alessi did not receive 20% discounts on

parts, would be "weak" but sufficient evidence to send the issue to the jury because, if the jury

chose to believe that 20% discounts were required but never given, they could calculate any

amount owed based on the "figures" in PX-9. (*Id.* at 361:25-362:16).  The Court, together with

the parties, then searched the record and confirmed that Mr. Alessi had testified that Alessi did

not receive a discount on parts, and Mr. Collins testified that APE generally provided only 15%

discounts to Alessi, even though he believed parts were not covered by the Agreement. (*Id.* at

358:16-361:2, 377:2-379:24; *see also id.* at 25:2-16, 296:6-297:8).   Thus, the Court concluded

that the issue of damages with respect to discounted parts came down to a credibility

determination, requiring the jury to choose whether to believe Mr. Collins or Mr. Alessi such that

the Court could not "step in . . . and say that, as a matter of law, that does not go to a jury."[17] (*Id.* at 380:3-8).  The Court then finalized the jury charge based on further feedback from the parties, with Alessi's failure to receive discounted parts included in the charge. (*Id.* at 380:21-384:22).

The next morning, before summations and also outside the presence of the jury, APE requested the Court's permission to use a demonstrative aid—which it had disclosed to Alessi about twenty minutes earlier—during APE's closing statement. (*Id.* at 386:2-389:10).  Besides objecting to the impropriety of this late request, Alessi contended that APE should not be permitted to include a heading on the demonstrative contending that 64X Vibros on certain invoices were "not covered by the 2012 Agreement." (*Id.* at 388:1-8, 391:18-392:5).  Alessi explained that "a demonstrative exhibit . . . would have to be supported by testimony and evidence[,] . . . [and] [t]here [wa]s no testimony that was elicited from any witness that [64X Vibros] were not applicable in this litigation" or that the 64X "is not a side-mounted vibro."[18] (*Id.* at 391:19-392:7).  Ultimately, the Court permitted APE to use the demonstrative with its headings and exhibit references intact, but (a) with all invoice amounts removed, and (b) with the caveat that the Court would instruct the jury that the demonstrative itself was not evidence. (*Id.* at 393:18-398:6).

On summation, APE argued that, consistent with the objected-to heading, PX-11, PX-23, PX-24 and PX-40 could not be a basis for damages because these invoices reflected sales to third-parties for 64X Vibros or a 23 Vibro E, yet "[t]here [wa]s no evidence . . . that th[is]

---

[17] When the Court gave APE the opportunity to be heard further on this ruling, counsel stated: "I think it's fine.  I mean, the point I had made to you, your Honor, was that there's no invoice . . . I understand your point. . . . I have nothing further to add on it." (*Id.* at 380:16-20).

[18] A few minutes later, when asked whether "anything in [the demonstrative] . . . [wa]s inaccurate," Alessi repeated this objection, stating, "the 64X is a device that was never testified to.  It was not a part of this litigation." (*Id.* at 393:1-8).  The Court responded: "Look at the top of that chart.  It says, 'Alessi claimed damages not covered by the 2012 Agreement.'  So that's exactly what [counsel for APE] is saying." (*Id.* at 393:9-11).

equipment . . . was covered by the 2012 Agreement" and Mr. Collins testified that the 64X was never sold to Alessi. (*Id.* at 419:18-422:24). APE further argued that with respect to sales to third-parties, even if the jury found that Alessi was entitled to a discount under the Agreement, any damages should be based on "something less than 15 percent" because (a) there was no evidence that a 20% discount was ever given to Alessi; (b) Mr. Collins testified that Alessi typically got a 15% discount; (c) Alessi's expenses would have prevented it from profiting from the entirety of any discount; and, (d) in exchange for being offered sales outside the Northeast, Alessi was required to pay APE a 2% commission. (*Id.* at 404:20-413:22, 416:3-417:12). With respect to sales outside the Northeast specifically, APE also took the position that the language in the 2012 Distributor Agreement did not cover the APE/J&M line of excavator mounted equipment, and Alessi would not necessarily have gotten every sale APE offered since customers outside the Northeast would have to pay Alessi extra travel costs. (*Id.* at 414:3-19). APE further urged the jury to exclude parts from any damages amount, arguing that there was no evidence beyond Mr. Alessi's word that parts were subject to the Agreement, and "nobody testified to what [PX-9] actually encompasses."[19] (*Id.* at 424:6-433:6). Finally, APE insisted that Alessi was not entitled to any damages based on APE's alleged failure to discount Alessi's purchases, as any discount was already reflected in the price, and Alessi consistently accepted products without the discount that Alessi believed was required. (*Id.* at 436:2-439:11).

Alessi's closing did not mention the 64X or 23 Vibro E, but rather, described the products subject to the Agreement as the "Robovib, . . . APE/J&M line of excavator mounted equipment, and the related parts." (*Id.* at 442:16-21). Alessi contended that a plain reading of the Agreement's provisions regarding sales outside the Northeast would lead to absurd results

---

[19] Moreover, APE argued, to the extent the jury chose to rely on PX-9, they must "net . . . out" any transactions listing sales credits because these were not "positive sales." (*Id.* at 434:16-23).

because these provisions describe the covered products as "excavator sales and rentals" and "excavators[] . . . [are] . . . vehicle[s]," which Alessi does not sell. (*Id.* at 443:16-444:11). Alessi further argued that the jury should credit Mr. White's testimony that the Agreement covered both parts and "side moun[t]ed vibros," since Mr. White signed and "negotiated it." (*Id.* at 448:15-449:2). Moreover, Mr. Alessi's testimony regarding industry standards and the parties' course of dealing, as well as the language in the 2004 Memorandum, confirmed that the parties had agreed that Alessi, as APE's distributor, was entitled to a 20% discount. (*Id.* at 445:14-447:13; *see also id.* at 452:8-453:4). Further relying on Mr. Alessi's testimony regarding these dealings and his company's business structure, Alessi disputed APE's contentions that (a) Alessi waived the opportunity to challenge APE's failure to provide the requisite discount; (b) Alessi would not necessarily have made every sale offered outside the Northeast; and (c) any damages should exclude the commissions Alessi would have had to pay APE on these sales. (*Id.* at 456:10-458:17). Alessi suggested that rather than parsing through invoices, the jury calculate damages based on PX-9—"[a] list of parts sold during the relevant period"—and PX-127—a list of "all the sales made by APE from the period relevant to this litigation." (*Id.* at 448:7-11; *see also id.* at 454:8-21, 458:18-459:3). After deliberations, the jury rendered a verdict finding APE liable for $920,846.70 in damages. (Docket No. 174).

## II.  DISCUSSION

Presently before the Court is APE's motion for judgment as a matter of law under 50(b) or, in the alternative, for a new trial or remittitur under Rule 59(a). APE argues that it is entitled to judgment as a matter of law with respect to Alessi's claim for damages based on APE's alleged failure to provide a discount on parts, because Alessi did not adduce sufficient evidence of parts-related transactions where it was not afforded such a discount. (Docket No. 184 at 5, 23-

25).  APE further argues that it is entitled to a new trial, or at the very least, remittitur, because

the jury's damages verdict was excessive, erroneous, and only supports a maximum recovery of

$658,024.32. (*Id.* at 26-27).  In response, Alessi contends that APE's Rule 50(b) motion "was not

properly noticed[] [and] is not properly before the Court." (Docket No. 191 at 2 n.1).  Alessi

further contends that the Court properly sent to the jury its claim for discounts on parts, and there

was sufficient evidence to support the verdict for all categories of damages sought. (*Id.* at 5-13).

The Court addresses each of APE's motions in turn.

**1.  Rule 50(b) Motion Based on Failure to Provide Discounted Parts**

Rule 50(a) provides that a court may grant a motion for judgment as a matter of law—

*i.e.*, a directed verdict—if "a party has been fully heard on an issue during a jury trial and the

court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for

the party on that issue." Fed. R. Civ. P. 50(a)(1).  A party may move for judgment as a matter of

law under Rule 50(a) "at any time before the case is submitted to the jury." Fed. R. Civ. P.

50(a)(2).  The moving party "must specify the judgment sought and the law and facts that entitle

the movant to the judgment." *Id.*  Although Rule 50(a) does not articulate how specific such a

motion must be, "the purpose of requiring the moving party to articulate the ground on which

[judgment as a matter of law] is sought 'is to give the other party an opportunity to cure the

defects in proof that might otherwise preclude him from taking the case to the jury.'" *Galdieri-*

*Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998) (quoting *Baskin v.*

*Hawley*, 807 F.2d 1120, 1134 (2d Cir. 1986)).

Under Rule 50(b), a party may also "file a renewed motion for judgment as a matter of

law" after trial. *See* Fed. R. Civ. P. 50(b).  In general, the grounds on which a party may rely in a

Rule 50(b) motion are "limited to those grounds that were specifically raised in the prior [Rule

50(a) motion]." *See Galdieri-Ambrosini*, 136 F.3d at 286 (quoting *McCardle v. Haddad*, 131

F.3d 43, 51 (2d Cir. 1997)) (internal quotations omitted); *accord Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1155 (2d Cir. 1994) ("[J]udgment as a matter of law is limited to those issues 'specifically raised in [a] prior motion for a directed verdict.'") (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 14 (2d Cir. 1993)).  A court may only grant a Rule 50(b) motion if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'" *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (quoting *Brady v. Wal–Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir.2008)) (alterations in original).  As the Second Circuit has instructed,

> The motion should be granted only if the court can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been compelled to accept the view of the moving party.  The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury.

*Id.* at 112-13 (quoting *Fairbrother v. Morrison*, 412 F.3d 39, 48 (2d Cir. 2005)) (internal quotations omitted).

As an initial matter, and contrary to Alessi's contentions, APE's Rule 50(b) motion is properly before the Court. (Docket No. 191 at 2 n.1).  Alessi argues, in conclusory fashion, that this basis for relief is "not set out in [APE's] Notice of Motion," and later, notes that a Rule 50(b) motion is a "renewed motion for judgment as a matter of law" following the denial of a Rule 50(a)(2) motion made before submission of the case to the jury. (*See id.* at 2 n.1, 4 (quoting Fed. R. Civ. P. 50(b))).  Alessi is correct that APE's Notice of Motion does not reference Rule 50(b), and thus, does not comply with Local Civil Rule 7.1. (Docket No. 183); *see* Local Civil Rule 7.1(a) of the Local Rules of the United States District Courts for the Southern and Eastern

Districts of New York.  However, in the interest of resolving APE's motion on the merits, the Court will overlook this oversight and presume that APE seeks relief under both rules cited in its opening brief. *Cf. Hilbert v. Fischer*, No. 12 CIV. 3843 (ER), 2013 WL 4774731, at *1 n.2 (S.D.N.Y. Sept. 5, 2013).

Moreover, to the extent Alessi attempts to challenge the sufficiency of APE's motion on the grounds that APE did not explicitly move pursuant to Rule 50(a) at trial, that argument is meritless.  APE raised the same issues on which its motion is based—namely, the sufficiency of Alessi's evidence of damages relating to APE's failure to provide discounts on parts—during the charging conference, in connection with the Court's proposed instructions regarding this category of damages. (*See generally* Tr. 355:9-19).  In response, the Court construed APE's objection as a motion for judgment as a matter of law under Rule 50(a), reviewing the relevant testimony and exhibits in evidence and considering whether there was more than "a scintilla . . . of evidence" that would allow the jury to decide the issue. (*Id.* at 361:13-17; *see also id.* at 358:16-361:2, 377:2-379:24); *see also Gunning v. Cooley,* 281 U.S. 90, 94 (1930) ("A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule 'that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed.'") (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).  Thus, APE sufficiently preserved this argument for renewal pursuant to Rule 50(b). *See* Fed. R. Civ. P. 50(a)(2), 50(b); *see also Gordon v. Cnty. of Rockland*, 110 F.3d 886, 887 n.2 (2d Cir. 1997) (finding that Rule 50(a) motion met specificity requirement where trial court "intervened and on [its] own discussed" the issue on which movant's Rule 50(b) motion was

based); *Campbell v. Liberty Transfer Co.*, No. CV-02-3084, 2005 WL 2002453, at \*2 (E.D.N.Y.
Aug. 19, 2005), *order vacated on reconsideration on other grounds*, 2006 WL 3751529
(E.D.N.Y. Dec. 19, 2006) ("treat[ing] that charge conference colloquy as motion for judgment as
a matter of law" where defendant raised the "insufficiency of plaintiff's proof" during the
conference but did not "expressly move for judgment as a matter of law at the conclusion of all
the evidence").

Nonetheless, APE's Rule 50(b) motion fails.  APE recycles its arguments from the
charging conference, contending that even if the jury found that APE was required to provide
discounts on parts, "Alessi offered insufficient evidence or testimony to support its position that
it did not receive such a discount and failed to identify any specific transaction where a discount
was not given with respect to . . . parts." (Docket No. 184 at 23).  However, as the Court ruled at
the charging conference, Alessi's evidence was sufficient to send this issue to the jury.
Witnesses from both sides stated under oath that during the relevant period, Alessi did not get a
20% discount on its purchases from APE, which included parts.[20] (Tr. 23:24-24:16, 49:2-50:16,
55:17-56:14, 210:4-14).  Mr. Alessi further testified that he stopped getting discounts "around
2013, 2014, somewhere in that neighborhood." (Tr. 24:9-15).  Moreover, Mr. Collins, APE's
current President and former CFO, testified that APE's practice was to designate parts with the
letter "P," and that based on the information contained in PX-9—including invoice numbers
beginning with "Ps," dates and sales amounts—PX-9 was a "listing of transactions" related to

---

[20] APE is incorrect that Mr. Collins was only discussing equipment when he testified that distributors like Alessi
"typically" received a 15% discount. (Docket No. 184 at 24 n.24; *see also* Tr. 296:22-297:8).  Mr. Collins provided
this testimony in response to the general question: "[W]hat was the discount that was typically given to
distributors?" (Tr. 296:22-23).  Counsel did not ask the question in connection with a particular invoice or
transaction, as APE claims, but rather, raised it directly after eliciting testimony regarding whether the 2012
Distributor Agreement encapsulated parts, and regarding APE's letter designations for parts and equipment. (*See id.*
at 296:2-18).  Therefore, the jury could have reasonably interpreted Mr. Collins' response to be referencing
discounts for both parts and equipment.

parts that was taken from APE's accounting system. (*Id.* at 161:3-165:23). Based on this evidence, the jury had sufficient information to infer that Alessi made the purchases of parts listed on PX-9 without receiving a 20% discount. If they believed Mr. Alessi that his company was entitled to such a discount, they could further infer that APE owed Alessi the difference for each undiscounted transaction on PX-9. It is not the Court's place to reevaluate such a credibility determination in connection with a Rule 50(b) motion. *See Wiercinski*, 787 F.3d at 112.

APE's belief that the jury had no specific transactions to consider with respect to this category of damages is also inaccurate. (Docket No. 184 at 25). The jury heard numerous times that Alessi did not receive discounts on parts during a specific timeframe, and through PX-9, was presented with several instances within that same period in which APE sold Alessi parts. In a breach of contract action under New York law, "where the existence of damages is certain, uncertainty as to their amount will not bar recovery, provided the claimant provides a 'stable foundation for a reasonable estimate.'" *Exodus Partners, LLC v. Cooke*, No. 04 Civ. 10239 (GEL), 2007 WL 120053, at *7 (S.D.N.Y. Jan. 17, 2007) (quoting *Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 392 (2d Cir. 2006)); *see also Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995). Therefore, the mere fact that PX-9 did not list the specific parts purchased on each occasion is immaterial. This is so given Mr. Collins' conclusion that most or all of the transactions therein involved parts, and given Mr. Alessi's unqualified testimony that he "always" received a 20% discount when he purchased from APE. (Tr. at 24:5-11, 163:11-165:23). Based on Mr. Alessi's phrasing, the jury could have reasonably understood Mr. Alessi to be recalling that before the parties' relationship devolved, APE consistently gave Alessi this discount on parts, irrespective of whether Alessi was purchasing specific parts covered by the

Agreement.  Nor was the jury's calculation based on PX-9 "speculat[ive]," (Docket No. 184 at 25), as Mr. Alessi testified that he realized that he stopped receiving discounts around 2013 or 2014, giving the jury a rough date from which to begin their damages calculation, (Tr. 24:9-16). *See also Exodus Partners*, 2007 WL 120053, at *7.  Indeed, while APE maintains that "[t]here was . . . no possible way . . . to determine on which transactions . . . Alessi failed to receive a twenty . . . percent discount," Mr. Alessi's insistence that the discounts stopped as of a certain point was sufficient evidence that *all* parts-related sales to Alessi listed on PX-9 from that date forward did not include the required discount. (Docket No. 184 at 25-26).  Viewing this testimony and PX-9 in the light most favorable to Alessi as the non-moving party, this evidence was sufficient for the jury to calculate damages based on APE's alleged failure to provide discounts on parts.

## 2.  Motion for a New Trial or Remittitur

Rule 59(a) provides, in relevant part, that "[t]he court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  A district court may grant a new trial "even if there is substantial evidence to support the jury's verdict." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992).  However, a district court "should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir. 1988).  The standard for granting a Rule 59(a) motion for a new trial is less stringent than the standard for granting a motion for judgment as a matter of law under Rule 50(b) because "a trial judge considering a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'" *See U.S. v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (quoting *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d

Cir. 1978)).  That said, a district judge should give deference to a jury's credibility assessment, *see Landau*, 155 F.3d at 104–05, and "should rarely disturb a jury's evaluation of a witness's credibility," *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). *See also Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992) ("Where the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."), *abrogated on other grounds as noted in Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005).

Rule 59 permits the district court "to set aside an excessive verdict and order a new trial on damages when the quantum of damages found by a jury is *clearly* outside the maximum limit of a reasonable range." *Paper Corp. of U.S. v. Schoeller Tech. Papers, Inc.*, 807 F. Supp. 337, 350 (S.D.N.Y. 1992) (emphasis in original).  "In some cases," however, "a remittitur provides an appropriate alternative to simply granting a new trial." *Exodus Partners*, 2007 WL 120053, at *12.  "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Cross v. New York City Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005) (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir.1990)) (internal quotations omitted).  This mechanism may be appropriate "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken," or "where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993) (quoting *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984)) (internal quotations omitted).  It may also be appropriate if it is apparent that "the jury awarded specific amounts of damages that were not supported by the record." *See Exodus*

22

*Partners*, 2007 WL 120053, at *12; *see also Trademark Research Corp.*, 995 F.2d at 337 (noting that "[i]f it could be demonstrated that the verdict included any of [the plaintiff's] unsubstantiated damages claims, the award would be by definition excessive," warranting remittitur).  Where, as here, remittitur or a new trial are requested in a diversity action, the Court applies state law to determine whether the verdict was excessive. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 430–31 (1996).

APE alleges that the jury's verdict was excessive and erroneous because, even giving Alessi every favorable inference—which the Court need not do—the maximum amount the jury could have reasonably awarded was $658,024.32. (Docket No. 184 at 26).  To support this argument, APE calculates the most it believes the jury could have found for each of Alessi's four categories of damages based on the evidence adduced at trial: (1) APE's sales of equipment to third-parties; (2) APE's sales of parts to third-parties; (3) APE's alleged failure to provide Alessi with discounts on equipment; and (4) APE's alleged failure to provide Alessi with discounts on parts. (*Id.* at 9-26).  APE further alleges that Alessi cannot recover damages for "lost profits arising from the failure to make sales" during the 2012 Agreement's two-year cancellation period because (1) Alessi did not seek this relief in its statement of damages in the Joint Pretrial Order; (2) the Court already precluded Alessi from claiming such damages at trial; and (3) Alessi did not offer sufficient evidence of lost profits. (*Id.* at 8 n.6).  The Court addresses each argument in turn.

**i.  Damages Related to Parts**

The Court easily disposes of APE's contention that a new trial or remittitur is warranted with respect to Alessi's claims for damages for (1) APE's failure to provide Alessi a discount on parts; and (2) APE's sales of parts to third-parties.  The jury had the opportunity to weigh the evidence and testimony of the witnesses with respect to the products covered by the 2012

23

Distributor Agreement, Alessi's alleged entitlement to a discount, and Alessi's purchases of parts during the relevant period.  The jury trial lasted for four days, and each party was given the opportunity to be heard and to fully present its case.

It is impossible to ascertain the jury's specific findings with respect to each category of damages because the verdict sheet required the jury to determine the total amount of Alessi's damages for breach of the Agreement without differentiating between moneys owed for parts or equipment. (Docket No. 174).  However, assuming, *arguendo*, that the jury's verdict was based, in part, on APE's alleged failure to discount parts and to direct parts sales to third-parties, it was not seriously erroneous.  Consistent with the Court's summary judgment decision, (Docket No. 114), the jury was instructed that they could consider extrinsic evidence to clarify ambiguous terms in the 2012 Distribution Agreement. *See generally Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 509 (2d Cir. 1989); N.Y. U.C.C. § 2-202; (Tr. 477:14-21).  The jury thus had every right to believe Mr. Alessi that based on his years-long relationship with APE, his memory of the contract negotiations, and his experience in the piledriving industry, the 2012 Distributor Agreement's exclusivity provisions for all territories covered both parts and equipment—an assertion echoed by Mr. White's deposition testimony. (Tr. 87:4-8, 102:20-103:24, 428:6-9).  Based on these same factors, the jury could have further believed Mr. Alessi that his company was promised a 20% discount on these products;[21] his company made a profit

---

[21] APE is incorrect that "at best, Alessi would only be entitled to an additional 5% (the delta between 15% and 20%)" with respect to this category of damages. (Docket No. 197 at 11 n.11).  APE also misconstrues the Court's comments on this point during the charging conference. (*Id.*).  At trial, while Mr. Collins represented that Alessi "typically" got a 15% discount, (Tr. 296:22-297:8), Mr. Alessi testified that "there c[a]me a period in time in which APE wasn't giving a 20 percent discount," and pointed to at least one instance where no discount was listed on an invoice, (*id.* at 24: 9-11, 47:24-49:6).  The Court's reference to damages for undiscounted parts based on "a delta" during the charging conference was simply meant to dispose of APE's Rule 50 motion by offering a hypothetical in which the jury could agree that Alessi "was entitled to [a discount of] 20 percent" as opposed to 15% "on parts," but also believed Mr. Collins that Alessi was "typically" given a 15% discount—entitling Alessi to the "delta" between the two percentages. (*Id.* at 296:22-297:8, 379:19-380:2).  However, if the jury believed Mr. Alessi, they could *also* have reasonably interpreted his testimony to mean that Alessi got *no* discount whatsoever on parts or equipment, and

by selling these products at "list price[s];" and at a certain point, APE stopped (a) giving Alessi

the requisite discounts on parts, as well as (b) referring sales leads for parts to Alessi. (Tr. 16:8-

13, 24:5-16, 49:2-50:16, 55:17-56:14).  PX-9 confirms that APE sold parts to third-parties

between July 3, 2012 and October 22, 2020 and, crediting Mr. Alessi's testimony, sets forth

several instances where APE sold Alessi parts without the requisite discount during the same

period. (*See* PX-9; Tr. 24:9-16, 25:2-8).  Moreover, although APE observes that the 2004

Memorandum was not the operative agreement during the relevant period, it supports Mr.

Alessi's contention that a 20% discount is typical for distributors in his industry. (*See* PX-3).

As noted above, it was entirely reasonable for the jury to rely on PX-9 to discern specific

transactions on which Alessi did not receive the required discount, and thus, calculate damages

based on the discount owed for each transaction. *See supra* Section II.1.  Similarly, based on the

above evidence regarding Alessi's pricing practices, the jury was entitled to calculate damages

for APE's sales of parts to third-parties in PX-9 based on the 20% profit that Alessi alleges it

would have made if Alessi were given the opportunity to make these sales in the first instance.

(Tr. 16:8-13).  The mere fact that APE found Mr. Alessi's testimony unconvincing, or challenged

his ability to realize this profit, does not render either of these damages calculations

"speculat[ive]." (Docket No. 184 at 25).  The same is true even though Mr. Collins—who had no

knowledge of the 2012 Distributor Agreement when it was signed—disputed Alessi's assertion

that the Agreement covered parts, and testified that if anything, Alessi only received 15%

discounts, with were incorporated into most invoices. (*Id.* at 17-18).  The jury was presented

---

thus, was owed 20% of each sale.  Given the credibility determination inherent in this finding, the Court will not
disturb the jury's verdict to the extent it relied on Alessi's entitlement to a 20% discount on parts or any other
products covered by the 2012 Agreement.

with two competing narratives regarding the parties' rights, obligations and course of performance under the Agreement, and simply picked the one they found most believable.

Because these findings ultimately hinged on a credibility determination, "the verdict which followed [is] particularly ill-suited to after-the-fact second guessing." *See ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014); *see, e.g.*, *Paper Corp.*, 807 F. Supp. at 348 (declining to order new trial where "a reasonable jury" could have believed plaintiff's witnesses regarding the parties' obligations since they "were the only people to testify who had first-hand knowledge of the commitments made by [defendant]" five years earlier). Therefore, this Court gives deference to the jury's assessments. In addition, after independently weighing the above evidence, the Court is not convinced that the jury "reached a seriously erroneous result or that the verdict is a miscarriage of justice." *See Smith*, 861 F.2d at 370.

Based on the Court's calculation, the total amount of sales to both third-parties and Alessi listed in PX-9 is $818,167.76. The Court agrees with the reasoning in APE's summation that any sales with an "SC" designation in the left-most column must be "net[ted] . . . out"—*i.e.*, subtracted—because they are sales credits, and thus, APE did not make money on these transactions. (Tr. 434:16-23). The Court's calculation accounts for this logic. 20% of $818,167.76 is $163,633.55. Thus, $163,633.55 represents the maximum amount the jury could have awarded Alessi for damages related to parts based on the inferences explained above.

Curiously, this number is slightly higher than what Alessi represents as "20% of the total listed value" of PX-9—$152,136.45.[22] (Docket No. 191 at 10). Nonetheless, the Court rejects

---

[22] This difference may have resulted from the fact that PX-9 is an image of an Excel spreadsheet produced by APE and Alessi did not have access to the native version when it submitted its opposition papers. (Tr. 162:1-12). On August, 30, 2022, at the Court's request, APE's counsel provided the native versions of both PX-9 and PX-127 by e-mail to Chambers and Alessi's counsel. The Court's calculation of the total sales in PX-9 is based on Excel's AutoSum feature, and appears to match a corrected calculation that APE provided in the same e-mail.

Alessi's nonsensical contention that "[t]he jury clearly on [sic] PX-9 to calculate the difference between 15 and 20 percent which . . . would result in an additional $99,881.25 (which is 20% of the total parts sales which a full discount was not provided)." (*Id.* at 11-12). As best as the Court can tell, Alessi appears to be overvaluing its parts-related damages by adding 20% of the sum of the sales on PX-9 to some additional percentage of APE's parts sales to Alessi. *(See id.*). However, that logic is flawed. Because PX-9 includes parts sales to third-parties and to Alessi, 20% of the total sales thereon accounts for Alessi's damages for both types of transactions. Though the Court is unable to pinpoint Alessi's method for arriving at the additional $99,881.25, it appears that Alessi is essentially double-counting, which the Court will not endorse.

**ii. Damages Related to Equipment**

Based on much of the same testimony above, a new trial is also unwarranted with respect to Alessi's alleged damages stemming from APE's sales of equipment to Alessi and third-parties. Assuming, *arguendo*, that the jury's verdict included such damages, it was not seriously erroneous. As explained, the jury's inferences regarding whether Alessi was entitled to a discount, the specific products covered by the 2012 Agreement, and the amount of any discount provided, were all credibility determinations, which the Court will not disturb. Mr. Alessi unequivocally testified that he was entitled to a 20% discount—without limitation to particular products—and that after the Agreement's execution, this discount was not received. (Tr. 24:5-16, 49:2-50:16, 55:17-56:14). He further testified that in addition to the Robovib, the Agreement covered "[t]he original top-mounted vibros, which is the 15, the 20, the 50, the 100 and the 150E," otherwise known as the "E-series line of equipment," and that the Agreement required APE to offer Alessi sales outside the Northeast in exchange for commissions. (Tr. 15:21-24, 23:24-24:4, 25:22-26:3, 62:17-63:13, 81:18-21). The jury was also instructed that APE had breached the Agreement by selling covered equipment to third-parties within the Northeast. (Tr.

475:24-476:1).  Based on all of this information, it was reasonable for the jury to infer that Alessi

was entitled to damages amounting to 20% of APE's sales of the above equipment to third-

parties and Alessi in all territories.

In addition to contesting these factual inferences, APE challenges the proper scope of

Alessi's equipment-related damages as well as the adequacy of Alessi's proof thereof.  With

respect to the scope of these damages, APE contends that it was improper for the jury to grant an

award based on transactions involving the 64X Vibro and 23 Vibro (E) because there was

insufficient evidence that these models were covered by the Agreement. (Docket No. 184 at 19-

20).  According to APE, this warrants a $46,798.00 deduction from Alessi's recovery, which

represents 20% of $233,990.00, the sum of APE's sales of these products to third-parties during

the relevant period. (*Id.* at 20).

The Court disagrees with this reasoning as it pertains to the 64X Vibro.  APE primarily

argues that Mr. Alessi did not mention the 64X Vibro when listing the products covered by the

2012 Distributor Agreement, such that it must be excluded. (*Id.* at 19).  However, APE overlooks

the fact that Mr. Alessi also provided testimony regarding PX-72, a price list he received from

APE that included the 64X. (Tr. 148:15-149:13; PX-72).  When Alessi introduced this exhibit

into evidence, APE objected on the grounds that the products listed were not subject to the

Agreement, but withdrew the objection and concurred when counsel for Alessi responded: "Your

Honor, if you look at the top portion of it, it refers to the 15E, 20E, 50E, 100E, and the 64X,

which is all subject to this litigation." (Tr. 149:8-15).  APE took no steps to initiate this colloquy

outside the presence of the jury, and thus, the jury heard both parties agree that Alessi's damages

claims encapsulated "all" of the products on the price list, including the 64X. (*See id.*).

Furthermore, although Mr. Alessi did not explicitly testify that the Agreement covered the 64X,

there was testimony from both sides acknowledging that the price list in PX-72 was provided by APE and listed the 64X alongside the E-series line of equipment, suggesting that both types of equipment were covered. (Tr. 148:15-149:21, 170:14-171:1).  This is especially so in light of the similarity of heading on the price list—defining the E-series line and 64X as "Excavator Mounted Vibratory Drivers/Extractors"—and the exclusivity provisions of the Agreement referencing "excavator mounted equipment." (*Compare* PX-4, *with* PX-72).  Counsel for APE did not cross-examine Mr. Alessi about the 64X Vibro; and while Mr. Collins told Alessi's counsel that he did not believe Alessi purchased the 64-X from APE, (Tr. 170:9-11), counsel for APE did not emphasize this point during its case-in-chief.  As a result, the jury was presented with conflicting evidence regarding whether the 64X Vibro was subject to the Agreement.  Moreover, counsel for APE may have confused the jury by first conceding that the Agreement covered it, and on summation, advocating for the opposite conclusion.[23]  In light of this course of events, it would have been reasonable for the jury to conclude that the 64X was subject to the Agreement.  The Court therefore declines to deduct Alessi's alleged damages associated with this product.

However, the Court agrees with APE that there was insufficient evidence that the Agreement covered the 23 Vibro (E). (Docket No. 184 at 19-20).  Alessi argues that this product was included because it is a piece of "excavator mounted equipment," but there is no evidence in the record supporting that view. (Docket No. 191 at 6).  Indeed, there is not a shred of testimony

---

[23] Contrary to APE's contentions, Alessi did not make any concessions regarding the Agreement's coverage of the 64X Vibro at trial. (Docket No. 184 at 19).   APE relies on Alessi's statement that "the 64X is a device that was never testified to.  It was not a part of this litigation" when Alessi objected to APE's proposed demonstrative aid in advance of closings. (Tr. 393:7-8).  While the passage cited by APE supports its argument when read in isolation, a careful review of the entire colloquy makes clear that Alessi was attempting to convince the Court that because there was no testimony ruling out the possibility that the 64X was subject to the litigation, transactions involving this product could be a basis for damages. (*See* Tr. 391:18-392:7).  The passage chosen by APE reflects a poor transcription or choice of words on Alessi's part, which the Court evaluates in the context of the entire colloquy.

mentioning the 23 Vibro (E), and tellingly, it is not included on the price list in PX-72. (*See* PX-72).  Moreover, while Alessi claims that the 23 Vibro (E) "clearly falls under the E-Series designation" because it includes the letter "E," (Docket No. 191 at 8), that assertion rings hollow in light of Mr. Alessi's testimony specifically listing the E-series equipment covered by the Agreement as "the 15, the 20, the 50, the 100 and the 150E," (Tr. 15:21-24).  The only additional information regarding the E-series provided to the jury was Mr. Alessi's testimony that "E designations" on certain parts refer to "mount[s] on an excavator." (Tr. 63:8-13).  Mr. Alessi gave this explanation in connection with PX-49, which was not admitted into evidence because the parts listed thereon included "E designations" and were "mounted to . . . excavator[s], but [were not] on a list of vibros that [Alessi] sold." (*Id.*).  The rational inference from this testimony is that while the Agreement covered certain equipment within the "E series," it did not apply to the entire universe of equipment containing "E" designations. (*See id.*).  Therefore, it would not have been reasonable for the jury to calculate damages for transactions involving the 23 Vibro (E), and the Court excludes such sales amounts from its calculations.[24]

APE next contends that to the extent the jury relied on PX-127 to calculate Alessi's damages related to equipment, it was unreasonable to use this document for several reasons. (Docket No. 197 at 4-7).  APE primarily contends that this exhibit has "no probative value in terms of [Alessi]'s damages because there was no trial testimony as to any of the specific transactions listed on this spreadsheet or the type of equipment sold." (*Id.* at 5).  However, APE contradicts itself, later noting that several transactions in PX-127 are duplicative of sales for covered equipment reflected in the invoices that Alessi entered into evidence. (*See id.* at 5-6).  Moreover, while brief, there was enough testimony regarding the information in PX-127 for the

---

[24] Alessi introduced evidence of only one transaction involving the 23 Vibro (E), which is reflected in PX-40 and Invoice No. E-603002 on PX-127. (*See* PX-127 at 3; PX-40).

jury to use it to calculate Alessi's damages, even though it was presented as a "commission schedule." (Tr. 320:8-9). Specifically, Mr. Collins testified that in addition to an "Employee/Salesperson listing with . . . paid dates," PX-127 also included "customer names" in the third column, "invoice numbers" in the fifth column, and "sales amounts" in the last column. (*See id.* at 320:10-19, 322:1-4). Although Mr. Collins was "not sure" whether the invoice numbers beginning with the letter "E" "identifie[d] the sales of equipment," (*id.* at 320:10-14), he testified to that when explaining the contents of PX-9, (*id.* at 161:3-163:18). Moreover, Mr. Collins conceded that PX-127 included APE's sales "for 2012 through 2019," with the caveat that it was "not comprehensive." (*Id.* at 322:5-13). Thus, this document is highly probative of Alessi's damages, as it contains at least some of APE's sales during the relevant period, and the jury could have inferred based on Mr. Collins' testimony that the invoice numbers beginning with the letter "E" designate sales of equipment potentially subject to the 2012 Distributor Agreement.

As for APE's argument that it is impossible to determine whether certain transactions on PX-127 actually involved covered equipment because there are no corresponding invoices in evidence, (Docket No. 197 at 5), the Court agrees in part. There are seven transactions on PX-127 to which this argument applies. The Court identifies these transactions by their invoice number designations in the fifth column: R-602076, ES-02206, E-602097, E-602560, ES-02443, E-603003 and E-601885.[25] With respect to Invoice No. R-602076, the jury was never told what "R" designations mean, and there is no other evidence that the subject transaction involved the sale of equipment. Thus, this transaction should not be a basis for Alessi's damages, and the Court excludes it from its calculations. *See Exodus Partners, LLC*, 2007 WL 120053, at *14

---

[25] APE is incorrect that Invoice No. E-601885 on PX-127 is duplicative of PX-41, as PX-41 is Invoice No. E-602817. (Docket No. 198-1 at 3; PX-41).

(noting that under New York law, "there must be some minimally reasonable evidentiary foundation on which the jury could have rested its estimate of the damages awarded" for a damages award to stand).  The Court also excludes Invoice No. E-602097, as that transaction corresponds with PX-15, an exhibit that Alessi withdrew on the third day of trial. (Tr. 315:15-18; *cf.* Docket No. 197 at 5).

However, to the extent the jury took the remaining invoice numbers—all beginning with the letter "E"—into account, this was not unreasonable or seriously erroneous. (*See* PX-127).  In this breach of contract action, Alessi was only required to "prove[]" its damages "with reasonable certainty." *Cf. Indu Craft*, 47 F.3d at 496.  As noted, the jury was told that "E" designations identify equipment, (Tr. 160:6-22), and thus, they could deduce from PX-127 that the subject transactions for these invoices involved equipment sales to both Alessi and third-parties in 2013 and 2016, when the 2012 Distributor Agreement was in force. (*See* PX-127 at 2-3).  Mr. Alessi testified that his company was damaged by these types of transactions because, pursuant to the Agreement, Alessi should have been given 20% discounts on sales of covered equipment,[26] and Alessi should have been referred or offered sales leads for covered equipment. (Tr. 24:9-16, 27:1-28:24-29:5, 49:2-50:16, 55:17-56:14).  APE had ample opportunity to introduce into evidence the actual invoices corresponding with these transactions—which are presumably in APE's possession—to demonstrate that the equipment sold therein was not covered by the Agreement, and therefore, could not be a basis for damages.  However, APE did not do so.  Nor did APE cross-examine Mr. Collins about PX-127 to demonstrate the possibility that these transactions were not subject to the Agreement.  APE's arguments raise questions of

---

[26] APE's conclusory assertion that calculations based on PX-127 should not "count[] . . . sales to Alessi" is baseless. (Docket No. 197 at 5).  As was repeatedly acknowledged at trial, Alessi's alleged damages stemmed not only from APE's sales to third-parties, but from its sales to Alessi without the requisite 20% discount.  Therefore, it would have been perfectly reasonable for the jury to incorporate the sales to Alessi on PX-127 into its damages calculation.

fact that APE was free to frame to its advantage at trial, but failed to do so and trial is now over, and these questions were "properly decided by the jury." *Cf. Trademark Research Corp.*, 995 F.2d at 335; *see also U.S. for Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 169 (2d Cir. 1996) (finding new trial unwarranted where "[a]ny lack of detail as to the amount of damages could have been explored on cross examination and [went] to the weight of the evidence, not the existence of evidence").  The jury was free to weigh the evidence presented to determine whether it was appropriate to count these transactions, and to the extent they did so, the Court does not fault that decision.

APE further takes issue with PX-127 because, as noted above, it contains many transactions that are duplicative of the invoices in evidence, and lists certain sales numerous times to reflect commissions paid to multiple salespeople on each transaction. (Docket No. 197 at 6).  Failure to exclude these repetitions, APE claims, would result in a "grossly exaggerat[ed] . . . total amount." (*Id.*).  However, APE did not present any of these arguments to the jury through a witness or on summation.  Nor did APE object to the admission of PX-127, request a limiting instruction or charge regarding these issues, or raise them to the Court in any other way during this litigation.  By failing to develop this testimony at trial or alert the jury to these discrepancies despite the evidence thereof being "readily available," APE waived the right to rely on them in the instant posttrial motion. *See Wallace v. Brown*, 485 F. Supp. 77, 78 (S.D.N.Y. 1979); *see, e.g.*, *Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 497–98 (S.D.N.Y. 2011), *aff'd*, 476 F. App'x 275 (2d Cir. 2012); *Baker v. Dorfman*, No. 97 CIV. 7512 (DLC), 1999 WL 191531, at *3–4 (S.D.N.Y. Apr. 6, 1999), *aff'd*, 239 F.3d 415 (2d Cir. 2000).  Indeed, "it is not the intention or purpose of Rule[] . . . 59 to allow parties to . . . present their case under new theories." *Sims v. Mme. Paulette Dry Cleaners*, No. 82 Civ. 5438 (MEL), 1986 WL 12511, at *1 (S.D.N.Y. Oct.

31, 1986).  APE's request essentially attempts to take the fact-finding process away from the jury

and amounts to a "second bite at the apple," which is unfair and procedurally improper. *See id.*;

*see also Wallace*, 485 F. Supp. at 78.  Thus, the Court declines to partake in this exercise.

The Court finds APE's request especially disingenuous in light of the fact that Mr.

Collins, APE's own witness, testified that PX-127 was "not comprehensive." (Tr. 322:5-13).

The Court further notes that while some sales on PX-127 are listed numerous times for the same

transaction, a review of the corresponding invoices reveals that some such sales on PX-127

reflect an amount that is *less than* the total payment listed on the corresponding invoices due to

previous down payments or credits.[27]  For those transactions, inclusion of the repeated sales

values allocated to each salesperson would not necessarily constitute a "gross[] . . .

exaggerat[ion]," and in some cases, would bring the total value of the transaction closer to the

actual amount paid. (*See* Docket No. 197 at 6).  Because of this subtlety, and because none of

these issues were pointed out to the jury, the jury's reliance on PX-127 for Alessi's equipment-

related damages was not "seriously erroneous" or "a miscarriage of justice." *See Smith*, 861 F.2d

at 370.

Moreover, "[i]n reviewing a claim that a damages award is excessive, courts 'accord

substantial deference to the jury's determination of factual issues.'" *Galin v. Goldfischer*, No. 03

Civ. 9019 (RJS), 2008 WL 5484318, at *13 (S.D.N.Y. Dec. 31, 2008) (quoting *Scala v. Moore*

*McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir. 1993)) (internal quotations omitted); *see also*

*MacDermid Printing Sols., LLC v. Cortron Corp.*, No. 3:08-CV-01649(MPS), 2015 WL 251527,

at *12 (D. Conn. Jan. 20, 2015), *aff'd in part, rev'd in part and remanded on other grounds*, 833

F.3d 172 (2d Cir. 2016) (""There is a presumption that a jury's award is valid, and '[t]he

---

[27] (*E.g.*, PX-19; PX-22; PX-81).

*possibility* of non-duplicative awards is enough to sustain the jury verdict.'") (quoting *Bseirani v. Mahshie*, 107 F.3d 2, at *2 (2d Cir. 1997)) (emphasis in original).  In light of the limited nature of APE's arguments at trial, to calculate Alessi's equipment-related damages, the jury reasonably could have relied on PX-127 for APE's equipment-related transactions that do not appear on any invoices in evidence or that must otherwise be excluded, plus all other invoices in evidence reflecting covered equipment.  By the Court's calculations, the total sales in PX-127 excluding E-602097, R-602076 and E-603002, *see supra* n.24-25, amount to $3,265,008.92.  20% of this figure is $653,001.58.  Further assuming that Alessi is entitled to a maximum of 20% of every third-party sale or purchase of equipment on the invoices that do not appear on PX-127,[28] Alessi is owed an additional $206,195.18.  Combining this sum with $653,001.58, plus $163,633.55, the maximum amount owed based on Alessi's parts-related damages, *see supra* Section II.2.i, the jury could have concluded that APE owes Alessi a total of $1,022,830.31 for its parts and equipment-related damages between the Agreement's execution and the date of the last transaction in evidence.  That is not far off from the jury's $920,846.70 award.  Since Alessi's counsel asked for almost $1.5 million,[29] "[t]he compromise nature of the verdict gives rise to an inference that the jury considered both parties' arguments and attempted to arrive at a reasonable

---

[28] These include PX-11, PX-13, PX-16, PX-17, PX-18, PX-20, PX-24, PX-26, PX-28, PX-33, PX-38, PX-41 and PX-79.  PX-26 and PX-38 reflect transactions in which Alessi was awarded 15% discounts, so the Court only includes an additional 5% discount for each of those exhibits in its calculation.  Moreover, unlike APE, in all of its calculations, the Court relies on the subtotal on each invoice before the application of any sales tax or discounts, and without deducting down payments or credits previously paid by the customer. (*Cf.* Docket No. 184 at 10).  The Court's approach is appropriate because it accounts for Alessi's ability to obtain a discount based on the full price of each product, rather than an artificially lower one stemming from prior negotiations between APE and a third-party.

[29] APE repeatedly faults Alessi for making exaggerated damages claims during its opening and closing statements. (*See* Docket No. 184 at 8 n.6).  While that may be so, APE ignores numerous instances during the trial when its own litigation strategies distorted the facts, and in any event, neither party's improper conduct was so serious as to warrant a new trial. *See Datskow v. Teledyne Cont'l Motors Aircraft Prod., a Div. of Teledyne Indus.*, Inc., 826 F. Supp. 677, 687 (W.D.N.Y. 1993).

estimate of [Alessi]'s damages." *See Care Travel Co. v. Pan American World Airways, Inc.*, 944 F.2d 983, 995 (2d Cir. 1991).

Alternatively, if the jury chose to calculate Alessi's equipment-related damages *solely* based on the invoices in evidence[30] and the transactions on PX-127 that do not correspond with invoices (as APE belatedly requests), the resulting equipment-related damages amount to $662,242.51.[31]  Combining this sum with Alessi's parts-related damages listed above, this method results in a total of $825,876.06 in damages.

While $825,876.06 is somewhat less than what the jury awarded, that does not render the verdict excessive.  Under New York law, "an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." *See* N.Y. C.P.L.R. § 5501(c).  "[D]amages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." *Boyce*, 464 F.3d at 384–85 (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003)) (internal quotations omitted).  APE cites no "basis to conclude that the award 'deviates materially' from other [similar] breach of contract cases where plaintiffs seek to be made whole." *See Qiyuan Shi v. Gyamera*, 401 F. Supp. 3d 452, 464–65 (S.D.N.Y. 2018); *see, e.g., Paper Corp.*, 807 F. Supp. at 350–51 (upholding $1 million verdict in breach of contract action involving manufacturer-distributor relationship over the course of three years).  Moreover, "the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Uni-Rty Corp. v. Guangdong Bldg., Inc.*, No.

---

[30] These include PX-11, PX-12, PX-13, PX-16, PX-17, PX-18, PX-19, PX-20, PX-21, PX-22, PX-23, PX-24, PX-26, PX-27, PX-28, PX-29, PX-30, PX-31, PX-33, PX-34, PX-37, PX-38, PX-39, PX-41, PX-42, PX-43, PX-44, PX-79 and PX-81.  PX-40 is excluded from this list for the reasons stated above. *See supra* n.24.

[31] This number is the sum of (a) $505,976.58—the discounts owed on all invoices reflecting sales of covered equipment during the relevant period, awarding only 5% when the invoice indicated that Alessi clearly got a 15% discount; and (b) $156,265.93—20% of the sum of the equipment sales on PX-127 that do not have a corresponding invoice (ES-02206, E-602560, ES-02443, E-603003, and E-601885).

95 CV 09432 (GBD), 2012 WL 1901200, at *5 (S.D.N.Y. May 25, 2012), *on reconsideration sub nom. Uni-Rty Corp. v. Guangdong Bldg. Fin., Inc.*, No. 95 CIV. 9432 (GBD), 2013 WL 150214 (S.D.N.Y. Jan. 11, 2013*), aff'd sub nom. Uni-Rty Corp. v. Guangdong Bldg., Inc.*, 571 F. App'x 62 (2d Cir. 2014) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007)).  However, APE did not alert the jury to the issues of uncertainty, duplication or improper methodology raised here.  Therefore, APE cannot fault the jury for working with the information they were given and arriving at a reasonable figure in between the two sums calculated above.  "[I]t is simply too late in the day to argue that the jury was misled by flawed methodology. " *Cf. Lurzer GMBH v. Am. Showcase, Inc.*, 75 F. Supp. 2d 98, 103 (S.D.N.Y. 1998), *opinion clarified*, No. 97 CIV. 6576 (JSR), 1999 WL 111931 (S.D.N.Y. Mar. 4, 1999), *and aff'd*, 201 F.3d 431 (2d Cir. 1999) (declining remittitur when defendant "chose not to cross-examine [plaintiff's] expert at trial as to how he arrived at his . . . figures").

Furthermore, remittitur is unwarranted because APE points to no "identif[iable] error" that caused the jury to incorporate a specific amount of improper damages. *See Trademark Research Corp.*, 995 F.2d at 337.  There is a multitude of reasons why the jury could have arrived at a slightly higher verdict than $825,876.06, based on "rough credibility determinations regarding the . . . calculations," the data, and the facts presented. *See Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 531–33 (S.D.N.Y. 2013).  Indeed, with several alleged obligations under the 2012 Distributor Agreement in dispute, it is entirely possible that the jury rejected a portion of them.  Neither party requested a special verdict form or special interrogatories, which may have helped elucidate the jury's reasoning.  In addition, the Court instructed the jury that they could not "guess[]" or "speculat[e]," nor could they award "excessive" damages, and that they were to "award damages only for those injuries" that Alessi

proved "by a preponderance of the evidence to have been the proximate result of [APE]'s failure to [ful]fill its contractual obligations."[32] (Tr. 480:4-481:5).   Thus, the jury understood the impropriety of awarding duplicative damages, and "is presumed to have followed the Court's instructions." *See Broker Genius Inc. v. Seat Scouts LLC*, 17-CV-8627 (SHS), 2019 WL 3000963, at *13 (S.D.N.Y. July 10, 2019) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)). APE did not request any additional instructions related to damages or object to any specific portion of the charge as legally incorrect.

For all of these reasons, there is no basis to grant APE a new trial or remittitur.   While APE may wish the trial had gone differently, the award does not constitute a "seriously erroneous result" or a "miscarriage of justice." *See Smith*, 861 F.2d at 370.   As the Court has repeatedly warned, APE must live with the consequences of its strategic decisions, and must also respect that the time to challenge Alessi's proof is past.   Moreover, while the jury evidently found that the Agreement covered both parts and equipment, they did not award the full amount Alessi sought.   Rather, it is clear that they thoughtfully and carefully considered the evidence and put Alessi to its proof.   Furthermore, the award is not unjust because Mr. Collins indicated that PX-127 did not include all of APE's equipment sales during the relevant period, nor did Alessi present any evidence regarding its future lost profits.   Therefore, the damages awarded do not represent a windfall.

Accordingly, the Court denies APE's Rule 59(a) motion for a new trial or remittitur.[33]

---

[32] Neither party requested jury instructions regarding Alessi's alleged damages for lost profits during the 2012 Distributor Agreement's two-year cancellation period, nor did the Court charge the jury on this issue.  Therefore, the Court need not address APE's future lost profits argument. (*See* Docket No. 184 at 8 n.6).

[33] An order regarding the parties' requests for prejudgment interest is forthcoming. (*See* Docket Nos. 186; 188).

## III.  CONCLUSION

For the foregoing reasons, the Court denies APE's motion for judgment as a matter of law or, in the alternative, for a new trial or remittitur.  The Clerk is respectfully requested to terminate the pending motion (Docket No. 183).

Dated:  September 2, 2022
         White Plains, New York

**SO ORDERED:**

_____
JUDITH C. McCARTHY
United States Magistrate Judge